SOCIAL JUSTICE LEGAL FOUNDATION
Maria del Pilar Gonzalez Morales (SBN 308550)
pgonzalez@socialjusticelaw.org
Vanessa M. Domenichelli (SBN 326867)
vdomenichelli@socialjusticelaw.org
Alyssa Martinez (SBN 342466)
amartinez@socialjusticelaw.org
Amelia Piazza (SBN 342473)
apiazza@socialjusticelaw.org
Shubhra Shivpuri (SBN 295543)
sshivpuri@socialjusticelaw.org
523 W 6th St, Suite 450
Los Angeles, California 90014
Telephone:   (213) 542-5241
Facsimile:    (213) 542-5241

Attorneys for Plaintiffs

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| LIGAYA RONDUEN; CARLOS CASTILLO; MIRIAM SCHEETZ; CESAR HERNANDEZ CARRILLO; WILFREDO GONZALEZ MENA; SOMBOON PHAYMANY; and YOLANDA MENDOZA, individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>THE GEO GROUP, INC., a Florida corporation,<br><br>Defendant. | Case No. 23-cv-00481<br>[CLASS ACTION]<br><br>**CLASS ACTION COMPLAINT FOR DAMAGES**<br><br>**DEMAND FOR JURY TRIAL** |

SOCIAL JUSTICE LEGAL FOUNDATION
523 6TH STREET, SUITE 450
LOS ANGELES, CALIFORNIA 90014
TEL (213) 542-5241
FAX (213) 542-5241

# TABLE OF CONTENTS

Introduction .................................................................................................... 3

Jurisdiction and Venue ................................................................................. 6

Parties ........................................................................................................... 6

Factual Allegations ...................................................................................... 7

    A.   Defendant GEO is Responsible for the Custody, Care and Well-being of Plaintiffs and the Detained Class ................................. 7

    B.   Defendant GEO Knowingly Utilizes A Toxic Chemical As A Disinfectant at Adelanto ........................................................... 8

        1.   HDQ Neutral is a Toxic Chemical ................................... 8

        2.   Defendant GEO Knew HDQ Neutral is a Toxic Chemical ................................................................................. 10

    C.   Defendant GEO Knowingly Poisoned Plaintiffs and the Detained Class with HDQ Neutral ..................................................... 10

        1.   Defendant GEO Poisoned Plaintiffs and Members of the Detained Class by Spraying HDQ Neutral Indoors and on all Surfaces ............................................................ 13

        2.   Defendant GEO Poisoned Plaintiffs and Members of the Detained Class with HDQ Neutral by Spraying Every 15-30 Minutes ................................................................... 14

        3.   Defendant GEO Poisoned Plaintiffs by Not Providing Plaintiffs and Members of the Detained Class with Necessary Personal Protective Equipment and Training 15

        4.   Defendant GEO Poisoned Plaintiffs and Members of the Detained Class by Improperly Diluting and Storing HDQ Neutral ................................................................... 17

    D.   Defendant GEO Lied and Obscured Its Use of HDQ Neutral and Its Adverse Health Effects ........................................... 18

        1.   Defendant GEO Falsely Told Plaintiffs and Members of the Detained Class GEO's Use of HDQ Neutral Was Necessary to Prevent COVID-19 .................................... 18

        2.   Defendant GEO Concealed the Dangers of HDQ Neutral from Plaintiffs and Members of the Detained Class ...... 19

        3.   Medical Staff Consistently Discounted the Medical Concerns of Plaintiffs and Members of the Detained Class as Unrelated to HDQ Neutral Exposure. ........................ 20

SOCIAL JUSTICE LEGAL FOUNDATION
523 6ᵗʰ STREET, SUITE 450
LOS ANGELES, CALIFORNIA 90014
TEL (213) 542-5241
FAX (213) 542-5241

- 1 -

4.   Defendant GEO Made False and Misleading Statements to Government and Regulatory Entities about its Use of HDQ Neutral ................................................................... 21

NAMED PLAINTIFFS' FACTUAL ALLEGATIONS ....................................... 22

Plaintiff Ligaya Ronduen ............................................ 23

Plaintiff Carlos Castillo ............................................. 25

Plaintiff Miriam Scheetz ............................................ 28

Plaintiff Cesar Hernandez ........................................... 32

Plaintiff Wilfredo Gonzalez Mena .................................... 34

Plaintiff Somboon Phaymany ......................................... 36

Plaintiff Yolanda Mendoza .......................................... 38

CLASS ALLEGATIONS ............................................... 39

CAUSES OF ACTION ................................................ 42

FIRST CAUSE OF ACTION ........................................... 42

SECOND CAUSE OF ACTION .......................................... 44

THIRD CAUSE OF ACTION ........................................... 46

FOURTH CAUSE OF ACTION .......................................... 48

FIFTH CAUSE OF ACTION ........................................... 49

SIXTH CAUSE OF ACTION ........................................... 50

PRAYER .......................................................... 51

DEMAND FOR TRIAL BY JURY ........................................ 53

SOCIAL JUSTICE LEGAL FOUNDATION
523 6TH STREET, SUITE 450
LOS ANGELES, CALIFORNIA 90014
TEL (213) 542-5241
FAX (213) 542-5241

COMPLAINT

## INTRODUCTION

1.     This case seeks justice and accountability for individuals who were systematically poisoned, ignored, and left to suffer by a multi-billion-dollar corporation profiting from human captivity. Seven individuals currently and formerly detained at Adelanto Detention Center ("Adelanto" or "the Facility") bring this lawsuit on their behalf and on behalf of the more than 1,300 other detained people harmed by Defendant GEO Group Inc.'s ("Defendant GEO" or "GEO") improper use of a toxic chemical at Adelanto from February 2020 to April 2021.

2.     Plaintiffs' exposure to the toxic chemical is but one half of the story, as Defendant GEO consistently ignored individuals' eerily similar reports of concerning symptoms, denying and misrepresenting the use and effects of the toxic chemical to people detained and regulators alike.

3.     Defendant GEO administers over 30 privately managed and operated Immigration and Customs Enforcement ("ICE") detention facilities across the country, including Adelanto. In its singular focus on its bottom line, Defendant GEO frequently falls short of minimum constitutional and state law standards, as evidenced by the numerous lawsuits, citations, and violations issued against Defendant GEO for its inadequate operation of Adelanto.

4.     On February 3, 2020, the United States Department of Health and Human Services declared the 2019 Novel Coronavirus ("COVID-19") a public health crisis. For people held inside the country's jails, prisons, and detention centers, this time was fraught with panic, misinformation, and isolation.

5.     Defendant GEO's handling of the COVID-19 pandemic inside the walls of Adelanto evinced its consistent practice of prioritizing profit over well-being.

6.     As news of COVID-19 reached the people detained at Adelanto—through their loved ones or their limited access to news sources—Defendant GEO placed the Facility in full lock down. Outside visitors (including attorneys) were banned, and movement within the Facility was severely curtailed. Even though Plaintiffs and other

SOCIAL JUSTICE LEGAL FOUNDATION
523 6ᵗʰ STREET, SUITE 450
LOS ANGELES, CALIFORNIA 90014
TEL (213) 542-5241
FAX (213) 542-5241

people detained at Adelanto were fully reliant on Defendant GEO for COVID-19 related updates, safety measures, and care, Defendant GEO provided little or no information to them.

7. Instead, virtually overnight, GEO staff began widely and indiscriminately spraying a powerful aerosol chemical called HDQ Neutral throughout the Facility. The chemical has a distinct red/pink color and noxious smell which lingers long after it is used. While HDQ Neutral was used as a cleaning disinfectant before the pandemic started, Defendant GEO significantly changed the manner and increased the frequency of its use beginning in February 2020 to a startling degree.

8. Defendant GEO's chemical spraying was a near-constant and invasive presence at Adelanto. GEO staff sprayed HDQ Neutral every 15 to 30 minutes from vats strapped to their backs and from smaller spray bottles. GEO staff sprayed this chemical into the air and onto all surfaces, including food contact surfaces, telephones, rails, door handles, bathrooms, showers, and sinks. GEO staff sprayed when people were eating, and the chemical mist would fall on their food. GEO staff sprayed at night, on or around the bunk beds and cells where people slept. And on at least one occasion, GEO staff sprayed individuals as a disciplinary measure.

9. Due to their incessant, months-long exposure to HDQ Neutral, Plaintiffs and others detained at Adelanto experienced acute symptoms, including but not limited to persistent cough, irritation of the throat and nasal passages, skin irritation and rashes, and headaches.

10. The named Plaintiffs' experiences capture the horrific, but all too common, effects of exposure to HDQ Neutral. Various Plaintiffs had nosebleeds or found blood in their mouth and saliva. Others had debilitating headaches or felt dizzy and lightheaded. Several Plaintiffs have chronic, long-term health effects. All of them suffered anxiety during the months in which the chemical was sprayed at Adelanto.

11. Plaintiffs and others detained at Adelanto, alarmed at the amount and frequency in which HDQ Neutral was being sprayed, began complaining. But with

SOCIAL JUSTICE LEGAL FOUNDATION
523 6TH STREET, SUITE 450
LOS ANGELES, CALIFORNIA 90014
TEL (213) 542-5241
FAX (213) 542-5241

1  little information about the pandemic, Plaintiffs and others had to rely on the

2  assurances made by Defendant GEO that HDQ Neutral was a necessary and safe

3  protective measure against COVID-19.

4         12.    As the pandemic raged on, Defendant GEO, through its CEO and other

5  representatives, assured the United States Congress, as well as federal agencies, that

6  the company was protecting the people in its custody from COVID-19, including by

7  safely utilizing HDQ Neutral.

8         13.    The lies publicly told by GEO's CEO and other representatives were

9  parroted by GEO staff, who were tasked with the care and custody of the people

10 detained within Adelanto.

11        14.    Meanwhile, Adelanto's medical staff toed a similar line, ignoring what

12 was being told to them by people detained, including Plaintiffs, who were suffering

13 from acute symptoms related to their HDQ Neutral exposure.

14        15.    Adelanto's medical staff failed to provide accurate information to

15 Plaintiffs about the cause of their suffering. Further, they failed to identify any

16 potential medical risks related to such a significant exposure to HDQ Neutral.

17        16.    As a result, Plaintiffs, and over 1,300 other people detained at Adelanto,

18 were forced to endure the months-long poisoning of their bodies and the emotional toll

19 of Defendant GEO's lies and denials—the effects of which continue today.

20        17.    Plaintiffs seek to certify a class of similarly situated people, all of whom

21 were detained at Adelanto between February 2020 and April 2021—including some

22 people who are still detained—and were exposed to HDQ Neutral (the "Detained

23 Class"). This was the period of time in which Defendant GEO recklessly sprayed HDQ

24 Neutral and continuously exposed the Detained Class to the harmful chemical mixture.

25        18.    Plaintiffs further seek compensatory and special damages for themselves

26 and all members of the Detained Class. Additionally, Plaintiffs seek the payment of

27 medical monitoring and expenses for the next five years to redress the harm caused to

28 them and the Detained Class by Defendant GEO's negligent and tortious acts.

SOCIAL JUSTICE LEGAL FOUNDATION
523 6TH STREET, SUITE 450
LOS ANGELES, CALIFORNIA 90014
TEL (213) 542-5241
FAX (213) 542-5241

19.     Lastly, based on Defendant GEO's unlawful misconduct, which was deliberate and undertaken with oppression, fraud, or malice, Plaintiffs seek exemplary damages sufficient to punish and deter Defendant GEO from such misconduct in the future.

### JURISDICTION AND VENUE

20.     This action is brought in diversity pursuant to 28 U.S.C. 1332(d) between the Plaintiffs, residents of California, individually and on behalf of the Detained Class, against Defendant GEO Group, Inc., a corporation headquartered in Florida. The matter in controversy exceeds $75,000.

21.     Venue is proper in the Central District of California under 28 U.S.C. § 1391(b)(2) because the events giving rise to the claims herein all occurred in the Central District and because the named Plaintiffs reside, and Defendant transacts, in the Central District.

### PARTIES

22.     Plaintiff Ligaya Ronduen ("Plaintiff Ronduen" or "Ms. Ronduen") is currently detained at Adelanto.

23.     Plaintiff Carlos Castillo ("Plaintiff Castillo" or "Mr. Castillo") is currently detained at Adelanto.

24.     Plaintiff Miriam Jeannette Scheetz ("Plaintiff Scheetz" or "Mrs. Scheetz") is a resident of California. From March 2019 through August 2020, she was detained at Adelanto.

25.     Plaintiff Cesar Hernandez Carrillo ("Plaintiff Hernandez" or "Mr. Hernandez") is a resident of California. From September 2020 through February 2022, he was detained at Adelanto.

26.     Plaintiff Wilfredo Gonzalez Mena ("Plaintiff Gonzalez Mena" or "Mr. Gonzalez Mena") is a resident of California. From November 2019 through September 2020, he was detained at Adelanto.

SOCIAL JUSTICE LEGAL FOUNDATION
523 6ᵀᴴ STREET, SUITE 450
LOS ANGELES, CALIFORNIA 90014
TEL (213) 542-5241
FAX (213) 542-5241

SOCIAL JUSTICE LEGAL FOUNDATION
523 6ᵀᴴ STREET, SUITE 450
LOS ANGELES, CALIFORNIA 90014
TEL (213) 542-5241
FAX (213) 542-5241

27.     Plaintiff Somboon Phaymany ("Plaintiff Phaymany" or "Mr. Phaymany") is a resident of California. From April 2018 through April 2020, he was detained at Adelanto.

28.     Plaintiff Yolanda Mendoza ("Plaintiff Mendoza" or "Mrs. Mendoza") is a resident of California. From September 2019 through October 2020, she was detained at Adelanto.

29.     Defendant GEO is a private company headquartered at 624 NW 53rd Street, Suite 700, Boca Raton, Florida 33487. Defendant GEO manages Adelanto and is responsible for providing staff and security personnel, administering the facilities, and enforcing facility practices and procedures at Adelanto. Defendant GEO is or was the physical custodian of Plaintiffs, the Detained Class, and the Facility.

## FACTUAL ALLEGATIONS

### A.     Defendant GEO is Responsible for the Custody, Care and Well-being of Plaintiffs and the Detained Class

30.     Plaintiffs and the Detained Class—civil immigration detainees—were, or are currently, held at Adelanto pending the outcome of their immigration proceedings. GEO has made billions in revenue from its management and operation of private detention centers that hold immigrant detainees, such as Adelanto, which has the capacity to house roughly 1,940 people.

31.     In its operation and management of Adelanto, GEO is required to abide by ICE's Performance-Based National Detention Standards ("PBNDS") and COVID-19 Pandemic Response Requirements ("PRR"), which set baseline requirements for the safety, security, and conditions of immigration detention facilities.

32.     The PRR direct each facility to maintain written plans that "address the management of infectious and communicable diseases." Further, the PRR require that GEO follow and implement the Center for Disease Control and Prevention ("CDC") guidelines to manage the spread of infectious and communicable diseases inside facilities such as Adelanto.

SOCIAL JUSTICE LEGAL FOUNDATION
523 6ᵀᴴ STREET, SUITE 450
LOS ANGELES, CALIFORNIA 90014
TEL (213) 542-5241
FAX (213) 542-5241

33.     The CDC provides regulations, standards, and guidelines instructing the operators of carceral facilities, like GEO, and their staff on how to implement and follow required procedures for maintaining the health and well-being of the people in their custody. These instructions include requiring trainings on manufacturers' safety data sheets, user-prepared labels, and a safety notice for those who come in contact with hazardous chemicals, such as HDQ Neutral.

34.     GEO is, and was at all times, responsible for ensuring all detained people have access to proper medical care and treatment within the Facility.

35.     Adelanto's medical staff are, and were at all times, entrusted to provide detained people, including Plaintiffs and the Detained Class, with competent, trustworthy, and complete medical care. Since the medical staff are the only internal medical providers at the Facility, detained people must rely on their medical assessments when they report symptoms, illnesses, or injuries.

### B.     Defendant GEO Knowingly Utilized a Toxic Chemical Mixture as a Disinfectant at Adelanto

#### 1.     HDQ Neutral is a Toxic Chemical Mixture

36.     GEO uses a highly toxic chemical at Adelanto called HDQ Neutral. HDQ Neutral is regulated by the Environmental Protection Agency ("EPA") and the Federal Insecticide, Fungicide and Rodenticide Act ("FIFRA").

37.     HDQ Neutral (EPA Registration Number 10324-155-5741) is a Quaternary Ammonium Compound disinfectant spray. HDQ Neutral is particularly dangerous because its two active components, DDAC and ADBAC[1], have been linked to numerous, serious acute (short-term) and chronic (long-term) health effects.

38.     The EPA classifies five types of acute toxicity data (oral, dermal, inhalation, skin irritation, and eye irritation) into four Toxicity Categories, with Category 1 being the highest hazard. The EPA has categorized acute toxicity data for

---

[1] Scientific names: didecyldimethylammonium chloride ("DDAC") and alkyl C12-16 dimethylbenzyl ammonium chloride ("ADBAC").

DDAC and ADBAC, the active components in HDQ Neutral, as Category 1 toxicity for skin and eye irritation, Category 2 for oral ingestion and inhalation, and Category 3 for dermal exposure.

39.   HDQ Neutral is associated with many acute adverse health effects. According to Spartan Chemical, the manufacturer of HDQ Neutral, inhalation of HDQ Neutral can result in nasal discomfort, nasal bleeding, coughing, sore throat, trouble breathing, and damage to the mucosal membrane of the respiratory tract. Skin contact can result in redness, blistering, and rashes. Ingestion can result in burns to the digestive tract, pain, nausea, vomiting, and diarrhea. Eye exposure can result in irritation, pain, redness, itchiness, swelling, and worsened vision.

40.   The active compounds in HDQ Neutral are also associated with many chronic health hazards. Scientific institutions like the Toxics Use Reduction Institute and journals such as Reproductive Toxicology have described, in detail, how exposure to DDAC and ADBAC is correlated with severe skin irritation that can lead to skin sensitization or dermatitis, respiratory irritation and inflammation, chronic obstructive pulmonary disease, reproductive and developmental effects (including decreased fertility, disruption of hormone-regulated processes like ovulation, late-term fetal death, and birth defects, including neural tube defects), and genotoxicity—a serious hazard characterized by DNA damage and disrupted cellular function and regulation.

41.   Moreover, the Mount Sinai Selikoff Centers for Occupational Health and the Bellevue/NYU Occupational Environmental Medicine Clinic have also detailed how chronic DDAC and ADBAC exposure can lead to respiratory sensitization and occupational asthma.

42.   Spartan Chemical provides usage regulations, safety information, and other warnings regarding the use of HDQ Neutral, including Spartan Chemical's HDQ Neutral Safety Data Sheet (the "Safety Data Sheet") and HDQ Neutral's Container Label (the "Container Label").

SOCIAL JUSTICE LEGAL FOUNDATION
523 6ᵗʰ STREET, SUITE 450
LOS ANGELES, CALIFORNIA 90014
TEL (213) 542-5241
FAX (213) 542-5241

43.     The Safety Data Sheet includes the following instructions for use:

| 11. TOXICOLOGICAL INFORMATION | |
|---|---|
| Likely Routes of Exposure: | Eyes, Skin, Ingestion, Inhalation. |
| Symptoms of Exposure: | |
| -Eye Contact: | Pain, redness, swelling of the conjunctiva and tissue damage.  Eye contact may cause permanent damage. |
| -Skin Contact: | Pain, redness, blistering and possible chemical burn. |
| -Inhalation: | Nasal discomfort and coughing. Irritation or damage to the mucus membranes of the respiratory tract. |
| -Ingestion: | Damage or chemical burns to mouth, throat and stomach. Pain, nausea, vomiting and diarrhea. |
| Immediate, Delayed, Chronic Effects | |
| Product Information: | Data not available or insufficient for classification. |
| Numerical Measures of Toxicity | |
| The following acute toxicity estimates (ATE) are calculated based on the GHS document. | |

44.     Additionally, pursuant to EPA pesticide requirements, Spartan Chemical includes the following warning on its Safety Data Sheet:

| 15. REGULATORY INFORMATION |
|---|
| **EPA Pesticide Label:** |
| DANGER. Corrosive. Causes irreversible eye damage and skin burns. Harmful if swallowed or absorbed through the skin. Do not get in eyes, on skin, or on clothing. Wear goggles or face shield and rubber gloves and protective clothing when handling. Wash thoroughly with soap and water after handling and before eating, drinking, chewing gum, using tobacco or using the toilet. Remove contaminated clothing and wash clothing before reuse. |

## 2.     Defendant GEO Knew HDQ Neutral is a Toxic Chemical Mixture

45.     For at least the last 10 years, GEO has used—and continues to use—HDQ Neutral at Adelanto to clean the indoor areas where detained people are held.

46.     As manager and operator of Adelanto, GEO is responsible for ensuring its staff follows regulations, guidelines, and manufacturer safety warnings for the use of chemicals at the Facility to safeguard the health and welfare of the people in its custody.

47.     GEO had access to all of Spartan Chemical's safety information regarding HDQ Neutral, including the Safety Data Sheet, the Container Label, and all other information available on Spartan Chemical's website.

48.     GEO was provided the Safety Data Sheet, which warns that HDQ Neutral should only be used "outdoors or in a well-ventilated area" and, that HDQ Neutral is meant to be applied to hard, non-porous surfaces.

SOCIAL JUSTICE LEGAL FOUNDATION
523 6TH STREET, SUITE 450
LOS ANGELES, CALIFORNIA 90014
TEL (213) 542-5241
FAX (213) 542-5241

49.     Furthermore, the Safety Data Sheet clearly labels the hazards and toxicity of HDQ Neutral. Specifically, it shows:



50.     Moreover, the Container Label requires HDQ Neutral to be sprayed 6–8 inches from the surface of the intended object to be cleaned, while warning its user to avoid breathing in the chemical.

51.     The Container Label also warns that HDQ Neutral should not be sprayed on anything that will go into the human body, and that its user should not eat, drink, or smoke while using the product.

52.     The EPA supports the instructions of the Safety Data Sheet and the Container Label by requiring users of chemicals intended to kill COVID-19 cells to use said chemicals on surfaces, NOT humans. Additionally, the EPA warns that fumigation and wide-area spraying of chemicals intended to kill COVID-19 cells are not appropriate. GEO was required to know and follow these EPA guidelines.

**C.     Defendant GEO Knowingly Poisoned Plaintiffs and the Detained Class with HDQ Neutral**

53.     On February 3, 2020, the United States Department of Health and Human Services declared COVID-19 a public health crisis and within weeks the federal government declared a National Emergency.

54.     News of the highly contagious and novel virus spread across the country. Local, state, and national government agencies made announcements regarding safety

SOCIAL JUSTICE LEGAL FOUNDATION
523 6ᵗʰ STREET, SUITE 450
LOS ANGELES, CALIFORNIA 90014
TEL (213) 542-5241
FAX (213) 542-5241

SOCIAL JUSTICE LEGAL FOUNDATION
523 6ᵀᴴ STREET, SUITE 450
LOS ANGELES, CALIFORNIA 90014
TEL (213) 542-5241
FAX (213) 542-5241

precautions and ways to prevent the virus from spreading. The news media, whether television, radio, or newspapers, reported daily updates on all COVID-19 related matters.

55.    However, for people caged in places such as Adelanto, information was much harder to access. Detained people at Adelanto have no internet access in their dormitory or cell blocks, and access to the internet in the law library is limited to legal resources. Detained people must rely on GEO staff to provide newspapers to their block, or to turn on the television to a news channel. Several of the Plaintiffs and many members of the Detained Class speak limited or no English. For these reasons, they heavily relied on the information GEO staff was willing to share about COVID-19.

56.    To the shock and concern of the Detained Class, shortly after learning of the COVID-19 pandemic, GEO placed Adelanto in lock down with no in-person visits. In the days that followed, Plaintiffs and members of the Detained Class witnessed GEO staff spraying a red/pink chemical mixture (HDQ Neutral) in each of their rounds—which occurred every 15 to 30 minutes—within all dormitory and cell blocks at the Facility.

57.    Plaintiffs and members of the Detained Class had no control or say over where, how, or how often the chemical mixture was sprayed.

58.    GEO staff fumigated the air and surfaces of the Facility's living areas with HDQ Neutral in a manner that dangerously exposed Plaintiffs and members of the Detained Class to the toxic chemical mixture by inhalation, skin and eye contact, and oral ingestion. This aggregate exposure heightened the dangers of HDQ Neutral's active components and violated the instructions of the Safety Data Sheet, the Container Label, and EPA guidelines.

59.    On July 29, 2020, the EPA conducted an inspection of Adelanto via video conference due to concerns that GEO staff may have been using HDQ Neutral in an improper manner. The EPA documented its findings from that virtual inspection in the EPA July 2020 Final Inspection Report ("EPA Report"). Following the inspection, the

EPA issued a Notice of Warning to GEO, formalizing its findings and noting several violations of FIFRA based on GEO's improper use of HDQ Neutral.

60.     The EPA Report and Notice of Warning were not made public until March 21, 2021, and were the first governmental and scientific finding publicly available about GEO's improper use of HDQ Neutral.

61.     Despite the EPA's July 2020 inspection and warnings, GEO continued its dangerous and indiscriminate use of HDQ Neutral as outlined below.

62.     On information and belief, GEO staff was instructed by supervisors, officers, and/or directors representing GEO to continue GEO's dangerous and indiscriminate use of HDQ Neutral until at least November or December 2020, and in some units, all the way until April 2021.

1.     <u>Defendant GEO Poisoned Plaintiffs and Members of the Detained Class by Spraying HDQ Neutral Indoors and on all Surfaces</u>

63.     Prior to the pandemic, although improperly used in poorly ventilated spaces, GEO staff primarily used HDQ Neutral as a cleaning product. But starting in February 2020, GEO staff began using HDQ Neutral in wide-area spraying as a purported COVID-19 safety measure.

64.     GEO staff sprayed HDQ Neutral indoors directly into the air and on all types of surfaces. HDQ Neutral was sprayed throughout all areas of the Facility, including the front lobby, administrative areas, living areas, food and microwave areas, day room, corridors, intake units, and medical units. In the living areas, GEO staff would spray onto all surfaces including on soft, porous surfaces like mattresses and sheets.

65.     Unlike other areas of the Facility, the cell or dormitory blocks where members of the Detained Class were held have no open air ventilation.

66.     People placed in cell blocks were crammed into small all-cement cells which hold anywhere between four to eight people each. The cells have no windows and their doors open into the inside common areas of the block. In the common areas

SOCIAL JUSTICE LEGAL FOUNDATION
523 6TH STREET, SUITE 450
LOS ANGELES, CALIFORNIA 90014
TEL (213) 542-5241
FAX (213) 542-5241

SOCIAL JUSTICE LEGAL FOUNDATION

523 6ᵀᴴ STREET, SUITE 450
LOS ANGELES, CALIFORNIA 90014
TEL (213) 542-5241
FAX (213) 542-5241

of the cell blocks, there are no windows that can open to the outside. Bathroom and shower areas are also located inside the cell block and have no windows that can open. Cell blocks have a single door that leads to a small cement quad. But these quads have tall, thick, cement walls and only the roof is opened to the outside. During the limited time that detained people have access to a quad, the open roof is the single source of fresh air.

67.     Members of the Detained Class held in dormitory blocks were crammed into poorly ventilated areas too. Like the cell blocks, dormitories have no windows that can open to the outside and only one door that opens to a cement quad. People placed in dormitories sleep in bunk beds located at the back of the dormitories, in tightly packed rows, far from the one door to the quad. The bathroom and shower areas are also located inside the dormitory block and have no windows that can open.

68.     With full knowledge of the poor ventilation of these living areas, GEO staff copiously sprayed HDQ Neutral throughout every cell and dormitory block in the Facility.

69.     The incessant indoor use of HDQ Neutral resulted in a pungent chemical smell that permeated Adelanto's living areas and a chemical mist that would linger for minutes after spraying took place. Members of the Detained Class had trouble breathing because HDQ Neutral remained in the air.

2.     <u>Defendant GEO Poisoned Plaintiffs and Members of the Detained Class with HDQ Neutral by Spraying Every 15–30  Minutes</u>

70.     GEO staff sprayed HDQ Neutral every 15 to 30 minutes, 24 hours a day, beginning in February 2020.

71.     GEO's rampant spraying of HDQ Neutral increased the likelihood that Plaintiffs and members of the Detained Class coming and going from an area would come into contact with the chemical before the 10-minute setting period required by the Container Label had passed.

SOCIAL JUSTICE LEGAL FOUNDATION
523 6TH STREET, SUITE 450
LOS ANGELES, CALIFORNIA 90014
TEL (213) 542-5241
FAX (213) 542-5241

72.     The frequency of the spraying caused the toxic chemical mixture to linger in the air leading to Plaintiffs and members of the Detained Class directly inhaling and/or ingesting the chemical.

73.     The incessant spraying also created build-up on surfaces frequently touched by Plaintiffs and members of the Detained Class, such as phones, door handles, railings, and tables, leading to dermal exposure.

74.     GEO staff carried out this constant spraying in violation of the PRR, which mandate that "cleaning supplies and frequency of cleaning schedule [be] sufficient to maintain a high level of sanitation within housing areas without negatively impacting the health of detainees or staff."

75.     Plaintiffs and members of the Detained Class would experience coughing, headaches, nosebleeds, dizziness, skin irritation, and other symptoms after exposure to HDQ Neutral and in plain view of GEO staff.

76.     Even though GEO staff could see the effects that the near-constant spraying of HDQ Neutral was having on Plaintiffs and members of the Detained Class, they continued this practice for months.

3.     <u>Defendant GEO Poisoned Plaintiffs and Members of the Detained Class by Not Providing Them with Necessary Personal Protective Equipment and Training</u>

77.     HDQ Neutral's Safety Data Sheet provides the following clear instructions for the toxic chemical mixture's use: "Wear protective [e.g., rubber or other chemical-resistant] gloves. Wear eye / face protection [e.g., splash goggles]. Wear protective clothing." It also instructs users to avoid contact with skin, eyes, or clothing; to wash hands and any exposed skin thoroughly after handling; and to not breathe in the mist, vapors, or spray.

78.     Despite these clear instructions, GEO subjected Plaintiffs and members of the Detained Class to near-constant HDQ Neutral exposure without such protections. GEO failed to provide Plaintiffs and members of the Detained Class with

adequate Personal Protective Equipment ("PPE") to protect them from oral, dermal, inhalation, or ocular exposure to HDQ Neutral.[2]

79.     Nor did GEO provide Plaintiffs and members of the Detained Class the opportunity to change or clean their contaminated clothing, in violation of the Safety Data Sheet.

80.     GEO provided surgical masks to Plaintiffs and members of the Detained Class only after the pandemic started and did so sporadically at best. Some Plaintiffs and members of the Detained Class received, at most, three surgical masks per week, others even less. The CDC recommends changing disposable masks, such as the surgical masks provided to Plaintiffs and the Detained Class, after a single use.

81.     GEO was even less likely to provide other types of PPE to Plaintiffs and members of the Detained Class. Rubber gloves or goggles were rarely available. On at least one occasion, when Plaintiff Scheetz requested protective goggles due to the pain in her eyes, a member of GEO's staff laughed at her.

82.     The EPA's Report and Notice of Warning cited this lack of access to PPE as one area of concern in GEO's use of HDQ Neutral.

83.     Although GEO staff sometimes used masks, gloves, goggles, and occasionally even full protective suits when spraying HDQ Neutral, this type of PPE was not provided to Plaintiffs or members of the Detained Class.

84.     In addition to failing to provide the necessary PPE to protect from GEO's indiscriminate use of HDQ Neutral, GEO failed to provide required training on the use of HDQ Neutral to Plaintiffs and members of the Detained Class who were tasked with cleaning.

SOCIAL JUSTICE LEGAL FOUNDATION
523 6ᵗᴴ STREET, SUITE 450
LOS ANGELES, CALIFORNIA 90014
TEL (213) 542-5241
FAX (213) 542-5241

---

[2] Of note, in January of 2023, GEO was fined over $100,000 by Cal OSHA for—among several things—failing to supply PPE to detained workers.

SOCIAL JUSTICE LEGAL FOUNDATION
523 6ᵗʰ STREET, SUITE 450
LOS ANGELES, CALIFORNIA 90014
TEL (213) 542-5241
FAX (213) 542-5241

85.     The PBNDS's Environmental Health and Safety requirements mandate that "[d]etainees shall receive safety instructions as necessary for living area-related assignments, such as working with cleaning products to clean general use areas."

86.     However, Plaintiffs and members of the Detained Class tasked with cleaning the Facility's living areas, such as Plaintiffs Ronduen, Castillo, and Scheetz, were not trained on how to safely use the cleaning products GEO provided them, including HDQ Neutral.

87.     As for those people not tasked with cleaning, GEO staff would leave spray bottles containing HDQ Neutral in the common areas of cell and dormitory blocks, where anyone could access them, without previously training them on how to safely utilize the toxic chemical mixture.

        4.     <u>Defendant GEO Poisoned Plaintiffs and Members of the Detained Class by Improperly Diluting and Storing HDQ Neutral</u>

88.     The Safety Data Sheet, Container Label, and efficacy bulletin for HDQ Neutral all state that this toxic chemical mixture should be diluted and applied at 1 ounce per gallon with 10 minutes of surface contact time. The Container Label only recommends a higher concentration if the chemical is being used in animal pens as a virucidal disinfectant.

89.     Moreover, the PRR mandated that GEO use an approved cleaning solution in the strength and in a manner as recommended by the product label.

90.     Further, the EPA's COVID-19 Guidance for Cleaning and Disinfecting recommends that users "[f]ollow the instructions on the label for all cleaning and disinfection products for concentration, dilution, application method, contact time and any other special considerations when applying."

91.     This information was available to GEO at all times. However, GEO consistently diluted and applied HDQ Neutral at 2 ounces per gallon.

SOCIAL JUSTICE LEGAL FOUNDATION
523 6TH STREET, SUITE 450
LOS ANGELES, CALIFORNIA 90014
TEL (213) 542-5241
FAX (213) 542-5241

92.    In fact, GEO Warden and officer James Janecka ("Warden Janecka") admitted to the EPA in the July 2020 virtual inspection that GEO staff improperly diluted HDQ Neutral at Adelanto.

93.    The improper dilution was also noted in both the EPA Report and Notice of Warning, which alerted GEO that the improper dilution was a violation of FIFRA.

**D.    Defendant GEO Lied and Obscured Its Use of HDQ Neutral and the Chemical's Adverse Health Effects**

1.    <u>Defendant GEO Falsely Told Plaintiffs and Members of the Detained Class GEO's Use of HDQ Neutral Was Necessary to Prevent COVID-19</u>

94.    GEO—through its employees, supervisors, officers, and/or directors—instructed GEO staff to use and represent to Plaintiffs and members of the Detained Class that HDQ Neutral was safe and necessary to prevent COVID-19.

95.    Plaintiffs and members of the Detained Class, held in different cell and dormitory blocks across Adelanto, raised concerns to GEO staff (including guards and supervisors) about the incessant spraying of HDQ Neutral.

96.    GEO staff's responses to these concerns were all the same: refraining from providing any information at all regarding the dangers of exposure to HDQ Neutral, intentionally dismissing valid concerns, and misrepresenting HDQ Neutral as the only safe available disinfectant against COVID-19.

97.    For example, Plaintiffs Scheetz and Gonzalez Mena asked GEO staff to stop spraying the chemical when people were eating or sleeping in their cells. Their requests were ignored and GEO staff told them that GEO had to continue spraying during every round to prevent the spread of COVID-19. Similarly, Plaintiff Mendoza made requests that GEO staff use the chemical mixture more carefully, but her requests were also ignored.

98.    Plaintiff Hernandez asked GEO staff about the safety of spraying the chemical mixture. GEO staff refused to provide information and misrepresented to him that the constant spraying was necessary to prevent the spread of COVID-19. Plaintiff

SOCIAL JUSTICE LEGAL FOUNDATION
523 6ᵀᴴ STREET, SUITE 450
LOS ANGELES, CALIFORNIA 90014
TEL (213) 542-5241
FAX (213) 542-5241

Hernandez even raised his concerns to a GEO supervisor but, like Plaintiffs Sheetz and Gonzalez Mena, he was dismissed and told only that the frequent spraying was due to COVID-19.

99.    Plaintiffs and other members of the Detained Class also brought up concerns about their physical well-being to GEO staff. They complained of eye irritation and pain, blurry vision, headaches and dizziness, persistent cough, and nasal and throat irritation. Even after Plaintiff Scheetz fainted, GEO staff did not seem concerned about how her exposure to HDQ Neutral may be affecting her health.

2.    <u>Defendant GEO Concealed the Dangers of HDQ Neutral from Plaintiffs and Members of the Detained Class</u>

100.    Instead of warning Plaintiffs and members of the Detained Class that HDQ Neutral was dangerous, GEO *concealed* the dangers of HDQ Neutral and GEO's wrongful use of the product.

101.    GEO staff would provide spray bottles of HDQ Neutral with no labeling, meaning that Plaintiffs and members of the Detained Class were not informed of the risk posed by the chemical mixture or how to ameliorate its harm.[3]

102.    GEO also stored large HDQ Neutral containers which they used to fill up the smaller spray bottles. On information and belief, GEO staff would at times remove the HDQ Neutral Container Label from these larger containers. This was a violation of the PRR which require "[a]ll cleaning and disinfecting materials be stored in secure areas, in their original containers, and with the manufacturer's label intact on each container."

103.    When containers had a label, it was only in English—which many Plaintiffs and members of the Detained Class did not understand. GEO never provided translations of the Container Label into other languages.

---

[3] The EPA's Notice of Warning made note that: "[a]ccording to the accounts of current and former detainees, the 32-ounce spray bottles given to detainees did not always have a label attached and the detainees were not given any instructions as to how to properly or safely apply the product."

104.   Moreover, Plaintiffs and members of the Detained Class witnessed multiple inspections at Adelanto by external agencies during which GEO staff would hide bottles of HDQ Neutral.

105.   On information and belief, GEO staff never verbally shared nor posted the Safety Data Sheet, the EPA Report, or the Notice of Warning regarding HDQ Neutral with Plaintiffs or members of the Detained Class.

3.   <u>Medical Staff Consistently Discounted the Medical Concerns of Plaintiffs and Members of the Detained Class as Unrelated to HDQ Neutral Exposure.</u>

106.   Plaintiffs and members of the Detained Class, many of whom were suffering from acute symptoms related to their HDQ Neutral exposure, sought out medical treatment from Adelanto's medical staff. During these consultations, members of the Detained Class, including several named Plaintiffs, raised concerns about their symptoms and a possible link to the red/pink chemical mixture that GEO was constantly spraying.

107.   Like the rest of the staff at Adelanto, medical staff disregarded the concerns of the Detained Class members about the red/pink chemical mixture.

108.   For example, Plaintiff Castillo was told by a medical staff member that the medical staff member had no knowledge of the chemical spray, even though it was being used throughout the entire facility. On at least one other occasion, a member of the Detained Class was mocked by the medical staff over his concerns regarding the chemical spray.

109.   On information and belief, medical staff would also knowingly and incorrectly attribute members of the Detained Class's symptoms to causes not involving HDQ Neutral.

110.   Plaintiffs' and members of the Detained Class's limited access to medical care outside of Adelanto was even more restricted during the pandemic. Therefore, they could only rely on the statements and actions of the Adelanto medical staff to assess the risk of HDQ Neutral exposure.

SOCIAL JUSTICE LEGAL FOUNDATION
523 6ᵀᴴ STREET, SUITE 450
LOS ANGELES, CALIFORNIA 90014
TEL (213) 542-5241
FAX (213) 542-5241

SOCIAL JUSTICE LEGAL FOUNDATION

523 6TH STREET, SUITE 450
LOS ANGELES, CALIFORNIA 90014
TEL (213) 542-5241
FAX (213) 542-5241

4.   Defendant GEO Made False and Misleading Statements to Government and Regulatory Entities About Its Use of HDQ Neutral

111.   GEO attempted to hide its callous use of HDQ Neutral by providing false and misleading information to the EPA and the United States Congress.

112.   At the outset of the July 29, 2020 EPA inspection, GEO objected to the participation of the California Department of Pesticide Regulation by claiming it lacked authority to do so, thus obstructing a more thorough investigation.[4]

113.   During that same inspection, Warden Janecka lied by claiming that GEO was using HDQ Neutral "in accordance to CDC guidelines." Warden Janecka also falsely represented that GEO did not use HDQ Neutral in areas where food was served or where detained people slept.

114.   Warden Janecka further claimed, contrary to fact, that GEO staff sprayed HDQ Neutral with a degree of care. For example, he represented that GEO staff would not spray tables or phones located next to those being used by a detained person, that GEO staff would not spray a particular area if individuals were sitting on the floor below, and that GEO staff would not spray the inside of cells or bunks.

115.   During the EPA inspection, Warden Janecka was asked by the EPA inspector if there were any reports of adverse health effects by detained people after the application of HDQ Neutral; he refused to answer.

---

[4] The California Department of Justice ("Cal DOJ") issued a 2021 "Immigration Detention in California" report in which it outlined a pattern of obstructive practices by GEO. For example, GEO denied Cal DOJ's multiple requests to conduct site visits, including a one-day site visit in 2017, and a multi-day site visit in 2018. When GEO did permit Cal DOJ staff to visit the Facility, such as a planned week-long visit in 2019, GEO severely limited certain aspects of Cal DOJ's review, most notably by restricting access to detained people (for interviews), and restricting access to medical files. Cal DOJ's report further details how GEO limited their access to housing units, the Facility, and the Facility's kitchens.

116.   Additionally, Warden Janecka falsely reassured EPA inspectors that GEO provided different types of PPE to detained people, including surgical masks, nitryl gloves, and safety goggles.

117.   Earlier that month, on July 13, 2020, GEO Chief Executive Officer, George Zoley ("CEO Zoley"), appeared before the Homeland Security Oversight Committee and claimed that GEO was "using that cleaning product [HDQ Neutral], which is registered with the Environmental Protection Agency, and follow[ing] strict safety guidelines set by FDA." Further, he stated that "doctors never reported any adverse effects by anybody."

118.   As part of the Oversight Committee Hearing, CEO Zoley was asked if he would make sure that HDQ Neutral is used in line with the manufacturer's instructions, to which he responded, "Absolutely. Absolutely."

119.   The pattern of lies and misrepresentations by GEO started at the highest levels of the company and trickled down to the Facility staff, all of whom, instead of ensuring the safety of detained people, actively harmed them.

## NAMED PLAINTIFFS' FACTUAL ALLEGATIONS

120.   The seven named Plaintiffs, individuals that spent months detained at Adelanto between February 2020 and April 2021, experienced firsthand the reckless spraying of HDQ Neutral by GEO staff and the subsequent coverup regarding GEO's unsafe use of the chemical.

121.   Plaintiffs, like members of the Detained Class, relied on GEO's affirmations regarding the necessity and safety of using HDQ Neutral. Some Plaintiffs joined or remained as part of the cleaning crew, others stopped filing grievances, and all of them refrained from seeking legal counsel or independent medical care because they could not know GEO was lying about its improper use of the chemical mixture.

122.   Plaintiffs' experiences are not unique; rather, they establish the patterns and practices exhibited by GEO in its attempt to coverup the poisoning of over 1,300

SOCIAL JUSTICE LEGAL FOUNDATION
523 6ᵀᴴ STREET, SUITE 450
LOS ANGELES, CALIFORNIA 90014
TEL (213) 542-5241
FAX (213) 542-5241

Detained Class members. Similarly, Plaintiffs' medical symptoms and harms from their exposure to HDQ Neutral are typical of those experienced by the Detained Class.

**Plaintiff Ligaya Ronduen**

123.   Plaintiff Ronduen (also known as Ligaya Jensen) is forty-six years old and a mother of two. Ms. Ronduen has been detained at Adelanto for over four years, since December 21, 2018.

124.   Throughout her time at Adelanto, Ms. Ronduen has been housed in a dormitory block.

125.   In or around February 2020, Ms. Ronduen began hearing rumors about a highly contagious virus that was spreading outside the Facility. Within a few days, Ms. Ronduen noticed significant changes within Adelanto. Although GEO staff refused to provide her information about the virus, they began spraying a red/pink chemical mixture during their rounds, meaning at least every 30 minutes.

126.   A strong chemical smell started lingering inside the dormitory where Ms. Ronduen was housed.

127.   GEO staff would spray the chemical into the air and on every surface. They frequently sprayed the stair railings, the phones that she used to speak to her loved ones, the tables and chairs where she ate her meals, and around the microwave that she used to heat up food from the commissary.

128.   Ms. Ronduen noticed that GEO staff would spray the chemical directly onto the surfaces, without using a rag, and would not wipe off the residue that remained. When GEO staff sprayed on the top floor, a mist of the chemical would fall on those standing under or near the staircase.

129.   At night, GEO staff would walk up and down spraying the aisles of bunk beds where detained women slept. The constant spraying at night made it very difficult to sleep. Ms. Ronduen would wake up coughing and had difficulty breathing. Multiple nights, she heard members of the Detained Class asking GEO staff to please stop spraying. GEO staff continued their practice of spraying on every round.

SOCIAL JUSTICE LEGAL FOUNDATION
523 6ᵗʰ STREET, SUITE 450
LOS ANGELES, CALIFORNIA 90014
TEL (213) 542-5241
FAX (213) 542-5241

130.   On at least one occasion, Ms. Ronduen complained to GEO staff about the constant spraying. Ms. Ronduen told staff that she felt her nose was burning. GEO staff stated that they were instructed to use the chemical and that it was necessary to prevent COVID-19.

131.   Throughout the entire time when GEO staff sprayed the red/pink chemical, Ms. Ronduen noticed that they always gave this same explanation, including when many other members of the Detained Class in her dormitory complained to GEO staff.

132.   Ms. Ronduen also noticed that some days the chemical was a darker color; on those days, the chemical smelled even stronger.

133.   Soon after GEO staff started using the chemical, Ms. Ronduen began experiencing respiratory issues. Ms. Ronduen felt burning in her nostrils and nasal passages; she had a persistent cough and had trouble breathing.

134.   Eventually, Ms. Ronduen began experiencing strong headaches and, at times, would feel dizzy. She also noticed that there were specks of blood when she coughed and in her nostrils and mucus.

135.   Ms. Ronduen grew concerned about her symptoms but did not understand what could be causing them. She had no information about the red/pink chemical, and did not even know the name of it, as the spray bottles used around the dormitory did not have labels.

136.   For the months to come, Ms. Ronduen continued to hear GEO staff reassuring members of the Detained Class that the chemical was a necessary COVID-19 precaution. She trusted these comments and believed that the chemical was being safely used.

137.   In or around July 2020, Ms. Ronduen was moved to a different dormitory where GEO's use of the red/pink chemical continued in the same manner.

SOCIAL JUSTICE LEGAL FOUNDATION
523 6ᵀᴴ STREET, SUITE 450
LOS ANGELES, CALIFORNIA 90014
TEL (213) 542-5241
FAX (213) 542-5241

138.   In or around October 2020, Ms. Ronduen began working as part of the cleaning crew. The cleaning crew is made up of detained people who are tasked with cleaning all the common areas in the dormitories or cell blocks.

139.   As part of the cleaning crew, Ms. Ronduen was instructed to clean the sinks along with the tables and chairs where detained women ate. She was provided the same red/pink chemical to clean that was being sprayed by GEO staff.

140.   Ms. Ronduen was not given any training or safety instructions on how to use the cleaning product. The bottle she used for cleaning had no label or instructions. She was not given protective goggles or clothing while cleaning with the red/pink chemical.

141.   When cleaning, Ms. Ronduen was careful not to spray directly into the air or close to other detained women. She would use a rag to wipe down the sinks and tables.

142.   Ms. Ronduen noticed a decrease in GEO's use of the chemical sometime in April 2021.

143.   Besides the physical symptoms that Ms. Ronduen experienced, the exposure to the chemical also affected her emotional well-being. Ms. Ronduen had trouble sleeping at night and felt anxious for months due to the various symptoms she experienced and her uncertainty of what was causing them.

**Plaintiff Carlos Castillo**

144.   Plaintiff Castillo is fifty-one years old and a father of two. He has lived in the U.S. for over twenty years and has been detained at Adelanto for over three years, since July 2019. Throughout his time at Adelanto, Mr. Castillo has been housed in a cell block.

145.   When Mr. Castillo first arrived at Adelanto, the cleaning crew was using a red/pink chemical to wipe down tables and other surfaces. The cleaning crew would use the red/pink chemical twice a day. The spray bottles were unlabeled and left in the janitorial closet and in the common areas.

SOCIAL JUSTICE LEGAL FOUNDATION
523 6TH STREET, SUITE 450
LOS ANGELES, CALIFORNIA 90014
TEL (213) 542-5241
FAX (213) 542-5241

146.   Once the COVID-19 pandemic started, Mr. Castillo noticed that the use of the red/pink chemical changed dramatically. GEO staff began spraying the chemical approximately every 30 minutes at all hours of the day and night. They would spray it while people were eating, and when GEO staff sprayed the top floor, the mist from the chemical would fall on people's food, hair, and skin.

147.   GEO staff would often wear masks, latex gloves, and sometimes goggles while spraying.

148.   On April 11, 2020, Mr. Castillo started work on Adelanto's cleaning crew.

149.   GEO staff did not provide Mr. Castillo a mask to use while working as part of the cleaning crew. There was only one pair of goggles in the janitorial closet, available for the whole cell block. GEO did not provide Mr. Castillo with any instruction on how to properly use the cleaning chemical, or any information on safety precautions or potential risks of exposure.

150.   Unlike GEO staff, Mr. Castillo and other members of the cleaning crew were careful to move other detained people away from the area being cleaned with the red/pink chemical. They were also careful not to clean the tables while people were eating or the phones while people were using them.

151.   Due to lack of ventilation, Mr. Castillo and other detained people could smell and feel the chemical in the air. Mr. Castillo began to suffer skin irritation; he developed a rash on his hands and arms. His eyes became very sensitive and felt like they were burning. Mr. Castillo had a constant cough and his throat and nose felt irritated. On more than one occasion, Mr. Castillo found blood in his nostrils.  He also started to experience frequent headaches.

152.   As GEO staff continued the constant spraying of the red/pink chemical, Mr. Castillo noticed spray residue building up on surfaces, such as door handles and the telephones which Mr. Castillo used once or twice a day to call his children, wife,

SOCIAL JUSTICE LEGAL FOUNDATION
523 6ᵀᴴ STREET, SUITE 450
LOS ANGELES, CALIFORNIA 90014
TEL (213) 542-5241
FAX (213) 542-5241

and other loved ones. Over time, Mr. Castillo noticed that metal on the door handles of the cells and the phones that he used to call his family had started to corrode.

153.   On several occasions, Mr. Castillo complained about the chemical to GEO staff. GEO staff never acknowledged or addressed his complaints.

154.   On one occasion, Mr. Castillo explained to a GEO staff supervisor that he was concerned that his face and hands were coming into contact with the chemical because of the constant spraying of surfaces like telephones. The GEO staff merely replied that GEO was authorized and approved to use the chemical for disinfecting.

155.   Mr. Castillo also sought medical care for his irritated skin. Mr. Castillo asked the medical staff if the chemical could be harming his skin. Instead of acknowledging the effect of the chemical, the medical staff told Mr. Castillo to buy skin cream from the commissary, which did not improve Mr. Castillo's symptoms.

156.   When Mr. Castillo told another medical staff member about his nosebleeds, he was told it was allergies and prescribed Loratadine. The Loratadine did not improve his symptoms.

157.   Mr. Castillo also shared with a third medical staff member his concerns that the chemical being sprayed could be irritating his eyes.  The medical staff denied any knowledge of the chemical, and simply gave Mr. Castillo a saline solution for his eyes. The saline solution did not improve his symptoms. Mr. Castillo's eyesight deteriorated over the following months, and toward the end of 2020, he was prescribed glasses.

158.   Although his health was deteriorating and he continued to suffer symptoms for months, Mr. Castillo had no reliable way to corroborate that it was the chemical spray, and GEO's misuse of it, that was causing his symptoms. He had to rely on the assurances from GEO and the medical staff about the chemical.

159.   Mr. Castillo suffers and continues to suffer emotional injury due to the stress of being exposed to a harmful chemical, frustration with GEO for doing nothing

SOCIAL JUSTICE LEGAL FOUNDATION
523 6TH STREET, SUITE 450
LOS ANGELES, CALIFORNIA 90014
TEL (213) 542-5241
FAX (213) 542-5241

to alleviate or even acknowledge his suffering, and despair at the dehumanization of detained people held in Adelanto.

**Plaintiff Miriam Scheetz**

160.    Plaintiff Scheetz is fifty-nine years old and a mother of nine children. Mrs. Scheetz works at Inland Coalition for Immigrant Justice where she helps other currently and formerly detained immigrants to access immigration and community resources.

161.    Mrs. Scheetz was detained at Adelanto for approximately eighteen months from March 2019 to August 2020. During her detention at Adelanto, she was housed in a dormitory block.

162.    In or around May 2019, Mrs. Scheetz was asked to be part of the cleaning crew.

163.    As a member of the cleaning crew, Mrs. Scheetz was given a bottle with a red/pink liquid to use for cleaning. GEO staff instructed Mrs. Scheetz to use this chemical to clean all common areas. GEO staff also instructed her to pour the chemical from a gallon bottle into a smaller spray bottle but did not provide her protective gloves when doing so.

164.    Mrs. Scheetz cleaned the tables and chairs where detained women ate their meals. She cleaned the inside of the microwave used to heat up food purchased at the commissary. She mopped the floor and wiped down the telephones used by detained people. She also cleaned the bathroom including the showers, toilets, and sinks.

165.    At no point during her time as part of the cleaning crew at Adelanto did GEO staff provide Mrs. Scheetz with gloves, face goggles, or other protective equipment to clean with the red/pink chemical. Nor did GEO staff provide her with any safety training or instruction on how to use it. Instead, she was only given a rag to use on surfaces and a mop for the floors.

SOCIAL JUSTICE LEGAL FOUNDATION
523 6TH STREET, SUITE 450
LOS ANGELES, CALIFORNIA 90014
TEL (213) 542-5241
FAX (213) 542-5241

SOCIAL JUSTICE LEGAL FOUNDATION
523 6ᵗʰ Street, Suite 450
Los Angeles, California 90014
Tel (213) 542-5241
Fax (213) 542-5241

166.   Mrs. Scheetz remained part of the cleaning crew until her release in August 2020.

167.   In or around February or March 2020, GEO staff began spraying the red/pink chemical, at all times of the day and night, throughout Mrs. Scheetz's block.

168.   GEO staff would spray the telephones, tables, chairs, the rails and stairs, and throughout the entire block. GEO staff would spray the rails and stairs of the second floor, which created a "shower" of chemical mist that would fall onto those on the lower floor, including on people's faces, hair, and food.

169.   When spraying surfaces, GEO staff did so at close range, without using any cloth or rag.

170.   GEO staff would also spray inside the bathrooms, including the showers, toilets, and sinks.

171.   In Mrs. Scheetz's block, there were several rows of bunk beds in the back of the dorm. At night, GEO staff would walk up and down the aisles of bunk beds and spray the red/pink chemical as the women attempted to sleep. Mrs. Scheetz would often wake up coughing and gasping for air. She felt chest pains as well.

172.   On one occasion, Mrs. Scheetz saw two detained women arguing and several GEO staff approached them. As the women continued to argue, the GEO staff began spraying the red/pink chemical all over the dorm and directly over the women. GEO staff sprayed such a vast amount of the chemical that people were choking and coughing incessantly. Eventually, GEO staff were forced to move all the detained women to the cement quad because the heaviness of the chemical mist was choking people.

173.   Mrs. Scheetz noticed that the chemical GEO staff sprayed once the COVID-19 pandemic began was a darker color than when she used it for cleaning prior to the pandemic.

174.   On several occasions, Mrs. Scheetz asked GEO staff if they could refrain from spraying so often, especially when people were eating. GEO staff only responded that it was necessary to prevent COVID-19.

175.   Although some GEO staff would, at times, wear protective equipment—such as gloves, face coverings, or plastic suits—while spraying the red/pink chemical, Mrs. Scheetz and the other detained women never received any equipment to protect them against it.

176.   Mrs. Scheetz continued to experience symptoms. She frequently suffered headaches, including a sharp pain behind her ear which would cause her vision to blur. The headaches were so strong that she would have to sit still for long periods of time. Mrs. Scheetz feared that she might faint and hurt herself during a fall. Mrs. Scheetz also experienced nosebleeds and several times she also bled from her mouth. Her eyes were constantly itchy and would become swollen. Mrs. Scheetz eventually lost her eyelashes while at Adelanto. When she requested goggles to prevent further harm to her eyes and vision, GEO staff laughed at her.

177.   Sometime after GEO began its increased used of the chemical, Mrs. Scheetz fainted. She had been cleaning the tables and chairs when she began to feel dizzy and light-headed. Mrs. Scheetz went to her bed to lay down and told two other detained women that she had a strong headache. Shortly thereafter, Mrs. Scheetz started vomiting. The other two women called for GEO staff and asked for a doctor. GEO staff called medical staff, and a nurse arrived to the dormitory block. The medical staff had Mrs. Scheetz moved to the medical unit. The medical staff gave some liquid to Mrs. Scheetz without identifying what it was.

178.   The medical staff eventually moved Mrs. Scheetz to an "observation" cell located in the medical unit of Adelanto. The cell had bright lights; there was a cot, a sink, and toilet. Mrs. Scheetz was not allowed to have any personal belongings with her.

SOCIAL JUSTICE LEGAL FOUNDATION
523 6TH STREET, SUITE 450
LOS ANGELES, CALIFORNIA 90014
TEL (213) 542-5241
FAX (213) 542-5241

SOCIAL JUSTICE LEGAL FOUNDATION
523 6ᵀᴴ STREET, SUITE 450
LOS ANGELES, CALIFORNIA 90014
TEL (213) 542-5241
FAX (213) 542-5241

179.   Mrs. Scheetz continued vomiting throughout the day, and although she felt dehydrated, neither GEO staff nor medical staff provided her any water or food. Mrs. Scheetz felt extremely weak throughout the day and had trouble standing or walking around. In the evening, a GEO staff member threw a food tray on the floor and kicked it towards Mrs. Scheetz, who could not stand up. During her stay at the "observation" cell, she did not receive any additional medical care. Mrs. Scheetz returned to her dormitory block later that evening.

180.   Mrs. Scheetz repeatedly sought medical attention for her symptoms. However, the medical staff brushed off her requests. On at least one occasion, she was told by medical staff that she complained a lot.

181.   Mrs. Scheetz also filed a medical complaint with GEO in which she raised concerns that her symptoms, specifically the blood in her mouth and saliva, were not being addressed. In response to the complaint, a medical staff member had her transferred to an isolation cell which had bright lights on 24-hours a day. She spent two days in the isolation cell without any medical care.

182.   No member of the medical staff ever warned Mrs. Scheetz of the dangers of exposure to the red/pink chemical or suggested that it may be causing Mrs. Scheetz's health issues. When Mrs. Scheetz herself raised concerns that the chemical may be causing at least some of her symptoms, the medical staff denied it.

183.   Prior to arriving at Adelanto, Mrs. Scheetz had not experienced the strong headaches, nor the pain and itchiness in her eyes, nose, and throat that became common during her time at Adelanto. She also did not have nosebleeds or blood in her mouth or saliva prior to her detention at Adelanto.

184.   The physical symptoms she experienced, and the constant exposure to this chemical, also took a toll on Mrs. Scheetz's mental health. She felt extremely anxious and had trouble sleeping. At times, the stress led her to feel disoriented or have trouble recounting information. She was constantly worried that her dizziness or headaches may cause her to fall and hurt herself.

185.   A few months after she was released from Adelanto, Mrs. Scheetz had to call 911 because of a painful headache and vomiting. When the paramedics arrived, they told her they could not take her to the hospital because of the pandemic. However, the paramedics gave her medication for her vomiting and remained with Mrs. Scheetz for several hours until her symptoms subsided.

186.   On a second occasion, Mrs. Scheetz's son took her to urgent care, again due to a debilitating headache. She was given medication and kept in observation overnight.

187.   To this day, Mrs. Scheetz continues to experience symptoms related to her exposure to HDQ Neutral. She still has headaches that feel like those she experienced while being exposed to the red/pink chemical at Adelanto. Her eyes are often irritated and itchy, and sometimes swollen. She still experiences nosebleeds and nasal and throat irritation. The smell of chemicals, such as bleach or Lysol, causes her anxiety and chest pains.

**Plaintiff Cesar Hernandez Carrillo**

188.   Plaintiff Hernandez Carrillo is thirty-seven years old. He has lived in the United States since he was fourteen.

189.   Mr. Hernandez was detained at Adelanto from September 2020 to February 2022. During his detention at Adelanto, Mr. Hernandez was housed in a cell block.

190.   Mr. Hernandez was constantly exposed to the red/pink chemical from September 2020 until approximately December 2020.  During that time GEO staff sprayed the red/pink chemical at least every hour.

191.   The chemical spray was used in Mr. Hernandez's living area, including on the door to his cell, common area tables, and railings on the upper tier of the cell block. When the red/pink chemical was used, Mr. Hernandez would notice irritation to his eyes, nose, and throat.

SOCIAL JUSTICE LEGAL FOUNDATION
523 6ᵀᴴ STREET, SUITE 450
LOS ANGELES, CALIFORNIA 90014
TEL (213) 542-5241
FAX (213) 542-5241

SOCIAL JUSTICE LEGAL FOUNDATION

523 6ᵀᴴ STREET, SUITE 450
LOS ANGELES, CALIFORNIA 90014
TEL (213) 542-5241
FAX (213) 542-5241

192.   On several occasions, Mr. Hernandez asked for clean water to alleviate the burning in his throat and eyes. He was sometimes required to wait hours before he could get clean water.

193.   GEO staff continued spraying in the dormitories at night while detained people were sleeping. Mr. Hernandez tried stuffing a towel under his door and covering his mouth and nose with his sheets to avoid breathing the chemical, but he could not avoid inhaling it.

194.   Due to the pervasive chemical smell, Mr. Hernandez often lost his appetite and was unable to eat meals.

195.   The common area phones were often coated in the chemical. Sometimes the phones were wet; other times, the dried chemical left a white residue. When making calls to his wife, Mr. Hernandez tried to use a napkin to protect his skin.

196.   On multiple occasions while Mr. Hernandez was on the phone, GEO staff sprayed nearby phones that were not in use. Mr. Hernandez felt the chemical land on his skin, burning his face and arms.

197.   GEO staff never provided Mr. Hernandez with any details about the chemical's safety warnings or instructions for safe use.

198.   Mr. Hernandez and others in his unit were given surgical masks to protect against COVID-19. But at times, the Facility would run out of masks, so Mr. Hernandez had to use the same mask for days at a time. When masks were provided, they were thin and loose fitting such that they did not prevent inhalation of the red/pink chemical.

199.   After weeks of constant exposure to the chemical, Mr. Hernandez noticed continuing symptoms: burning and itching eyes, headaches and dizziness, and sustained irritation to his nose and throat. Mr. Hernandez had a persistent cough—sometimes bad enough that he coughed up blood—and he also had nosebleeds on multiple occasions.

200.   The chemical and accompanying symptoms also exacerbated Mr. Hernandez's anxiety and depression. While detained, he felt that he was treated like an animal.

201.   When Mr. Hernandez asked GEO staff about the red/pink chemical, they informed him that it was meant to kill the COVID-19 virus, and spraying was part of their job.

202.   On one occasion, Mr. Hernandez told a GEO supervisor that the red/pink chemical was too strong. That supervisor replied that GEO staff were required to use the chemical to prevent spread of COVID-19.

203.   At some point while detained, Mr. Hernandez heard that a judge had ordered GEO to stop using the chemical, and he wondered if the chemical was possibly dangerous. Still, GEO did not provide safety information about the red/pink chemical to Mr. Hernandez.

204.   Upon his release from Adelanto in February 2022, Mr. Hernandez's eyesight was noticeably worse. Mr. Hernandez does not have health insurance to obtain glasses with a stronger prescription, so he is unable to drive at night. Mr. Hernandez's chronic cough also persisted after he was released.

205.   Mr. Hernandez experiences intense anxiety when he smells chemicals. Although he used to work as a handyman, tasks like painting now cause him to feel tightness in his chest, as though he cannot breathe. He has had to forego job opportunities because of the anxiety and physical symptoms he continues to experience.

**Plaintiff Wilfredo Gonzalez Mena**

206.   Plaintiff Gonzalez Mena is forty-nine years old. He volunteers at an animal shelter in order to give back to his community. He has lived in the United States since he was twenty-four.

SOCIAL JUSTICE LEGAL FOUNDATION
523 6ᵗʰ STREET, SUITE 450
LOS ANGELES, CALIFORNIA 90014
TEL (213) 542-5241
FAX (213) 542-5241

SOCIAL JUSTICE LEGAL FOUNDATION
523 6ᵗʰ STREET, SUITE 450
LOS ANGELES, CALIFORNIA 90014
TEL (213) 542-5241
FAX (213) 542-5241

207.   Mr. Gonzalez Mena was detained at Adelanto for almost a year, from November 2019 through September 2020. For the first eight months of his detention, he was housed in a cell block and later moved to a dormitory block.

208.   In or around February or March 2020, GEO staff began spraying a red/pink chemical on a daily basis throughout Mr. Gonzalez Mena's block. GEO staff would spray the chemical every 15 to 30 minutes directly into the air. GEO staff would spray the telephones, tables, chairs, the rails and stairs, and throughout the entire block, including the sleeping areas. They sprayed directly onto all surfaces without using a cloth or rag. GEO staff would also haphazardly spray inside the bathrooms, including the showers and sinks, even when people were using a nearby shower or sink.

209.   GEO staff sprayed the red/pink chemical at all times of the day, including when Mr. Gonzalez Mena and others were eating. They also sprayed outside of the cells and around the door of the cell at night while he and other detained people slept. The chemical would enter the cell through the spaces between the door and the walls and floor. Mr. Gonzalez Mena tried to use his sheets to prevent inhaling the chemical, but it did not protect him. On at least one occasion, GEO staff sprayed the red/pink chemical directly inside the cell while Mr. Gonzalez Mena and other detained people were inside, without permitting them to leave the cell.

210.   When he was moved to the dormitory block, GEO staff would walk up and down the aisles of bunk beds at night and spray the red/pink chemical as the men attempted to sleep. Mr. Gonzalez Mena would often wake up coughing and gasping for air.

211.   On several occasions, Mr. Gonzalez Mena asked GEO staff if they could refrain from spraying the chemical, especially when people were eating. GEO staff only responded that it was necessary to prevent COVID-19. GEO staff never gave any warnings about the dangers of the red/pink chemical to Mr. Gonzalez Mena, nor expressed any concerns about the chemical.

212.   Although some GEO staff would, at times, wear protective equipment—such as gloves, goggles, or white plastic suits—while spraying the red/pink chemical, Mr. Gonzalez Mena and the other detained people never received any protective equipment to protect them.

213.   After GEO staff increased spraying of the chemical, Mr. Gonzalez Mena started experiencing redness of the skin on both eyelids, rashes and/or tender red bumps on the edge of his eyelid, worsening eyesight, dry skin, body pain, and a burning sensation on the palm of his hands, the soles of his feet, and his back. Additionally, he experienced headaches, felt dizzy, and his vision became blurry. He also began to suffer respiratory issues, including a persistent cough, itchiness in his throat, and trouble breathing, especially at night and early morning.

214.   The physical symptoms he experienced, and the constant exposure to the chemical, also took a toll on Mr. Gonzalez Mena's mental health. Mr. Gonzalez Mena repeatedly saw psychologists while at Adelanto. He was being treated for depression that was exacerbated by being confined and sprayed with chemicals. Mr. Gonzalez Mena's depression caused panic attacks and anxiety during his detention. He experienced insomnia due to the fear of falling asleep while the red/pink chemical was being sprayed all around him.

215.   To this day, Mr. Gonzalez Mena continues to experience symptoms. He has headaches and a persistent cough similar to what he experienced while being detained at Adelanto. His vision is impaired and he now requires glasses for reading, which he did not prior to being exposed to the chemical. Additionally, Mr. Gonzalez Mena experiences anxiety and discomfort when aerosol cleaning products are used in his vicinity.

**Plaintiff Somboon Phaymany**

216.   Plaintiff Phaymany is forty-six years old. He helps his sister care for their elderly parents. He has lived in the United States for over forty years.

SOCIAL JUSTICE LEGAL FOUNDATION
523 6ᵀᴴ STREET, SUITE 450
LOS ANGELES, CALIFORNIA 90014
TEL (213) 542-5241
FAX (213) 542-5241

217.   Mr. Phaymany was detained at Adelanto for almost two years, from April 2018 until April 2020. He was housed in a cell block throughout his time at Adelanto.

218.   When Mr. Phaymany arrived at Adelanto in 2018, another detained person asked if he was interested in joining the cleaning crew, which paid $1 each day. Mr. Phaymany wanted to earn some money while detained, so he agreed.

219.   Mr. Phaymany's duties included cleaning the common area twice a day. Before each cleaning session, detained people would leave the common area, generally going into their cells, while the cleaning crew sprayed the tables, railings, and door handles with the chemical. The spray bottles they used did not have labels.

220.   Mr. Phaymany did not know the name of the chemical he was using but trusted that GEO staff knew whether the chemical was safe to use.

221.   In or around February 2020, Mr. Phaymany noticed a substantial change in the use of the chemical spray at Adelanto. While the cleaning crew continued spraying twice a day, GEO staff started spraying far more frequently, with no regard for whether detained people were in the immediate vicinity.

222.   The only instruction Mr. Phaymany received with respect to spraying was to let the chemical sit on surfaces for up to ten minutes, rather than wiping the chemical away after spraying.

223.   On multiple occasions, when Mr. Phaymany was in the common area, he inhaled the chemical when GEO staff sprayed it nearby. On some occasions, GEO staff sprayed the chemical while Mr. Phaymany was eating nearby.

224.   While GEO staff wore surgical masks when spraying the chemical, there were no surgical masks provided to detained people.

225.   In the early months of 2020, Mr. Phaymany also noticed a number of symptoms: exacerbation of his asthma, a persistent cough, dry and cracking skin, irritation and burning sensation in his eyes, nausea, and headaches. On multiple occasions, he noticed traces of blood when blowing his nose.

SOCIAL JUSTICE LEGAL FOUNDATION
523 6ᵗʰ STREET, SUITE 450
LOS ANGELES, CALIFORNIA 90014
TEL (213) 542-5241
FAX (213) 542-5241

226.   Mr. Phaymany was concerned about these symptoms, particularly the exacerbation of his asthma and increased need to use his inhaler, but he did not know what caused it. Even after he was released from Adelanto in April 2020, his asthma flare-up persisted, leading Mr. Phaymany to seek additional care.

**Plaintiff Yolanda Mendoza**

227.   Plaintiff Mendoza is fifty-four years old. Ms. Mendoza has lived in the United States for thirty years. She is the mother of a twenty-three-year-old son.

228.   She was detained at Adelanto from September 2019 to October 2020. Ms. Mendoza was housed in dormitory blocks.

229.   When Ms. Mendoza arrived at Adelanto, she participated in cleaning her living areas three times daily, although she was not paid. She and other detained people were instructed to use a chemical that smelled like bleach, which was applied from spray bottles and a mop bucket.

230.   After the pandemic started, GEO staff began using a different chemical, which was a red/pink color, to spray the common areas as often as every 15 minutes. The red/pink chemical had an extremely strong odor.

231.   Ms. Mendoza was exposed to the chemical day and night. She began noticing symptoms, such as irritated and itchy skin, trouble breathing, and a feeling of her throat constricting.

232.   On multiple occasions, Ms. Mendoza was in her bed when GEO staff sprayed the sleeping area, including a doorway mere feet from her bed.

233.   On multiple occasions, Ms. Mendoza could see the chemical falling onto her food while she ate at the downstairs dining tables. She tried to use her hands and arms to cover her food, but often she had to throw the food away.

234.   In the beginning of the pandemic, Ms. Mendoza and other detained people did not have masks to wear. When Ms. Mendoza saw GEO staff approaching with spray bottles, she would pull her shirt up over her mouth and nose to try to avoid inhaling the red/pink chemical.

SOCIAL JUSTICE LEGAL FOUNDATION
523 6ᵀᴴ STREET, SUITE 450
LOS ANGELES, CALIFORNIA 90014
TEL (213) 542-5241
FAX (213) 542-5241

235.   On one occasion, Ms. Mendoza witnessed a GEO staff spray another detained person directly on their body.

236.   When Ms. Mendoza and other detained people asked GEO staff to be more careful with the red/pink chemical, GEO staff dismissed the complaints, saying that they had been ordered to spray.

237.   During this period, Ms. Mendoza developed a rash on her face. She began suffering nosebleeds, eye irritation, nausea, and dizziness. Often, she felt so ill that she expressed to friends that she thought she might die.

238.   Ms. Mendoza submitted multiple medical requests and sought medical care for her symptoms, which Adelanto medical staff attributed to poor water quality and high blood pressure. She was advised by Adelanto's medical staff to drink water, try exercise, and take ibuprofen.

239.   After Ms. Mendoza was released from Adelanto, she noticed that her eyesight and sense of smell had deteriorated while she was in detention. Years later, she still experiences dizziness and sensitivity in her nasal passages.

## CLASS ALLEGATIONS

240.   Pursuant to Federal Rule of Civil Procedure 23(b)(3), Plaintiffs bring this lawsuit on behalf of themselves and as a class action on behalf of the following class:
**Detained Class**: All persons who were detained at Adelanto Detention Center between February 2020 through April 2021 that were exposed to HDQ Neutral.

241.   Excluded from the Detained Class are any entities, including Defendant GEO and its officers, agents, and employees. Also excluded from the Detained Class are officers, agents, and employees of any other governmental or corporate entity affiliated with the operation and management of Adelanto.

242.   The proposed Detained Class satisfies the requirements of Federal Rule of Civil Procedure 23(a)(1) because it is so numerous that joinder of all members is impracticable. Upon information and belief, there were over 1,300 people detained at

COMPLAINT

SOCIAL JUSTICE LEGAL FOUNDATION
523 6TH STREET, SUITE 450
LOS ANGELES, CALIFORNIA 90014
TEL (213) 542-5241
FAX (213) 542-5241

Adelanto on or around February 2020, when Defendant GEO began spraying HDQ Neutral as a purported COVID-19 safety measure.

243.   The proposed Detained Class meets the commonality requirements of Federal Rule of Civil Procedure 23(a)(2). There are numerous questions of law or fact common to each member of the Detained Class. For the Detained Class, those common questions of law and fact predominate over any question affecting only an individual in the Detained Class. Defendant GEO acted on grounds generally applicable to the Detained Class in improperly using HDQ Neutral, and making misrepresentations regarding the chemical and its use.

244.   The proposed Detained Class meets the typicality requirements of Federal Rule of Civil Procedure 23(a)(3) because Plaintiffs' claims are typical of the claims of the Detained Class. The claims of Plaintiffs and members of the Detained Class arise from the same set of actions, statements, misrepresentations, concealment, and other actions by Defendant GEO relating to its use of HDQ Neutral at Adelanto.

245.   Plaintiffs meet the requirements of Federal Rule of Civil Procedure 23(a)(4) as they will fairly and adequately protect the interest of the Detained Class. Plaintiffs do not have any interests antagonistic to, or in conflict with, the Detained Class that Plaintiffs seek to represent. Plaintiffs, as well as the Detained Class, seek compensatory and punitive damages arising from Defendant GEO's negligent, fraudulent, and other tortious acts which caused them injury.

246.   The proposed Detained Class also meets the requirements of Federal Rule of Civil Procedure 23(b)(3) because questions of law or fact common to the class "predominate" over questions affecting the individual members, and a class action is "superior" to other methods available for adjudicating the controversy. The numerous common questions of law and fact that predominate will advance resolution of the litigation as to all the Detained Class members. These common legal and factual issues include the following:

a.   whether Defendant GEO engaged in the conduct alleged herein;

SOCIAL JUSTICE LEGAL FOUNDATION
523 6ᵀᴴ STREET, SUITE 450
LOS ANGELES, CALIFORNIA 90014
TEL (213) 542-5241
FAX (213) 542-5241

b. whether Defendant GEO's use of HDQ Neutral was a wrongful and offensive touching causing Plaintiffs and the Detained Class harm;

c. whether Defendant GEO's conduct violated duties owed to Plaintiffs and the Detained Class;

d. whether Defendant GEO made unlawful and misleading representations or material omissions with respect to the safety of Defendant GEO's and its staff's use of HDQ Neutral at Adelanto;

e. whether Defendant GEO took steps to conceal the toxic and harmful use of HDQ Neutral at Adelanto or otherwise falsely assured Plaintiffs and the Detained Class that its use of HDQ Neutral was safe; and

f. whether Plaintiffs and the Detained Class are entitled to damages and other monetary relief, including punitive damages, and if so, in what amount.

247. A class action is superior to other available methods for the fair and efficient adjudication of the controversy. Treatment as a class action will permit a large number of similarly situated persons to adjudicate their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of effort and expense that numerous individual actions would produce. Treatment of the matter as a class will also permit the adjudication of claims by many members of the Detained Class who could not individually afford to litigate such a claim. This class action likely presents no difficulties in management that would preclude maintenance as a class action.

248. Plaintiffs and the Detained Class are represented by counsel experienced in class action lawsuits, civil rights litigation, and representation of people in carceral settings.

SOCIAL JUSTICE LEGAL FOUNDATION
523 6ᵗʰ STREET, SUITE 450
LOS ANGELES, CALIFORNIA 90014
TEL (213) 542-5241
FAX (213) 542-5241

249.   Plaintiffs and the Detained Class have all suffered and will continue to suffer harm and damages as a result of Defendant GEO's wrongful conduct and use of HDQ Neutral.

250.   Plaintiffs reserve the right to amend the Detained Class definition if discovery and further investigation reveal that the Detained Class should be expanded, divided into subclasses, or modified in any other way.

## CAUSES OF ACTION

### FIRST CAUSE OF ACTION
### Cal. Civ. Code § 1714(a)
### NEGLIGENCE

#### (ON BEHALF OF PLAINTIFFS AND THE DETAINED CLASS)

251.   Plaintiffs hereby incorporate allegations contained in the preceding paragraphs, as though fully set forth herein.

252.   Defendant GEO had a special duty of care to protect Plaintiffs and the Detained Class, people detained in a facility they own and operate, from foreseeable harm.

253.   Defendant GEO knew or should have known that eye contact and skin contact with HDQ Neutral could cause pain, redness, swelling, tissue damage, blistering, and burning, among other symptoms.

254.   Defendant GEO knew or should have known that inhalation of HDQ Neutral could cause coughing and nasal irritation, among other symptoms.

255.   Defendant GEO knew or should have known that frequent spraying of HDQ Neutral in poorly ventilated areas posed a risk of inhalation, eye contact, and skin contact with HDQ Neutral.

256.   Defendant GEO knew or should have known that frequent spraying of HDQ Neutral onto surfaces and objects that Plaintiffs and the Detained Class touched would pose a risk of skin contact.

SOCIAL JUSTICE LEGAL FOUNDATION
523 6TH STREET, SUITE 450
LOS ANGELES, CALIFORNIA 90014
TEL (213) 542-5241
FAX (213) 542-5241

257.   Defendant GEO knew or should have known that exposure to HDQ Neutral without protective equipment such as goggles, gloves, and masks posed a risk of inhalation, ingestion, eye contact, and skin contact with HDQ Neutral.

258.   Defendant GEO knew or should have known that failure to dilute HDQ Neutral as recommended by the manufacturer could increase the severity of exposure symptoms.

259.   In breach of its duty to Plaintiffs and the Detained Class, Defendant GEO sprayed HDQ Neutral as often as every fifteen minutes in poorly ventilated areas.

260.   In breach of its duty to Plaintiffs and the Detained Class, Defendant GEO sprayed HDQ Neutral and instructed detained people to spray HDQ Neutral onto surfaces and objects such that the chemical mixture came into contact with Plaintiffs' and the Detained Class members' skin.

261.   In breach of its duty to Plaintiffs and the Detained Class, Defendant GEO failed to provide Plaintiffs and the Detained Class with goggles, gloves, and masks sufficient to prevent inhalation, ingestion, eye contact, and skin contact with HDQ Neutral.

262.   In breach of its duty to Plaintiffs and the Detained Class, Defendant GEO failed to dilute HDQ Neutral as recommended.

263.   As a result of Defendant GEO's actions, Plaintiffs and the Detained Class suffered and continue to suffer physical injuries, including, but not limited to, chronic coughing and shortness of breath, skin rashes and blisters, eye irritation and burning, blurred vision, nosebleeds, headaches, dizziness, nausea, fatigue, and/or fainting.

264.   Defendant GEO's actions also caused Plaintiffs and the Detained Class to suffer and continue to suffer fear, anxiety, depression, claustrophobia, and/or other emotional distress.

265.   Instead, as detailed in the preceding paragraphs, Defendant GEO made material misrepresentations to the public about its use of HDQ Neutral and continued to clandestinely misuse the pesticide at Adelanto, warranting punitive damages.

SOCIAL JUSTICE LEGAL FOUNDATION
523 6ᵗʰ Street, Suite 450
Los Angeles, California 90014
Tel (213) 542-5241
Fax (213) 542-5241

SOCIAL JUSTICE LEGAL FOUNDATION

523 6TH STREET, SUITE 450
LOS ANGELES, CALIFORNIA 90014
TEL (213) 542-5241
FAX (213) 542-5241

## SECOND CAUSE OF ACTION

## BATTERY

### (ON BEHALF OF PLAINTIFFS AND THE DETAINED CLASS)

266.  Plaintiffs hereby incorporate allegations contained in the preceding paragraphs, as though fully set forth herein.

267.  Without consent or legal privilege, Defendant GEO intentionally assaulted and physically battered Plaintiffs and the Detained Class with the intent to harm Plaintiffs and the Detained Class by spraying a toxic chemical mixture on and around their person while Plaintiffs and the Detained Class were eating. Such conduct was extreme and outrageous and would be deemed highly offensive to a reasonable person.

268.  Without consent or legal privilege, Defendant GEO intentionally assaulted and physically battered Plaintiffs and the Detained Class with the intent to harm Plaintiffs and the Detained Class by spraying a toxic chemical mixture on and around their person while Plaintiffs and the Detained Class were sleeping in their living quarters. Such conduct was extreme and outrageous and would be deemed highly offensive to a reasonable person.

269.  Without consent or legal privilege, Defendant GEO intentionally assaulted and physically battered Plaintiffs and the Detained Class with the intent to harm Plaintiffs and the Detained Class by spraying a toxic chemical mixture on and around their person while Plaintiffs and the Detained Class were talking on the phone. Such conduct was extreme and outrageous and would be deemed highly offensive to a reasonable person.

270.  Without consent or legal privilege, Defendant GEO intentionally assaulted and physically battered Plaintiffs and the Detained Class with the intent to harm Plaintiffs and the Detained Class by spraying a toxic chemical mixture on and around their person while Plaintiffs and the Detained Class were detained at Adelanto.

Such conduct was extreme and outrageous and would be deemed highly offensive to a reasonable person.

271.   As a result of the wrongful touching by Defendant GEO, Plaintiffs and the Detained Class suffered and continue to suffer physical injuries, including, but not limited to, chronic coughing and shortness of breath, skin rashes and blisters, eye irritation and burning, blurred vision, nosebleeds, headaches, dizziness, nausea, fatigue, and/or fainting.

272.   As a result of the wrongful touching by Defendant GEO, Plaintiffs and the Detained Class suffered and continue to suffer fear, anxiety, depression, claustrophobia, and/or other emotional distress.

273.   Defendant GEO acted with malice and oppression and with a conscious disregard of Plaintiffs' and the Detained Class's rights, making all Defendants liable for punitive damages under California Civil Code § 3294.

### THIRD CAUSE OF ACTION
### Cal. Civ. Code § 1714(a)
### PREMISES LIABILITY

#### (ON BEHALF OF PLAINTIFFS AND THE DETAINED CLASS)

274.   Plaintiffs hereby incorporate allegations contained in the preceding paragraphs, as though fully set forth herein.

275.   At all relevant times, Adelanto was operated, leased, possessed, managed, maintained, secured, inspected, serviced, staffed, and/or otherwise controlled by Defendant GEO.

276.   At all relevant times, Defendant GEO had the right to control conditions on the premises of Adelanto.

277.   Defendant GEO acted wantonly, recklessly, negligently, and carelessly in owning, operating, leasing, possessing, managing, maintaining, securing, inspecting, servicing, staffing, and/or otherwise controlling Adelanto. Among other things, Defendant GEO created a hazardous condition on the premise of Adelanto by using

SOCIAL JUSTICE LEGAL FOUNDATION
523 6ᵗʰ STREET, SUITE 450
LOS ANGELES, CALIFORNIA 90014
TEL (213) 542-5241
FAX (213) 542-5241

HDQ Neutral without properly diluting it; spraying HDQ Neutral in poorly ventilated spaces and on food, clothing, and objects coming into contact with skin and eyes; and, on information and belief, instructing and permitting its employees to use HDQ Neutral without training them about how to maintain the safety of the detained persons in their care.

278.   Defendant GEO acted wantonly, recklessly, negligently, and carelessly in owning, operating, leasing, possessing, managing, maintaining, securing, inspecting, servicing, staffing, and/or otherwise controlling Adelanto. Among other things, Defendant GEO failed to warn detained persons of a hazardous condition on the premises of Adelanto; failed to guard against the misuse of HDQ Neutral by properly training its employees to safely use HDQ Neutral; failed to guard against the negative health effects of HDQ Neutral by providing goggles, masks, or other equipment sufficient to mitigate the known hazards of HDQ Neutral; and failed to heed complaints from detained people experiencing the negative health effects of HDQ Neutral on the premises.

279.   Defendant GEO had actual and/or constructive notice that its use of HDQ Neutral created a hazardous and unsafe condition on the premises: among other things, Defendant GEO had access to Spartan Chemical's HDQ Neutral Safety Data Sheet warning of the risks of HDQ Neutral.

280.   It was reasonably foreseeable that Plaintiffs and the Detained Class would suffer injury as a result of Defendant GEO's overuse and misuse of HDQ Neutral at Adelanto, as well as GEO's failure to take reasonable precautions in light of the available evidence.

281.   As a result of the continued hazard on the premises controlled by Defendant GEO, Plaintiffs and the Detained Class suffered and continue to suffer physical injuries, including, but not limited to, chronic coughing and shortness of breath, skin rashes and blisters, eye irritation and burning, blurred vision, nosebleeds, headaches, dizziness, nausea, fatigue, and/or fainting.

SOCIAL JUSTICE LEGAL FOUNDATION
523 6ᵀᴴ STREET, SUITE 450
LOS ANGELES, CALIFORNIA 90014
TEL (213) 542-5241
FAX (213) 542-5241

COMPLAINT

282. As a result of the continued hazard on the premises controlled by Defendant GEO, Plaintiffs and the Detained Class suffered and continue to suffer fear, anxiety, depression, claustrophobia, and/or other emotional distress.

283. Defendant GEO acted willfully and with malice by consciously disregarding the risks of misusing HDQ Neutral, concealing its use, and refusing to use it differently even in the face of injuries brought to Defendant's attention.

284. Defendant GEO knew that its use of HDQ Neutral on the premises without training, safeguards, or protective equipment could cause health injury to Plaintiffs and the Detained Class who were in Defendant GEO's care. Despite this knowledge, and although the dangerous use of HDQ Neutral continued for sufficient time to have been remedied, Defendant GEO nevertheless consciously and deliberately failed to act to avoid the probability of injury.

285. Instead, as detailed in the preceding paragraphs, Defendant GEO made material misrepresentations to the public about its use of HDQ Neutral and continued to clandestinely misuse the pesticide at Adelanto, warranting punitive damages.

### FOURTH CAUSE OF ACTION
### Cal. Civ. Code § 1710(3)
### CONCEALMENT
#### (ON BEHALF OF PLAINTIFFS AND THE DETAINED CLASS)

286. Plaintiffs reallege and incorporate the allegations set forth in the preceding paragraphs as though fully set forth herein.

287. Defendant GEO concealed and suppressed its improper use of HDQ Neutral indoors on and around Plaintiffs and the Detained Class at Adelanto.

288. Defendant GEO concealed and suppressed its improper dilution of HDQ Neutral at Adelanto.

289. Defendant GEO concealed and suppressed its failure to provide the required PPE for use of HDQ Neutral.

SOCIAL JUSTICE LEGAL FOUNDATION
523 6TH STREET, SUITE 450
LOS ANGELES, CALIFORNIA 90014
TEL (213) 542-5241
FAX (213) 542-5241

290.   As the party responsible for the custody, care, and well-being of Plaintiffs and the Detained Class, Defendant GEO had a special duty to inform Plaintiffs and the Detained Class of its improper use and dilution of HDQ Neutral.

291.   Defendant GEO intentionally concealed and suppressed its improper use and dilution of HDQ Neutral indoors on and around Plaintiffs and the Detained Class, improper dilution of HDQ Neutral, and failure to provide PPE, among other failures, with the intent to defraud Plaintiffs and the Detained Class.

292.   Plaintiffs and the Detained Class were unaware of Defendant GEO's actual improper use of HDQ Neutral indoors on and around Plaintiffs and the Detained Class, improper dilution, and failure to provide PPE, among other failures.

293.   Plaintiffs and the Detained Class would not have acted as they did if they had known of the concealed and suppressed facts.

294.   As a result of the concealment and suppression of these and other material facts, Plaintiffs and the Detained Class suffered and continue to suffer physical injuries, including, but not limited to, chronic coughing and shortness of breath, skin rashes and blisters, eye irritation and burning, blurred vision, nosebleeds, headaches, dizziness, nausea, fatigue, and/or fainting.

295.   Defendant GEO's actions also caused Plaintiffs and the Detained Class to suffer and continue to suffer fear, anxiety, depression, claustrophobia, and/or other emotional distress.

296.   Defendant GEO acted with fraud, malice and oppression, and with a conscious disregard of Plaintiffs' and the Detained Class's rights, making all Defendants liable for punitive damages under California Civil Code § 3294.

### FIFTH CAUSE OF ACTION
### Cal. Civ. Code § 1710(1)
### INTENTIONAL MISREPRESENTATION
#### (ON BEHALF OF PLAINTIFFS AND THE DETAINED CLASS)

SOCIAL JUSTICE LEGAL FOUNDATION
523 6™ STREET, SUITE 450
LOS ANGELES, CALIFORNIA 90014
TEL (213) 542-5241
FAX (213) 542-5241

297.   Plaintiffs hereby incorporate by reference all preceding paragraphs of this Complaint as if fully set forth herein.

298.   Defendant GEO made false and material misrepresentations to the public regarding its use of HDQ Neutral at Adelanto.

299.   Defendant GEO made false and material misrepresentations to the public regarding the availability of PPE to Plaintiffs and the Detained Class who used or were exposed to HDQ Neutral at Adelanto.

300.   Defendant GEO made false and material misrepresentations to Plaintiffs and the Detained Class that HDQ Neutral was for COVID safety, that HDQ Neutral was not causing their health issues, and regarding Defendant GEO's lack of available alternative products.

301.   Defendant GEO knowingly made the aforementioned false and material misrepresentations. Alternatively, Defendant GEO made the misrepresentations recklessly and without regard for their truth.

302.   Defendant GEO intended that Plaintiffs and the Detained Class rely on these misrepresentations.

303.   Plaintiffs and the Detained Class reasonably relied on Defendant's misrepresentations.

304.   As a result of Defendant GEO's misrepresentations, Plaintiffs and the Detained Class suffered and continue to suffer physical injuries, including, but not limited to, chronic coughing and shortness of breath, skin rashes and blisters, eye irritation and burning, blurred vision, nosebleeds, headaches, dizziness, nausea, fatigue, and/or fainting.

305.   Defendant GEO's actions also caused Plaintiffs and the Detained Class to suffer and continue to suffer fear, anxiety, depression, claustrophobia, and/or other emotional distress.

SOCIAL JUSTICE LEGAL FOUNDATION
523 6ᵗʰ STREET, SUITE 450
LOS ANGELES, CALIFORNIA 90014
TEL (213) 542-5241
FAX (213) 542-5241

306.   Plaintiffs' and the Detained Class's reliance on Defendant GEO's misrepresentations was a substantial factor in causing harm to Plaintiffs and the Detained Class.

307.   Defendant GEO acted with fraud, malice and oppression, and with a conscious disregard of Plaintiffs' and the Detained Class's rights, making all Defendants liable for punitive damages under California Civil Code § 3294.

**SIXTH CAUSE OF ACTION**
**Cal. Civ. Code § 1710(2)**

**NEGLIGENT MISREPRESENTATION**

**(ON BEHALF OF PLAINTIFFS AND THE DETAINED CLASS)**

308.   Plaintiffs hereby incorporate by reference all preceding paragraphs of this Complaint as if fully set forth herein.

309.   Defendant GEO made false and material misrepresentations to the public regarding the use of HDQ Neutral at Adelanto.

310.   Defendant GEO made false and material misrepresentations to Plaintiffs and the Detained Class regarding the use of HDQ Neutral at Adelanto.

311.   Defendant GEO made those false and material misrepresentations with no reasonable ground for believing them to be true.

312.   Defendant GEO intended that Plaintiffs and the Detained Class rely on the misrepresentations.

313.   Plaintiffs and the Detained Class reasonably relied on the misrepresentations.

314.   Plaintiffs and the Detained Class suffered and continue to suffer physical injuries, including, but not limited to, chronic coughing and shortness of breath, skin rashes and blisters, eye irritation and burning, blurred vision, nosebleeds, headaches, dizziness, nausea, fatigue, and/or fainting.

SOCIAL JUSTICE LEGAL FOUNDATION
523 6TH STREET, SUITE 450
LOS ANGELES, CALIFORNIA 90014
TEL (213) 542-5241
FAX (213) 542-5241

315.   Defendant's actions also caused Plaintiffs and the Detained Class to suffer and continue to suffer fear, anxiety, depression, claustrophobia, and/or other emotional distress.

316.   Plaintiffs' and the Detained Class's reliance on Defendant GEO's misrepresentations was a substantial factor in causing harm to Plaintiffs and the Detained Class.

### PRAYER

317.   WHEREFORE, Plaintiffs, individually and on behalf of the Detained Class, respectfully request that the Court enter judgment in their favor against Defendant GEO Group, Inc., and award the following relief:

A.   Certifying the Detained Class and appointing Plaintiffs as Class Representatives for the Detained Class;

B.   Awarding each Plaintiff compensatory and special damages for injuries;

C.   Awarding each Plaintiff punitive damages;

D.   Awarding Detained Class members compensatory and special damages for injuries;

E.   Awarding Detained Class members punitive damages;

F.   For an order requiring Defendant GEO to pay for medical monitoring and expenses for the next five (5) years of each Plaintiff;

G.   For an order requiring Defendant GEO to pay for medical monitoring and expenses for the next (5) years for each Detained Class member;

H.   Awarding Plaintiffs and the Detained Class reasonable attorney's fees, costs, and expenses as allowed by law;

I.   Awarding declaratory relief that Defendant GEO knowingly poisoned and harmed Plaintiffs and the Detained Class in violation of California law;

J.   Awarding further appropriate equitable relief; and

K.   Granting any other relief this Court deems just and proper.

SOCIAL JUSTICE LEGAL FOUNDATION
523 6ᵗʰ STREET, SUITE 450
LOS ANGELES, CALIFORNIA 90014
TEL (213) 542-5241
FAX (213) 542-5241

## DEMAND FOR TRIAL BY JURY

Plaintiffs, individually and on behalf of the Detained Class, demand a trial by jury as to all those issues triable as of right.

Dated: March 20, 2023

Respectfully submitted,

Maria del Pilar Gonzalez Morales
Vanessa Domenichelli
Shubhra Shivpuri
Alyssa Martinez
Amelia Piazza
SOCIAL JUSTICE LEGAL
FOUNDATION
523 West 6th St., Suite 450
Los Angeles, CA 90014
T: 213-542-5241
F: 213-542-5241

- 53 -
COMPLAINT