UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

| Case No. | **EDCV 23-481 JGB (SHKx)** | Date | July 6, 2023 |
|---|---|---|---|
| Title | *Ligaya Ronduen et al. The Geo Group, Inc.* | | |

| Present: The Honorable | JESUS G. BERNAL, UNITED STATES DISTRICT JUDGE |
|---|---|

| MAYNOR GALVEZ | Not Reported |
|---|---|
| Deputy Clerk | Court Reporter |

| Attorney(s) Present for Plaintiff(s): | Attorney(s) Present for Defendant(s): |
|---|---|
| None Present | None Present |

**Proceedings:** Order (1) DENYING Defendant's Motion to Dismiss (Dkt. No. 23); and (2) VACATING the July 10, 2023 Hearing (IN CHAMBERS)

Before the Court is a motion to dismiss filed by Defendant The GEO Group, Inc. ("GEO" or "Defendant") pursuant to Federal Rules of Civil Procedure 12(b)(6) and 9(b). ("Motion," Dkt. No. 23.) The Court finds this matter appropriate for resolution without a hearing. See Fed. R. Civ. P. 78; L.R. 7-15. After considering the papers filed in support of and in opposition to the Motion, the Court **DENIES** the Motion. The Court **VACATES** the July 10, 2023 hearing.

## I.  BACKGROUND

On March 20, 2023, Plaintiffs Ligaya Ronduen, Carlos Castillo, Mariam Scheetz, Cesar Hernandez Carrillo, Wilfredo Gonzalez Mena, Somboon Phaymany, and Yolanda Mendoza (collectively, "Plaintiffs") filed a putative class action complaint against Defendant. ("Complaint," Dkt. No. 1.)  The Complaint asserts six causes of action on behalf of Plaintiffs and the putative class: (1) negligence, pursuant to Cal. Civ. Code § 1714(a); (2) battery; (3) premises liability, pursuant to Cal. Civ. Code § 1714(a); (4) concealment, pursuant to Cal. Civ. Code § 1710(3); (5) intentional misrepresentation, pursuant to Cal. Civ. Code § 1710(1); and (6) negligent misrepresentation, pursuant to Cal. Civ. Code § 1710(2).  (See id.)

On April 13, 2023, the parties filed a stipulation extending the time for Defendant to answer the Complaint.  (Dkt. No. 19.)

On May 12, 2023, Defendant filed the Motion. (Motion.) In support of the Motion, Defendant filed a declaration of Gabriel J. Padilla. ("Padilla Declaration," Dkt. No. 23-1.)

On June 2, 2023, Plaintiffs opposed the Motion. ("Opposition," Dkt. No. 27.) In support of the Opposition, Plaintiffs filed a request for incorporation by reference of documents ("Request," Dkt. No. 27-1) and two exhibits. ("Ex. 1," Dkt. No. 27-2; "Ex. 2," Dkt. No. 27-3.)[1]

On June 12, 2023, Defendant replied in support of the Motion. ("Reply," Dkt. No. 29.) The same day, Defendant filed an objection to Plaintiffs' Request. ("Objection to Request," Dkt. No. 30.)

On June 23, 2023, the Court continued the hearing on the Motion from June 26, 2023 to July 10, 2023. (Dkt. No. 31.)

## II. FACTUAL ALLEGATIONS

Plaintiffs allege the following facts, which are assumed to be true for the purposes of this Motion. See Am. Fam. Ass'n, Inc. v. City & Cnty. of San Francisco, 277 F.3d 1114, 1120 (9th Cir. 2002).

"This case seeks justice and accountability for individuals who were systematically poisoned, ignored, and left to suffer by a multi-billion-dollar corporation profiting from human captivity. Seven individuals currently and formerly detained at Adelanto Detention Center ('Adelanto' or 'the Facility') bring this lawsuit on their behalf and on behalf of the more than 1,300 other detained people harmed by [GEO's] improper use of a toxic chemical at Adelanto from February 2020 to April 2021." (Complaint ¶ 1.) GEO is a private company that manages and operates the Immigration and Customs Enforcement ("ICE") detention and processing facility in Adelanto, California. (Complaint ¶¶ 3, 29.) Plaintiffs and the putative class are or were civil immigration detainees held at Adelanto pending the outcome of their immigration proceedings. (Id. ¶ 30.) Plaintiffs include two individuals currently detained at Adelanto and five individuals who are former detainees of the Facility. (See id. ¶¶ 22-28.)

After the onset of the Covid-19 pandemic, between February 2020 and April 2021, GEO staff sprayed a red/pink toxic chemical called HDQ Neutral throughout Adelanto, approximately every 15 to 30 minutes, daily. (See id. ¶¶ 8, 56.) GEO had also used HDQ Neutral as a cleaning disinfectant before the Covid-19 pandemic had started, but beginning in February 2020, Defendant "significantly changed the manner and increased the frequency of its use . . . to a startling degree." (Id. ¶ 7.) "Defendant GEO's chemical spraying was a near-constant and invasive presence at Adelanto. GEO staff sprayed HDQ Neutral every 15 to 30 minutes from vats strapped to their backs and from smaller spray bottles. GEO staff sprayed this chemical into

---

[1] Although Exhibits 1 and 2 are consistently referenced throughout the Complaint and likely can be considered in ruling on the Motion by the incorporation by reference doctrine, they are also unnecessary for resolution of the Motion. As such, the Request is DENIED AS MOOT.

the air and onto all surfaces, including food contact surfaces, telephones, rails, door handles, bathrooms, showers, and sinks. GEO staff sprayed when people were eating, and the chemical mist would fall on their food. GEO staff sprayed at night, on or around the bunk beds and cells where people slept. And on at least one occasion, GEO staff sprayed individuals as a disciplinary measure." (Id. ¶ 8.)

"Due to their incessant, months-long exposure to HDQ Neutral, Plaintiffs and others detained at Adelanto experienced acute symptoms, including but not limited to persistent cough, irritation of the throat and nasal passages, skin irritation and rashes, and headaches." (Id. ¶ 9.) "The named Plaintiffs' experiences capture the horrific, but all too common, effects of exposure to HDQ Neutral. Various Plaintiffs had nosebleeds or found blood in their mouth and saliva. Others had debilitating headaches or felt dizzy and lightheaded. Several Plaintiffs have chronic, long-term health effects. All of them suffered anxiety during the months in which the chemical was sprayed at Adelanto." (Id. ¶ 10.)

HDQ Neutral is a highly toxic chemical that is "particularly dangerous because its two active components, DDAC and ADBAC1, have been linked to numerous, serious acute (short-term) and chronic (long-term) health effects." (Id. ¶ 37.) The Environmental Protection Agency ("EPA") "classifies five types of acute toxicity data (oral, dermal, inhalation, skin irritation, and eye irritation) into four Toxicity Categories, with Category 1 being the highest hazard. The EPA has categorized acute toxicity data for DDAC and ADBAC, the active components in HDQ Neutral, as Category 1 toxicity for skin and eye irritation, Category 2 for oral ingestion and inhalation, and Category 3 for dermal exposure." (Id. ¶ 38.) HDQ Neutral's manufacturer acknowledges that "inhalation of HDQ Neutral can result in nasal discomfort, nasal bleeding, coughing, sore throat, trouble breathing, and damage to the mucosal membrane of the respiratory tract. Skin contact can result in redness, blistering, and rashes. Ingestion can result in burns to the digestive tract, pain, nausea, vomiting, and diarrhea. Eye exposure can result in irritation, pain, redness, itchiness, swelling, and worsened vision." (Id. ¶ 39.) Reputable scientific sources have documented how DDAC and ADBAC are "correlated with severe skin irritation that can lead to skin sensitization or dermatitis, respiratory irritation and inflammation, chronic obstructive pulmonary disease, reproductive and developmental effects (including decreased fertility, disruption of hormone-regulated processes like ovulation, late-term fetal death, and birth defects, including neural tube defects), and genotoxicity—a serious hazard characterized by DNA damage and disrupted cellular function and regulation." (Id. ¶¶ 40-41.) HDQ Neutral's manufacturer, Spartan Chemical, "provides usage regulations, safety information, and other warnings regarding the use of HDQ Neutral, including Spartan Chemical's HDQ Neutral Safety Data Sheet (the 'Safety Data Sheet') and HDQ Neutral's Container Label (the 'Container Label')." (Id. ¶ 42.) These include specific instructions for use and a warning issued pursuant to EPA pesticide requirements of harms from improper use. (See id. ¶¶ 42-43.) Defendant has used HDQ Neutral for at least 10 years at Adelanto. (Id. ¶ 45.) "As manager and operator of Adelanto, GEO is responsible for ensuring its staff follows regulations, guidelines, and manufacturer safety warnings for the use of chemicals at the Facility to safeguard the health and welfare of the people in its custody." (Id. ¶ 46.) Defendant had access to all of this publicly available safety information, including instructions for proper use and the potential consequences

of using HDQ Neutral without protective equipment or without following its directions for use, and therefore knowingly poisoned Plaintiffs and the putative class by ignoring these warnings and instructions. (See id. ¶¶ 45-57.) "The EPA supports the instructions of the Safety Data Sheet and the Container Label by requiring users of chemicals intended to kill COVID-19 cells to use said chemicals on surfaces, NOT humans. Additionally, the EPA warns that fumigation and wide-area spraying of chemicals intended to kill COVID-19 cells are not appropriate. GEO was required to know and follow these EPA guidelines." (Id. ¶ 52.)

Defendant's use of HDQ Neutral went against its manufacturer's and regulators' safety guidelines, including through constant spraying indoors, improper dilution (diluting and applying HDQ neutral with a ratio of 2 ounces per gallon, when all available information indicated that it should be diluted with a ratio of 1 ounce per gallon, except for when used in animal pens as a virucidal disinfectant), failing to provide Personal Protective Equipment (PPE), and failing to train detained individuals on its proper use. (See id. ¶¶ 59, 63-93.) Plaintiffs were not aware that Defendant's use of HDQ Neutral went against these safety guidelines. (See id.) Plaintiffs and putative class members "had no control or say over where, how, or how often the chemical mixture was sprayed." (Id. ¶ 57.)

Plaintiffs reported to GEO and medical staff concerns about the frequency and manner in which GEO staff sprayed HDQ Neutral and the symptoms Plaintiffs experienced. (See, e.g., id. ¶¶ 97-99, 130, 155.) GEO staff ignored Plaintiffs' concerns, continued the constant spraying of HDQ Neutral, and repeatedly told Plaintiffs and other detained individuals that HDQ Neutral was necessary and required to prevent the spread of Covid-19. (See id. ¶¶ 94, 98, 136, 174, 201, 211.) Medical staff at Adelanto either ignored or failed to provide information and adequate medical care for the symptoms Plaintiffs experienced. (See id. ¶¶ 155-57, 180.)

"As news of COVID-19 reached the people detained at Adelanto—through their loved ones or their limited access to news sources—Defendant GEO placed the Facility in full lock down. Outside visitors (including attorneys) were banned, and movement within the Facility was severely curtailed. Even though Plaintiffs and other people detained at Adelanto were fully reliant on Defendant GEO for COVID-19 related updates, safety measures, and care, Defendant GEO provided little or no information to them." (Id. ¶ 6.) "Plaintiffs and others detained at Adelanto, alarmed at the amount and frequency in which HDQ Neutral was being sprayed, began complaining. But with little information about the pandemic, Plaintiffs and others had to rely on the assurances made by Defendant GEO that HDQ Neutral was a necessary and safe protective measure against COVID-19." (Id. ¶ 11.) "Detained people at Adelanto have no internet access in their dormitory or cell blocks, and access to the internet in the law library is limited to legal resources. Detained people must rely on GEO staff to provide newspapers to their block, or to turn on the television to a news channel. Several of the Plaintiffs and many members of the Detained Class speak limited or no English. For these reasons, they heavily relied on the information GEO staff was willing to share about COVID-19." (Id. ¶ 55.) Defendant did not provide Plaintiffs with safety information for HDQ Neutral, such as container labels, safety data sheets, or regulatory guidelines. (See id. ¶¶ 98, 102, 105.)

On July 29, 2020, the EPA conducted an inspection of Adelanto via videoconference due to concerns that GEO staff may have been using HDQ Neutral in an improper manner. (Id. ¶ 59.) The EPA documented its findings from its inspection in the EPA July 2020 Final Inspection Report ("EPA Report"). Following its inspection, the EPA issued a Notice of Warning to GEO, formalizing its findings and noting multiple violations of the Federal Insecticide, Fungicide and Rodenticide Act ("FIFRA"). (Id.) "The EPA Report and Notice of Warning were not made public until March 21, 2021, and were the first governmental and scientific finding publicly available about GEO's improper use of HDQ Neutral." (Id. ¶ 60.) "Despite the EPA's July 2020 inspection and warnings, GEO continued its dangerous and indiscriminate use of HDQ Neutral." (Id. ¶ 61.) Defendant never shared any of the EPA's findings regarding HDQ Neutral with Plaintiffs or members of the putative class. (Id. ¶ 105.)

Defendant lied about and obscured its use of HDQ Neutral and its adverse health effects to Plaintiffs and members of the putative class, in that "GEO—through its employees, supervisors, officers, and/or directors— instructed GEO staff to use and represent to Plaintiffs and members of the Detained Class that HDQ Neutral was safe and necessary to prevent COVID-19." (Id. ¶ 94.) When Plaintiffs and putative class members raised concerns, "GEO staff's responses to these concerns were all the same: refraining from providing any information at all regarding the dangers of exposure to HDQ Neutral, intentionally dismissing valid concerns, and misrepresenting HDQ Neutral as the only safe available disinfectant against COVID-19." (Id. ¶ 96.) "For example, Plaintiffs Scheetz and Gonzalez Mena asked GEO staff to stop spraying the chemical when people were eating or sleeping in their cells. Their requests were ignored and GEO staff told them that GEO had to continue spraying during every round to prevent the spread of COVID-19." (Id. ¶ 97.) "Plaintiff Hernandez asked GEO staff about the safety of spraying the chemical mixture. GEO staff refused to provide information and misrepresented to him that the constant spraying was necessary to prevent the spread of COVID-19. Plaintiff Hernandez even raised his concerns to a GEO supervisor but, like Plaintiffs Sheetz and Gonzalez Mena, he was dismissed and told only that the frequent spraying was due to COVID-19." (Id. ¶ 98.)

"Instead of warning Plaintiffs and members of the Detained Class that HDQ Neutral was dangerous, GEO *concealed* the dangers of HDQ Neutral and GEO's wrongful use of the product." (Id. ¶ 100.) "GEO staff would provide spray bottles of HDQ Neutral with no labeling, meaning that Plaintiffs and members of the [putative class] were not informed of the risk posed by the chemical mixture or how to ameliorate its harm." (Id. ¶ 101.) "GEO also stored large HDQ Neutral containers which they used to fill up the smaller spray bottles." GEO staff at times removed the HDQ Neutral container label from these larger containers. (Id. ¶ 102.) When containers had a label, it was only in English, which many Plaintiffs and class members did not understand. GEO never provided translations of the labels. (Id. ¶ 103.) Plaintiffs and putative class members "witnessed multiple inspections at Adelanto during which GEO staff would hide bottles of HDQ Neutral." (Id. ¶ 104.)

"Like the rest of the staff at Adelanto, medical staff disregarded the concerns of the [putative class] members about the red/pink chemical mixture." (Id. ¶ 107.) "For example,

Plaintiff Castillo was told by a medical staff member that the medical staff member had no knowledge of the chemical spray, even though it was being used throughout the entire facility. On at least one other occasion, a member of the [putative class] was mocked by the medical staff over his concerns regarding the chemical spray." (Id. ¶ 108.) Medical staff also "knowingly and incorrectly" attributed putative class members' "symptoms to causes not involving HDQ Neutral," such as allergies. (Id. ¶¶ 108, 156.) Plaintiffs and putative class members' access to outside medical care was even more restricted during the pandemic, forcing them to "rely on the statements and actions of the Adelanto medical staff to assess the risk of HDQ Neutral exposure." (Id. ¶ 110.)

### III.   LEGAL STANDARD

**A.   Rule 12(b)(6)**

Under Federal Rule of Civil Procedure 12(b)(6) ("Rule 12(b)(6)"), a party may bring a motion to dismiss for failure to state a claim upon which relief can be granted. Rule 12(b)(6) must be read in conjunction with Federal Rule of Civil Procedure 8(a), which requires a "short and plain statement of the claim showing that a pleader is entitled to relief," in order to give the defendant "fair notice of what the claim is and the grounds upon which it rests." Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 555 (2007); see Ileto v. Glock Inc., 349 F.3d 1191, 1199-1200 (9th Cir. 2003). When evaluating a Rule 12(b)(6) motion, a court must accept all material allegations in the complaint—as well as any reasonable inferences to be drawn from them—as true and construe them in the light most favorable to the non-moving party. See Doe v. United States, 419 F.3d 1058, 1062 (9th Cir. 2005); ARC Ecology v. U.S. Dep't of Air Force, 411 F.3d 1092, 1096 (9th Cir. 2005); Moyo v. Gomez, 32 F.3d 1382, 1384 (9th Cir. 1994). Courts are not required, however, "to accept as true allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences." In re Gilead Scis. Sec. Litig., 536 F.2d 1049, 1055 (9th Cir. 2008) (internal citation and quotation omitted). Courts also need not accept as true allegations that contradict facts which may be judicially noticed. See Mullis v. U.S. Bankr. Court, 828 F.2d 1385, 1388 (9th Cir. 1987).

"While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the 'grounds' of his 'entitlement to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." Twombly, 550 U.S. at 555 (citations omitted). Rather, the allegations in the complaint "must be enough to raise a right to relief above the speculative level." Id.

To survive a motion to dismiss, a plaintiff must allege "enough facts to state a claim to relief that is plausible on its face." Id. at 570; Ashcroft v. Iqbal, 556 U.S. 662 (2009). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully. Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it stops short of the line between possibility and plausibility of 'entitlement to relief.'" Iqbal, 556 U.S. at 678 (quoting Twombly, 550 U.S. at 556). The Ninth Circuit has clarified that (1) a complaint must "contain sufficient allegations of

underlying facts to give fair notice and to enable the opposing party to defend itself effectively," and (2) "the factual allegations that are taken as true must plausibly suggest an entitlement to relief, such that it is not unfair to require the opposing party to be subjected to the expense of discovery and continued litigation." Starr v. Baca, 652 F.3d 1202, 1216 (9th Cir. 2011).

### B. Rule 9(b)

Federal Rule of Civil Procedure 9(b) ("Rule 9(b)") imposes a heightened pleading standard where a complaint alleges fraud or mistake. Fed. R. Civ. P. 9(b). "In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake. Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally." Id. To state a claim for fraud, a party must plead with "particularity the circumstances constituting the fraud," and the allegations must "be specific enough to give defendants notice of the particular misconduct . . . so that they can defend against the charge and not just deny that they have done anything wrong." Kearns v. Ford Motor Co., 567 F.3d 1120, 1124 (9th Cir. 2009) (internal citation and quotation omitted). "Averments of fraud must be accompanied by 'the who, what, when, where, and how' of the misconduct charged." Vess v. Ciba-Geigy Corp., 317 F.3d 1097, 1106 (9th Cir. 2003) (quoting Cooper v. Pickett, 137 F.3d 616, 627 (9th Cir. 1997)).

### IV. DISCUSSION

Defendant raises two primary arguments in the Motion: the claims of Plaintiffs Scheetz, Mena, Phaymany and Mendoza are barred by the applicable statutes of limitations, and all Plaintiffs fail to plead with particularity their causes of action based on deceit and fraud, claims four, five and six. (See Motion.) The Court addresses these arguments in turn.

### A. Statutes of Limitations

Plaintiffs bring six causes of action raising theories of negligence, battery, premises liability and deceit. (See Complaint.) The parties dispute which of California's statutes of limitations apply to these claims. Defendant argues that all of Plaintiffs' theories are personal injury claims arising out of their exposure to HDQ Neutral, which makes California Code of Civil Procedure § 335.1 and its two-year clock the applicable statute of limitations. See Cal. Code Civ. P. § 335.1 ("Within two years: An action for assault, battery, or injury to, or for the death of, an individual caused by the wrongful act or neglect of another."); Klein v. City of Beverly Hills, 865 F.3d 1276, 1278 (9th Cir. 2017). Plaintiffs agree that a two-year statute of limitations applies to their negligence, battery and premises liability claims, although they believe California Code of Civil Procedure § 340.8 governs, for that statute applies "in any civil action for injury or illness based upon exposure to a hazardous material or toxic substance[.]" Cal. Code. Civ. P. § 340.8. Although it makes little difference to the outcome, the Court agrees with Plaintiffs that Section 340.8 applies, for its specific language more directly maps onto the substantive nature of Plaintiffs' claims, even though their general theories of liability involve battery and negligence. See Nelson v. Indevus Pharm., Inc., 142 Cal. App. 4th 1202, 1209 (2006) (holding that Cal. Civ.

Proc. Code § 340.8 "under its plain meaning applies to cases which allege personal injury caused by harmful chemicals.").

"Generally, a personal injury claim accrues[,] and the period of limitations commences when a wrongful act takes place." Sidney-Vinstein v. A.H. Robins Co., 697 F.2d 880, 882 n.1 (9th Cir. 1983) (citation omitted). In California, a personal injury action would ordinarily accrue "on the date of the injury" and therefore would have to be brought within two years of that date, unless the statute of limitations is tolled. See Goldrich v. Natural Y Surgical Specialties, Inc., 25 Cal. App. 4th 772, 779 (1994). As the parties agree, Section 340.8 incorporates the delayed discovery rule through its plain language, for it states that "the time for commencement of the action shall be no later than either two years from the date of injury, or two years after the plaintiff becomes aware of, or reasonably should have become aware of, (1) an injury, (2) the physical cause of the injury, and (3) sufficient facts to put a reasonable person on inquiry notice that the injury was caused or contributed to by the wrongful act of another, whichever occurs later." Cal. Code. Civ. P. § 340.8(a). California's delayed discovery rule "postpones accrual of a cause of action until the plaintiff discovers, or has reason to discover, the cause of action." Fox v. Ethicon Endo-Surgery, Inc., 35 Cal. 4th 797, 807 (2005). Where the rule applies, the statute of limitations does not begin to run until the plaintiff "suspects or should suspect that her injury was caused by wrongdoing, that someone has done something wrong to her," whereafter she is "held to her actual knowledge as well as knowledge that could reasonably be discovered through investigation of sources open to her." Jolly v. Eli Lilly & Co., 44 Cal. 3d 1103, 1109-10 (1988). If a reasonable investigation would not reveal the factual basis for a cause of action, the claim does not accrue. Fox, 35 Cal. 4th at 803. Moreover, discovery of the *factual* cause of a plaintiff's injury does not trigger the statute of limitations by itself; an investigation must reveal a *tortious* cause. See Jolly, 44 Cal. 3d at 1109, 1109 n.4 (explaining that the plaintiff must be aware of both injury and negligent cause). A plaintiff that invokes the delayed discovery rule "must specifically plead facts to show (1) the time and manner of discovery; and (2) the inability to have made earlier discovery despite reasonable diligence." Fox, 35 Cal. 4th at 808 (internal quotations and citation omitted). Whether the delayed discovery rule applies is a question of fact, while a court cannot decide as a matter of law at what point an investigation would have revealed the factual basis for a claim unless the allegations in a complaint can support only one reasonable conclusion. See E-Fab, Inc. v. Accountants, Inc. Servs., 153 Cal. App. 4th 1308, 1320, 1325-26 (2007); Broberg v. The Guardian Life Ins. Co. of Am., 171 Cal. App. 4th 912, 921 (2009).

The parties also debate which statute of limitations applies to Plaintiffs' claims involving fraud and deceit. According to Plaintiffs, California Code of Civil Procedure § 338(d) and its three-year statute of limitations applies to their fourth, fifth and sixth cause of action, for that statute encompasses "[a]n action for relief on the ground of fraud or mistake," wherein "[t]he cause of action in that case is not deemed to have accrued until the discovery, by the aggrieved party, of the facts constituting the fraud or mistake." Cal. Code. Civ. P. § 338(d). Defendant asserts that Section 340.8 and its two-year clock applies, as its plain language references "*any* civil action for injury or illness based upon exposure to a hazardous material or toxic substance," Cal. Code. Civ. P. § 340.8(a) (emphasis added), while courts have applied it in certain fraud

actions. See, e.g., Nguyen v. Western Digital Corp., 229 Cal. App. 4th 1522, 1551 (2014) (applying § 340.8 to fraudulent concealment claims). The Court assumes without deciding that Defendant is correct and that the shorter two-year period applies. Even so, Section 340.8 and the delayed discovery rule render Plaintiffs' claims timely.

Plaintiffs filed their Complaint on March 20, 2023. (Complaint.) Mr. Phaymany alleges that he was detained at Adelanto until April 2020, Ms. Scheetz until August 2020, Mr. Mena until September 2020, and Ms. Mendoza through October 2020. (See id. ¶¶ 161, 207, 207, 217.) The central question is thus whether Plaintiffs have filed suit "no later than either two years from the date of injury, or two years after the plaintiff becomes aware of, or reasonably should have become aware of, (1) an injury, (2) the physical cause of the injury, and (3) sufficient facts to put a reasonable person on inquiry notice that the injury was caused or contributed to by the wrongful act of another, whichever occurs later." Cal. Code. Civ. P. § 340.8(a); see also Fox, 35 Cal. 4th at 807. In the Court's view, this is the paradigmatic case for application of the delayed discovery rule: according to the allegations in the Complaint, Plaintiffs operated at a near total information deficit regarding the cause of their injuries, whereas Defendant knew or should have known it was harming Plaintiffs by misusing HDQ Neutral, and then took multiple affirmative steps to prevent Plaintiffs from discovering the nature of their claims. Although the Complaint could have made this point more explicitly, the only reasonable inference from it is that Plaintiffs were first on inquiry notice of Defendant's allegedly tortious conduct when the EPA Report was publicly released on March 21, 2021. (See Complaint ¶ 60) ("The EPA Report and Notice of Warning were not made public until March 21, 2021, and were the first governmental and scientific finding publicly available about GEO's improper use of HDQ Neutral."). The EPA found, among other things, that GEO's improper dilution of HDQ Neutral was a violation of FIFRA. (See, e.g., id. ¶ 93.) Plaintiffs have plead in significant detail how and why they were unable to discover the nature and extent of Defendant's allegedly tortious conduct prior to the release of the EPA Report, despite reasonable diligence.

As outlined in greater detail above (see Section II), Plaintiffs allege, in sum, that (1) Plaintiffs had virtually no access to outside information while detained at Adelanto, due both to the inherent nature of their confinement and the special restrictions placed on visitors and movement during COVID-19; (2) Plaintiffs could not access the internet to discover information related to COVID-19, HDQ Neutral or any related matters; (3) GEO provided virtually no information to them about COVID-19 or safety measures to prevent its spread; (4) Defendant repeatedly told Plaintiffs that its use of HDQ Neutral was safe and necessary; (5) language barriers prevented the transmission of information regarding HDQ Neutral, while Defendant made no effort to translate any materials that could have apprised them of its proper use; (6) Defendant never provided Plaintiffs with safety information for HDQ Neutral, such as container labels, safety data sheets, or regulatory guidelines; (7) not only did Defendant fail to provide relevant safety information, but its staff took affirmative steps to *prevent* Plaintiffs from accessing information that would otherwise exist, e.g., by removing labels from containers so that Plaintiffs could not see their safety instructions or proper dilution ratios; (8) Defendant did not provide Plaintiffs with training on how to safely use HDQ Neutral or inform them that it could only be safely used when wearing PPE; (9) Defendant did not share any information with Plaintiffs

regarding inspections by the EPA or its findings; (10) Plaintiffs were never informed that Defendant's use of HDQ Neutral was inconsistent with safety guidelines; and (11) when Plaintiffs approached medical staff with their concerns that HDQ Neutral may have caused adverse health effects, GEO medical employees denied any causal link and told Plaintiffs that any symptoms they were experiencing were attributable to other causes. Plaintiffs' allegations suggest they may have suspected that the constant spraying of HDQ Neutral played some role in causing symptomatic injuries, but they lacked the necessary information to comprehend the nature of Defendant's allegedly tortious conduct, i.e., the cause and effect between the *improper* use of HDQ Neutral and the injuries they suffered. Plaintiffs also allege reasonable diligence, for they allege both in general terms and through specific examples how they complained to Defendant about the use of HDQ Neutral and attempted to gather more information about its use. Without exception, Defendant's employees, purportedly acting upon instructions from management, stonewalled Plaintiffs' inquiries, refused to provide information, and misrepresented to them that the way GEO was using HDQ Neutral was safe and necessary to prevent the spread of COVID-19. Moreover, as further noted below, Plaintiffs allege in significant detail that GEO knew the use of HDQ Neutral was improper and was causing harm, and nevertheless continued its spraying practices long after any reasonable entity would have stopped. Plaintiffs allege, for example, that GEO staff hid bottles of HDQ Neutral from inspectors on multiple occasions. (Id. ¶ 104.) Even after the EPA inspected GEO in July 2020 and warned Defendant that it was using HDQ Neutral improperly, "GEO continued its dangerous and indiscriminate use of HDQ Neutral." (Id. ¶ 61.)

As alleged in the Complaint, the nature of Plaintiffs' claims thus fall within the heartland of delayed discovery cases:

> A common thread seems to run through all the types of actions where courts have applied the discovery rule. The injury or the act causing the injury, or both, have been difficult for the plaintiff to detect. In most instances, in fact, the defendant has been in a far superior position to comprehend the act and the injury. And in many, the defendant had reason to believe the plaintiff remained ignorant he had been wronged. Thus, there is an underlying notion that plaintiffs should not suffer where circumstances prevent them from knowing they have been harmed. And often this is accompanied by the corollary notion that defendants should not be allowed to knowingly profit from their injuree's ignorance.

Apr. Enterprises, Inc. v. KTTV, 147 Cal. App. 3d 805, 831 (Ct. App. 1983). Every one of these circumstances is present in the facts alleged here, for Plaintiffs were unable to detect the nature of the torts against them, Defendant was in a far superior position to comprehend the risks of misusing HDQ Neutral, Defendant was put on notice of the injuries it was potentially causing by Plaintiffs' frequent complaints, and Defendant refused to do anything about them. Moreover, as Plaintiffs repeatedly allege, even if they suspected that HDQ Neutral may have been causing harm in some way, they were forced to rely upon, and did rely upon, Defendant's constant

assurances that the use of HDQ Neutral was safe and necessary, and repeated denials that HDQ Neutral could have been the reason they experienced symptoms such as coughing and irritation. Courts have found that official notices informing plaintiffs they may have been exposed to toxic substances do not support a finding as a matter of law that the plaintiffs should have suspected contaminants posed a risk to their health, wherein the notices did not inform them that the "exposure to the contamination might be harmful to their health" and the disclosures "contained additional information suggesting the opposite." Alexander v. Exxon Mobil, 219 Cal. App. 4th 1236, 1259 (2013). Where Plaintiffs first learned from an authoritative government source that Defendant's use of HDQ Neutral was potentially dangerous and harmful when the EPA Report was released publicly on March 21, 2021, and the only message Plaintiffs received from Defendant prior to that date suggested the opposite, Plaintiffs could not have been on inquiry notice before March 21, 2021. To dismiss Plaintiffs' claims under the statute of limitations, at least at the pleadings stage, would simply allow Defendant to "knowingly profit from their injuree's ignorance." Apr. Enterpises, 147 Cal. App. 3d at 831. The delayed discovery rule does not allow them to do so. Since Plaintiffs learned of their injury, the cause of their injury, and Defendant's role in causing their injury no earlier than March 21, 2021, and they filed suit on March 20, 2023, their claims fall within the two-year statute of limitations.[2] The Motion is DENIED as to Defendant's statute of limitations defense.

## B. Adequacy of Fraud Allegations

Plaintiffs bring three causes of action asserting different theories of fraudulent deceit: concealment, pursuant to Cal. Civ. Code § 1710(3) (fourth cause of action); intentional misrepresentation, pursuant to Cal. Civ. Code § 1710(1) (fifth cause of action); and negligent misrepresentation, pursuant to Cal. Civ. Code § 1710(2) (sixth cause of action). (See Complaint.) At the outset, the Court rejects Defendant's threshold argument, which is that Plaintiffs' failure to specifically invoke Cal. Civ. Code § 1709 in the Complaint, in addition to Section 1710, defeats their claims. As Defendant notes, Section 1709 ("Deceit; Damages") arguably does create a cause of action for deceit, in that it states, "[o]ne who willfully deceives another with intent to induce him to alter his position to his injury or risk, is liable for any damage which he thereby suffers." Cal. Civ. Code § 1709. Section 1710 ("Deceit Defined") defines deceit as "either" one of four things, e.g., "[t]he suggestion, as a fact, of that which is not true, by one who does not believe it to be true," Cal. Civ. Code § 1710(1), commonly known as intentional misrepresentation. Whereas Section 1709 establishes the cause of action generally, Section 1710 provides four separate theories of deceit. Both California courts and courts within the Ninth Circuit have found the two statutes to be inextricably linked, and have either used them interchangeably or found that they both applied to specific causes of action for deceit. See, e.g., Bily v. Arthur Young & Co., 3 Cal. 4th 370, 414 (1992), as modified (Nov. 12, 1992) ("In California, the elements of the misrepresentation torts (which are also denominated forms of 'deceit') are prescribed by statute (§§ 1572; 1710) and our common law tradition."); Ventura

---

[2] Because the delayed discovery rule applies, the Court declines to reach Plaintiffs' additional argument for tolling of the statute of limitations, Defendant's purported fraudulent concealment. (See Opposition at 7-9.)

Cnty. Nat. Bank v. Macker, 49 Cal. App. 4th 1528, 1529 (1996) (discussing a cause of action for negligent misrepresentation as arising under Section 1710, without mentioning Section 1709); Metro. Bus. Mgmt., Inc. v. Allstate Ins. Co., 282 F. App'x 544, 546 (9th Cir. 2008) ("The California Civil Code recognizes causes of action for 'actual fraud' and 'fraudulent deceit.' Cal. Civ. Code §§ 1572, 1709–1710."); Dodaro v. Standard Pac. Corp., 2012 WL 12948706, at *11 n.8 (C.D. Cal. Mar. 26, 2012) ("Sections 1709 and 1710 create liability for the act of 'fraudulent deceit'"). While it may have been better if Plaintiffs had also labelled each claim as arising under Section 1709 in addition to Section 1710, it is not erroneous to have cited only the latter in the Complaint. Moreover, Defendants were not deprived of fair notice of Plaintiffs' claims, for they clearly understood Plaintiffs' intent to bring three distinct conceit claims, and argued at length why Plaintiffs had failed to sufficiently plead them. (See Motion at 6-11.)

In California, "[t]he elements of fraud, which give rise to the tort action for deceit, are (1) a misrepresentation, (2) with knowledge of its falsity, (3) with the intent to induce another's reliance on the misrepresentation, (4) justifiable reliance, and (5) resulting damage." Conroy v. Regents of Univ. of California, 45 Cal. 4th 1244, 1255 (2009) (citing Small v. Fritz Cos., Inc., 30 Cal. 4th 167, 173 (2003)); see also Robinson Helicopter Co. v. Dana Corp., 34 Cal. 4th 979, 990 (2004); Lazar v. Superior Court, 12 Cal. 4th 631, 638 (1996); 5 Witkin, Cal. Procedure (5th ed. 2008) Pleading, § 710, p. 125 ("The essential allegations of a cause of action of deceit are: representation, falsity, knowledge of falsity, intent to deceive, and reliance and resulting damage (causation)"). A plaintiff must "establish a complete causal relationship" between the alleged misrepresentations and the harm claimed to have resulted therefrom. OCM Principal Opportunities Fund, L.P. v. CIBC World Markets Corp., 157 Cal. App. 4th 835, 864 (2007). The plaintiff must have undertaken a detrimental action in actual reliance on the defendant's misrepresentation and show that the detrimental action caused his alleged damage. Beckwith v. Dahl, 205 Cal. App. 4th 1039, 1062 (2012). California courts have refined these elements for each of Plaintiffs' specific causes of action asserting theories of deceit.

To state a claim for fraudulent concealment, Plaintiffs must allege "1) concealment or suppression of a material fact; (2) by a defendant with a duty to disclose the fact to the plaintiff; (3) the defendant intended to defraud the plaintiff by intentionally concealing or suppressing the fact; (4) the plaintiff was unaware of the fact and would not have acted as he or she did if he or she had known of the concealed or suppressed fact; and (5) plaintiff sustained damage as a result of the concealment or suppression of the fact." Hambrick v. Healthcare Partners Med. Grp., Inc., 238 Cal. App. 4th 124, 162 (2015), reh'g denied (June 17, 2015), review denied (Sept. 30, 2015).

"To establish a claim for deceit based on intentional misrepresentation, the plaintiff must prove seven essential elements: (1) the defendant represented to the plaintiff that an important fact was true; (2) that representation was false; (3) the defendant knew that the representation was false when the defendant made it, or the defendant made the representation recklessly and without regard for its truth; (4) the defendant intended that the plaintiff rely on the representation; (5) the plaintiff reasonably relied on the representation; (6) the plaintiff was harmed; and (7) the plaintiff's reliance on the defendant's representation was a substantial factor

in causing that harm to the plaintiff." Manderville v. PCG&S Grp., Inc., 146 Cal. App. 4th 1486, 1498 (2007).

Negligent misrepresentation is a "species of the tort of deceit" that does not require intent to defraud. Conroy, 45 Cal. 4th at 1255. It only requires an assertion of a fact which is not true by a party who has no reasonable grounds to believe the assertion's truth. Id. Thus, a cause of action for negligent misrepresentation has the same elements of intentional fraud, "with the exception that there is no requirement of intent to reduce reliance . . . ." Tenet Healthsystem Desert, Inc. v. Blue Cross of California, 245 Cal. App. 4th 821, 845 (2016) (citing Small, 30 Cal. 4th at 173); see also Charnay v. Cobert, 145 Cal. App. 4th 170, 184 (2006).

Plaintiffs alleging claims for fraud or mistake "must state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b). However, "[m]alice, intent, knowledge, and other conditions of a person's mind may be alleged generally." Id. The particularity requirement applies to state-law claims and to claims that are "grounded in fraud" or that "sound in fraud," regardless of whether fraud is an essential element of the claim. Vess, 317 F.3d at 1103. "To satisfy Rule 9(b), a pleading must identify 'the who, what, when, where, and how of the misconduct charged,' as well as 'what is false or misleading about [the purportedly fraudulent] statement, and why it is false.'" Cafasso, U.S. ex rel. v. Gen. Dynamics C4 Sys., Inc., 637 F.3d 1047, 1055 (9th Cir. 2011) (citations omitted). "Where a fraudulent omission is at issue, the requirements of Rule 9(b) are relaxed, but not eliminated." UMG Recordings, Inc. v. Glob. Eagle Entm't, Inc., 117 F. Supp. 3d 1092, 1107 (C.D. Cal. 2015) (citation omitted); see also Baggett v. Hewlett-Packard Co., 582 F. Supp. 2d 1261, 1267 (C.D. Cal. 2007) ("[A] fraud by omission or fraud by concealment claim can succeed without the same level of specificity required by a normal fraud claim.") (internal citation and quotation omitted).

Defendant claims that Plaintiffs' "bare-boned allegations" are insufficient to support their deceit actions. (Motion at 10.) The argument is disingenuous, for Defendant cites only to the paragraphs in the Complaint directly under causes of action four, five and six, while ignoring the 250 preceding paragraphs incorporated by reference therein. (See id. at 10-12; Complaint.) Over the course of their 53-page Complaint, Plaintiffs plausibly allege each of the elements of their deceit claims with more than enough factual detail to satisfy the strictures of Rule 12(b)(6) and the particularity required by Rule 9(b).

Plaintiffs have alleged multiple misrepresentations, or false representations of material facts. They plead misrepresentations made by Defendant's staff about the specific characteristics of HDQ Neutral and its proper use, including that Defendant's constant spraying of HDQ Neutral in the manner it was applied was required and necessary to prevent COVID-19, when a court could find that Defendant's use of the chemical was discretionary, improper, and potentially even ineffective. (See, e.g., Complaint ¶¶ 94-98, 107-110, 130, 136, 174, 202, 211.) Plaintiffs allege that Defendant's employees lied on multiple occasions, including claiming to EPA inspectors that HDQ Neutral was not sprayed inside cells or bunks and that GEO staff provided safety googles to immigrants detained at Adelanto; those statements were not true. (See id. ¶¶ 114, 116.) At a Congressional oversight hearing and during the July 19, 2020 EPA

inspection, Defendant's CEO and Adelanto's Warden both misrepresented that GEO staff exercised the proper degree of care while using HDQ Neutral and followed regulatory guidelines, when a court could find those representations to be false.  (See id. ¶¶ 113-118.)

Plaintiffs "need not allege [GEO] made an intentionally false statement, but simply one as to which [it] lacked any reasonable ground for believing the statement to be true" to state a claim for negligent misrepresentation.  Charnay, 145 Cal. App. 4th at 184.  To state a claim for intentional misrepresentation, Plaintiffs can allege that "the defendant knew that the representation was false when the defendant made it, or the defendant made the representation recklessly and without regard for its truth."  Manderville, 146 Cal. App. 4th at 1498.  Plaintiffs plausibly allege that Defendant acted with knowledge of falsity in the form of at least reckless disregard for the truth.  They allege that Defendant had used HDQ Neutral for over 10 years, an ample period of time to amass information about the costs and benefits of its use and the need to use it carefully if it was to be used at all.  (See Complaint ¶ 45.)  They allege in significant detail that Defendant knew of all the publicly available information regarding the risks of using HDQ Neutral improperly, knew that it was using HDQ Neutral improperly, and to cover up its improper use, made misrepresentations to hide its improper use.  (See, e.g., id. ¶¶ 45-52, 58-62, 88-93, 94, 98, 111-119, 121, 130, 136, 202, 211.)  Defendant is a large corporation providing services in a highly regulated environment, and can be charged with notice of applicable safety regulations.  Even if not, Plaintiffs' allegations that GEO had significant knowledge about HDQ Neutral are more than plausible, not least because the safety information and warnings were listed on every container that Defendant purchased.  The many specific deceptive acts Plaintiffs allege in the Complaint of lying and covering up the scope of Defendant's use of HDQ Neutral further demonstrate knowledge of the falsity of its safety-related representations.

Plaintiffs adequately plead intent to induce reliance and justifiable or reasonable reliance on Defendant's misrepresentations.  "An 'intent to deceive' is not an essential element of the cause of action," for "the required intent is an intent to induce action."  Beckwith, 205 Cal. App. 4th at 1062 (citations and internal quotation marks omitted).  This requirement can also be framed as an intent to induce *inaction*.  See id. ("Beckwith's complaint alleged Dahl made promises to him with the intent to induce him to take the action of holding off on presenting MacGinnis with the will.  Beckwith sufficiently pled the element of intent.").  Intent may often be inferred from a defendant's subsequent conduct, Petersen v. Allstate Indem. Co., 281 F.R.D. 413, 419 (C.D. Cal. 2012), including subsequent misrepresentations designed to cover up earlier allegedly fraudulent conduct.  Cf. United States v. Brugnara, 856 F.3d 1198, 1208 (9th Cir. 2017) (discussing use of circumstantial evidence to establish specific intent to defraud in criminal context).  The allegations in the Complaint and the reasonable inferences that can be drawn from them are sufficient to show intent to induce reliance, in that Defendant likely did not want Plaintiffs and members of the putative class to complain about the use of HDQ Neutral, contact outside authorities (including government inspectors), file grievances, seek legal counsel, or demand independent medical care; those representations did, in turn, lead Plaintiffs to take action, or to refrain from action.  (See, e.g., Complaint ¶ 121) ("Some Plaintiffs joined or remained as part of the cleaning crew, others stopped filing grievances, and all of them refrained from seeking legal counsel or independent medical care because they could not know GEO was

lying about its improper use of the chemical mixture."). A plaintiff must allege "facts to show that his or her actual reliance on the representations was justifiable, so that the cause of the damage was the defendant's wrong and not the plaintiff's fault." Beckwith, 205 Cal. App. 4th at 1066 (citation omitted). Plaintiffs allege that they were forced to rely upon Defendant's statements and that they were justified in relying upon those misrepresentations, some of which came from authoritative sources like medical staff. They allege that they experienced symptomatic injuries; attempted to engage GEO and medical staff; GEO staff ignored their complaints; medical staff dismissed their complaints and, in several instances, told them their symptoms were not caused by HDQ Neutral, but were caused by allergies or other sources; and they had no other sources of information that could have informed them of the truth. (See, e.g., Complaint ¶¶ 14-15, 95-99, 106-109, 129-131, 135, 149, 153-157, 174, 180-182, 202-203, 236, 238.) These allegations demonstrate justifiable reliance.

Plaintiffs also adequately plead that their damages were "caused by the actions [they] took in reliance on [D]efendant's misrepresentations." Beckwith, 205 Cal. App. 4th at 1064 (citation omitted). They allege damages in the form of acute and chronic physical injuries, emotional injuries, and medical bills. (See, e.g., Complaint ¶¶ 120-239, 294-295, 304-305, 314-15.) The Complaint alleges that but for Defendant's misrepresentations, Plaintiffs would have acted differently, including removing themselves from the cleaning crew that gave them increased exposure to HDQ Neutral, filing grievances, and seeking independent medical care or legal advice. (See id. ¶¶ 121, 138, 149, 166, 219, 293, 306, 316.) There are no obvious intervening causes that would break the causal chain between Defendant's misrepresentations and the harms allegedly suffered by Plaintiffs.

Plaintiffs state a claim for fraudulent concealment for the reasons stated above, and because they properly allege that Defendant had a duty to close materials facts to them. See Hambrick, 238 Cal. App. 4th at 162. "There are 'four circumstances in which nondisclosure or concealment may constitute actionable fraud: (1) when the defendant is in a fiduciary relationship with the plaintiff; (2) when the defendant had exclusive knowledge of material facts not known to the plaintiff; (3) when the defendant actively conceals a material fact from the plaintiff; and (4) when the defendant makes partial representations but also suppresses some material facts.'" LiMandri v. Judkins, 52 Cal. App. 4th 326, 336 (1997) (citation omitted). As already noted at some length, Plaintiffs adequately allege that Defendant had exclusive knowledge of facts not known to them, concealed material facts, and made misleading partial representations. (See, e.g., ¶¶ 6, 11, 94, 96, 98, 36-91, 100-105, 111-119, 121, 130, 136, 174, 202, 211, 242.)[3]

Plaintiffs have also satisfied Rule 9(b). "Perhaps the most basic consideration for a federal court in making a judgment as to the sufficiency of a pleading for purposes of Rule 9(b) . . . is the determination of how much detail is necessary to give adequate notice to an adverse party and enable that party to prepare a responsive pleading." United States v. United Healthcare Ins. Co., 848 F.3d 1161, 1180 (9th Cir. 2016) (citation omitted). "Broad allegations that include no particularized supporting detail do not suffice, but 'statements of the time, place and nature of

---

[3] The Court need not assess the existence of a fiduciary relationship.

the alleged fraudulent activities are sufficient[.]'" Id. (citation omitted). "Because this standard 'does not require absolute particularity or a recital of the evidence,' a complaint need not allege 'a precise time frame,' 'describe in detail a single specific transaction' or identify the 'precise method' used to carry out the fraud[.]" Id. (citations omitted). As outlined above, Plaintiffs have identified the who, what, when, where, and how of the misconduct charged; what is false or misleading about Defendant's representations; and why they are false. See Cafasso, 637 F.3d at 1055.

Defendant complains that Plaintiffs fail to identify specific GEO staff by name and therefore do not meet the "who" requirement of Rule 9(b). The "who" is GEO, by and through the acts of its employees. Where fraud is alleged against a corporate entity like Defendant, Rule 9(b) is satisfied either by alleging the "names of the employees or agents who purportedly made the fraudulent representations or omissions" *or* by "identify[ing] them by their titles and/or job responsibilities." Umg Recordings, 117 F. Supp. 3d at 1108. The Ninth Circuit has recognized an exception to Rule 9(b) where "the facts constituting the circumstances of the alleged fraud are peculiarly within the defendant's knowledge or are readily obtainable by him" and has "held that the general rule that allegations of fraud based on information and belief do not satisfy Rule 9(b) may be relaxed with respect to matters within the opposing party's knowledge. In such situations, plaintiffs cannot be expected to have personal knowledge of the relevant facts." Neubronner v. Milken, 6 F.3d 666, 672 (9th Cir. 1993). Under the circumstances, the Court finds that Plaintiffs have done all they can to satisfy Rule 9(b)'s particularity requirements, and that Defendant has received fair notice of the allegedly fraudulent acts of its employees. Plaintiffs have named GEO's CEO, George Zoley, and Adelanto's Warden, James Janecka, by name in the Complaint, as well as other staff members by title and role, including supervisors, GEO staff, and medical staff. (See, e.g., Complaint ¶¶ 7-8, 13, 29, 56, 58, 62, 68-76, 92, 94-105, 111-18, 120-239.) Plaintiffs are unlikely to know the names of the individual staff members alleged to have made certain misrepresentations at this stage of the proceedings, but the identifying information concerning the GEO staff who worked at Adelanto during the relevant time period and were responsible for the conduct pertaining to HDQ Neutral is information within Defendant's knowledge or can easily be obtained by it. See Neubronner, 7 F.3d at 672.

Because Plaintiffs have plausibly alleged their deceit claims and complied with the heightened pleading standards of Rule 9(b), the Court **DENIES** the Motion as to Plaintiffs' fourth, fifth and sixth causes of action.

## V.     CONCLUSION

For the reasons above, the Court **DENIES** the Motion. The July 10, 2023 hearing is **VACATED**.


**IT IS SO ORDERED.**