

1 | SOCIAL JUSTICE LEGAL FOUNDATION
Sara Haji (SBN 330834)
2 | shaji@socialjusticelaw.org
Marjorie J. Menza (SBN 321512)
3 | mmenza@socialjusticelaw.org
Vanessa Domenichelli (SBN 326867)
4 | vdomenichelli@socialjusticelaw.org
523 West 6th Street, Suite 450
5 | Los Angeles, California 90014
Telephone:  (213) 542-5241
6
HUESTON HENNIGAN LLP
7 | John C. Hueston (SBN 164921)
jhueston@hueston.com
8 | Robert N. Klieger (SBN 196962)
rklieger@hueston.com
9 | Emily Michael Munson (SBN 338433)
mmunson@hueston.com
10 | 523 West 6th Street, Suite 400
Los Angeles, CA 90014
11 | Telephone:  (213) 788-4340

12 | *Attorneys for Plaintiffs*

13 | UNITED STATES DISTRICT COURT

14 | CENTRAL DISTRICT OF CALIFORNIA

15

16 | LIGAYA RONDUEN, et al.,

| Plaintiffs,

17

18 | vs.

19 | THE GEO GROUP, INC., a Florida corporation, and SPARTAN CHEMICAL COMPANY, INC., an Ohio corporation,

20

21 | Defendants.

22

23 | THE GEO GROUP, INC., a Florida corporation,

24 | Third-Party Plaintiff,

25 | vs.

26 | SPARTAN CHEMICAL COMPANY, INC. and ROES 1-10,

27

28 | Third-Party Defendants.

Case No. 23-cv-00481-JGB(SHKx)

[CLASS ACTION]

**FIRST AMENDED CLASS ACTION COMPLAINT FOR DAMAGES**

**DEMAND FOR JURY TRIAL**

1
FIRST AMENDED COMPLAINT

# I.    INTRODUCTION

1.    This case seeks accountability from a multi-billion-dollar private-prison corporation and a global pesticide manufacturer that poisoned the people confined in their care. Six of those people bring this lawsuit for themselves and thousands of others held in civil immigration detention at Adelanto Detention Center, where Defendant The GEO Group ("Defendant GEO" or "GEO") sprayed them 50 times per day, each day, with a toxic pesticide at concentration levels appropriate only to disinfect livestock pens—not to spray indiscriminately in places where human beings eat, sleep, and live without access to the outside world.

2.    Plaintiffs' exposure to a toxic chemical is only one half of the story. As detained people began reporting similar symptoms from the pink mist that clung to their food, clothes, beds, and bodies, GEO denied to government regulators that its misuse of the chemical had any role in the injuries.  And rather than providing training, instructions, or an altogether different chemical, Defendant Spartan Chemical Company, Inc.—the manufacturer that serviced and monitored GEO's use of the toxic chemical—continued to justify its use of a doubly concentrated dose as appropriate "given the nature of [GEO's] business."

3.    GEO's business is to detain immigrants awaiting the results of their immigration proceedings.  In the process of administering, managing, and operating more than 30 Immigration and Customs Enforcement ("ICE") detention facilities across the country, GEO makes its shareholders approximately two billion dollars per year. In its singular focus on maximizing its bottom line, however, GEO frequently falls short of minimum constitutional and state law standards, as evidenced by the numerous lawsuits, citations, and federal statutory violations issued against GEO for its poor operation of Adelanto.

4.    On February 3, 2020, the United States Department of Health and Human Services declared the 2019 Novel Coronavirus ("COVID-19") a public health crisis.

For people held inside the country's jails, prisons, and detention centers, this time was fraught with panic, misinformation, and isolation.

5.    GEO's handling of the COVID-19 pandemic within Adelanto evinced its consistent practice of prioritizing profit over the health and safety of the people detained within its walls.

6.    As news of COVID-19 reached the people detained at Adelanto—through their loved ones or their limited access to news sources—GEO placed the Facility in full lockdown. Outside visitors (including attorneys) were banned, and movement within the Facility was severely curtailed. Even though Plaintiffs and other people detained at Adelanto were fully reliant on GEO for COVID-19 related updates, safety measures, and care, GEO failed to provide any information to them.

7.    In fact, virtually overnight, GEO staff began widely and indiscriminately spraying an over-concentrated solution of a powerful chemical called HDQ Neutral throughout the Facility. The chemical has a distinct red/pink color and noxious smell that lingers long after it is used. While HDQ Neutral was used as a cleaning disinfectant before the pandemic started, GEO recklessly changed the manner and increased the frequency of its use beginning in February 2020.

8.    Defendant GEO's chemical spraying was a near-constant and invasive presence at Adelanto. GEO staff sprayed HDQ Neutral every 15 to 30 minutes from vats strapped to their backs and from smaller spray bottles. GEO staff sprayed this chemical into the air and onto all surfaces, including food contact surfaces, telephones, rails, door handles, bathrooms, showers, and sinks. GEO staff sprayed when people were eating, and the chemical mist would fall on their food. GEO staff sprayed at night, on or around the bunk beds and cells where people slept. And on at least one occasion, GEO staff sprayed individuals as a disciplinary measure.

9.    Defendant Spartan Chemical was responsible for monitoring GEO's use of HDQ Neutral, yet it made no effort to inquire into why GEO's monthly orders of

concentrated HDQ Neutral in 2020 skyrocketed—in at least one month, GEO ordered five times its monthly average of HDQ Neutral from years prior.

10.    Due to their incessant, months-long exposure to HDQ Neutral, Plaintiffs and others detained at Adelanto experienced acute symptoms, including but not limited to persistent cough, irritation of the throat and nasal passages, skin irritation and rashes, and headaches.

11.    The named Plaintiffs' experiences capture the horrific, but all too common, effects of exposure to HDQ Neutral. Various Plaintiffs had nosebleeds or found blood in their mouth and saliva. Others had debilitating headaches or felt dizzy and lightheaded. To this day, several Plaintiffs have chronic, long-term health effects.

12.    Plaintiffs and others detained at Adelanto, alarmed at the amount and frequency at which HDQ Neutral was being sprayed and the residual mist that lingered, began complaining. But with little information about the pandemic, Plaintiffs and others had to rely on GEO's assurances that HDQ Neutral was a necessary and safe protective measure against COVID-19.

13.    As the pandemic raged on, GEO, through its CEO and other representatives, assured the United States Congress, as well as federal agencies, that the company was protecting the people in its custody from COVID-19, including by safely utilizing HDQ Neutral.

14.    The lies publicly told by GEO's CEO and other representatives were parroted by GEO staff, who were tasked with the care and custody of the people detained within Adelanto.

15.    But GEO knew that its comments to the public and in response to detainee complaints were untrue. GEO confirmed with Defendant Spartan Chemical that it was using a 2-ounce-per-gallon dilution ratio of HDQ Neutral, contrary to the safety label's instructions for a dilution ratio of 1 ounce of concentrate per gallon of water. GEO also knew that Defendant Spartan Chemical justified that over-concentration based only on its unexplained belief that it was appropriate "given the nature of the business."

16.     Similarly, Adelanto's medical staff ignored commonalities of consistent complaints by people detained, including Plaintiffs, who were suffering acute symptoms from their HDQ Neutral exposure.

17.     Adelanto's medical staff failed to provide accurate information to Plaintiffs about the cause of their suffering. Further, they failed to identify any potential medical risks related to such a significant exposure to HDQ Neutral.

18.     As a result, Plaintiffs and at least 1,300 other people detained at Adelanto were forced to endure the months-long poisoning of their bodies and the emotional toll of Defendant GEO's lies and denials—the effects of which continue today.

19.     Plaintiffs seek to certify a class of similarly situated people, all of whom were detained at Adelanto between February 2020 and November 2020 and were exposed to HDQ Neutral (the "Detained Class"). This was the period in which GEO recklessly sprayed HDQ Neutral and continuously exposed the Detained Class to the harmful pesticide. It was also the period during which Spartan Chemical failed to ensure that Plaintiffs and the Detained Class had access to federally mandated health and safety warning labels and directions for use of HDQ Neutral—even as Spartan Chemical knew that GEO was purchasing significantly more of the product and using it at an increased frequency and concentration.

20.     Plaintiffs further seek compensatory and special damages for themselves and all members of the Detained Class. Additionally, Plaintiffs seek the payment of medical monitoring and expenses for the next five years to redress the harm caused to them and the Detained Class by Defendant GEO's negligent and tortious acts.

21.     Lastly, based on Defendant GEO's unlawful misconduct—which was deliberate and undertaken with oppression, fraud, or malice—Plaintiffs seek exemplary damages sufficient to punish and deter Defendant GEO from such misconduct in the future.

## II.    JURISDICTION AND VENUE

22.    This action is brought in diversity pursuant to 28 U.S.C. § 1332(d) between the Plaintiffs, residents of California, individually and on behalf of the Detained Class, against Defendant GEO Group, Inc., a corporation headquartered in Florida and Defendant Spartan Chemical Company, Inc., a corporation headquartered in Ohio. The matter in controversy exceeds $75,000.

23.    Venue is proper in the Central District of California under 28 U.S.C. § 1391(b)(2) because the events giving rise to the claims herein all occurred in the Central District and because most of the named Plaintiffs reside, and Defendants transact, in the Central District.

## III.    PARTIES

24.    Plaintiff Ligaya Ronduen ("Plaintiff Ronduen" or "Ms. Ronduen") is currently detained at Eloy Detention Center in Eloy, Arizona. Ms. Ronduen was detained at Adelanto from December 18, 2018, to November 21, 2023, at which point she was suddenly (and without explanation) transferred away from her home state and family in California to an immigration facility in Louisiana and, finally, Arizona.

25.    Plaintiff Carlos Castillo ("Plaintiff Castillo" or "Mr. Castillo") is a resident of San Salvador, El Salvador. Mr. Castillo was detained at Adelanto from July 3, 2019, to approximately September 15, 2024.

26.    Plaintiff Miriam Jeannette Scheetz ("Plaintiff Scheetz" or "Mrs. Scheetz") is a resident of California. From March 2019 through August 2020, she was detained at Adelanto.

27.    Plaintiff Wilfredo Gonzalez Mena ("Plaintiff Gonzalez Mena" or "Mr. Gonzalez Mena") is a resident of California. From November 2019 through September 2020, he was detained at Adelanto.

28.    Plaintiff Somboon Phaymany ("Plaintiff Phaymany" or "Mr. Phaymany") is a resident of California. From April 2018 through April 2020, he was detained at Adelanto.

29.     Plaintiff Yolanda Mendoza ("Plaintiff Mendoza" or "Mrs. Mendoza") is a resident of California. From September 2019 through October 2020, she was detained at Adelanto.

30.     Defendant GEO is a publicly traded company headquartered at 624 NW 53rd Street, Suite 700, Boca Raton, Florida 33487. Defendant GEO manages Adelanto and is responsible for providing staff and security personnel, administering the facilities, and enforcing facility practices and procedures at Adelanto. Defendant GEO is or was the physical custodian of Plaintiffs, the Detained Class, and the Facility.

31.     Defendant Spartan Chemical is a privately owned company with wholly owned subsidiaries all over the world. Its world headquarters are 1110 Spartan Dr, Maumee, Ohio 43537. Defendant Spartan Chemical manufactures HDQ Neutral and sold HDQ Neutral to Defendant GEO for use at Adelanto—including for use within the living and eating quarters of Plaintiffs and the Detained Class—from 2011 through November 1, 2020. Defendant Spartan Chemical also provided and maintained the labels, equipment, instruction, signage and warnings for use of its product, HDQ Neutral.

## IV.     FACTUAL ALLEGATIONS

### A.     Defendant GEO is Responsible for the Custody, Care and Well-being of Plaintiffs and the Detained Class

32.     Plaintiffs and the Detained Class—civil immigration detainees—were, or are currently, held at Adelanto pending the outcome of their immigration proceedings. GEO has made billions in revenue from its management and operation of private detention centers like Adelanto, which has the capacity to house roughly 1,940 people.

33.     In its operation and management of Adelanto, GEO is required to abide by ICE's Performance-Based National Detention Standards ("PBNDS") and COVID-19 Pandemic Response Requirements ("PRR"), which set baseline requirements for the safety, security, and conditions of immigration detention facilities.

34.     The PRR direct each facility to maintain written plans that "address the management of infectious and communicable diseases." Further, the PRR require that GEO follow and implement the Center for Disease Control and Prevention ("CDC") guidelines to manage the spread of infectious and communicable diseases inside facilities such as Adelanto.

35.     The CDC provides regulations, standards, and guidelines instructing the operators of carceral facilities, like GEO, and their staff on how to implement and follow required procedures for maintaining the health and well-being of the people in their custody. These instructions include required training on manufacturers' safety data sheets, user-prepared labels, and a safety notice for those who come in contact with hazardous chemicals, such as HDQ Neutral.

36.     GEO is, and was at all times, responsible for ensuring all detained people have access to proper medical care and treatment within the Facility.

37.     Adelanto's medical staff are, and were at all times, entrusted to provide detained people, including Plaintiffs and the Detained Class, with competent, trustworthy, and complete medical care. Since the medical staff are the only internal medical providers at the Facility, detained people must rely on their medical assessments when they report symptoms, illnesses, or injuries.

**B.     Defendant GEO Has Purchased Disinfectants and Cleaning Supplies from Defendant Spartan Chemical for Over a Decade**

38.     Defendant GEO has purchased disinfecting or cleaning supplies from Defendant Spartan Chemical since at least 2011.

39.     On or about January 6, 2020, GEO and Spartan Chemical's National Sales Representative executed a Statement of Work effective December 1, 2019 through November 30, 2022. *See* ECF No. 35 at 11.

40.     Under the terms of that Statement of Work, Spartan Chemical representatives agreed to conduct an escorted tour of the GEO facility to determine installation, purchasing, and service needs for Spartan Chemical products. *Id.* at 17.

Spartan Chemical would thereafter provide continuous, on-demand disinfecting and other cleaning chemicals—including HDQ Neutral concentrate—for all GEO facilities with negotiated set prices. *Id.* at 11. In addition to timely delivering product, Spartan Chemical agreed to provide and maintain "Spartan chemical dispensers," also known as dilution centers and "containment cages." *Id.* at 13–14. Spartan Chemical also promised to provide monthly usage reports, including "cost per inmate" reports and company (GEO) and division (regional) average usage reports. *Id.* at 14. Finally, Spartan Chemical promised to "host monthly review calls with [the] field team to address any spikes in usage and report corrective measures to each regional vice president." *Id.*

41.    Spartan Chemical sales representatives earned commissions on each order of HDQ Neutral that GEO placed under the Statement of Work.

## C.    Defendant GEO Knowingly Used a Pesticide as a Disinfectant at Adelanto

### 1.    HDQ Neutral is a Toxic Pesticide

42.    HDQ Neutral (EPA Registration Number 10324-155-5741) is a Quaternary Ammonium Compound disinfectant regulated by the Environmental Protection Agency ("EPA") and the Federal Insecticide, Fungicide and Rodenticide Act ("FIFRA").

43.    As a pesticide, HDQ Neutral is approved for use as a very diluted disinfectant in industrial and institutional settings. Unlike common household cleaners, however, it is not available directly to consumers at retail stores.

44.    HDQ Neutral is particularly dangerous because its two active components, DDAC and ADBAC[1], have been linked to numerous, serious acute (short-term) and chronic (long-term) health effects.

---

[1] Scientific names: didecyldimethylammonium chloride ("DDAC") and alkyl C12-16 dimethylbenzyl ammonium chloride ("ADBAC").

45.     The EPA classifies five types of acute toxicity data (oral, dermal, inhalation, skin irritation, and eye irritation) into four Toxicity Categories, with Category 1 being the highest hazard. The EPA has categorized acute toxicity data for DDAC and ADBAC, the active components in HDQ Neutral, as Category 1 toxicity for skin and eye irritation, Category 2 for oral ingestion and inhalation, and Category 3 for dermal exposure.

46.     HDQ Neutral is associated with many acute adverse health effects. According to Defendant Spartan Chemical, the manufacturer of HDQ Neutral, inhalation of HDQ Neutral can result in nasal discomfort, nasal bleeding, coughing, sore throat, trouble breathing, and damage to the mucosal membrane of the respiratory tract. Skin contact can result in redness, blistering, and rashes. Ingestion can result in burns to the digestive tract, pain, nausea, vomiting, and diarrhea. Eye exposure can result in irritation, pain, redness, itchiness, swelling, and worsened vision.

47.     The active compounds in HDQ Neutral are also associated with many chronic health hazards. Scientific institutions like the Toxics Use Reduction Institute and journals such as Reproductive Toxicology have described, in detail, how exposure to DDAC and ADBAC is correlated with severe skin irritation that can lead to skin sensitization or dermatitis, respiratory irritation and inflammation, chronic obstructive pulmonary disease, reproductive and developmental effects (including decreased fertility, disruption of hormone-regulated processes like ovulation, late-term fetal death, and birth defects, including neural tube defects), and genotoxicity—a serious hazard characterized by DNA damage and disrupted cellular function and regulation.

48.     Moreover, the Mount Sinai Selikoff Centers for Occupational Health and the Bellevue/NYU Occupational Environmental Medicine Clinic have also detailed how chronic DDAC and ADBAC exposure can lead to respiratory sensitization and occupational asthma.

49.     Spartan Chemical provides usage regulations, safety information, and other warnings regarding the use of HDQ Neutral, including Spartan Chemical's HDQ

Neutral Safety Data Sheet (the "Safety Data Sheet"), HDQ Neutral's Container Label for five-gallon buckets of concentrate (the "Container Label"), and labels for spray bottles and bulk sprayers ("Secondary Labels").

> 2.    <u>Defendants GEO and Spartan Chemical Knew HDQ Neutral is a Toxic Pesticide. Plaintiffs and the Detained Class Did Not</u>

50.    From at least 2011 until late 2020, GEO used HDQ Neutral at Adelanto to disinfect the indoor areas where detained people are held. As described throughout this Complaint, the nature of GEO's use changed dramatically in 2020.

51.    As manager and operator of Adelanto, GEO is responsible for safeguarding the health and welfare of the people in its custody, including by ensuring its staff follows regulations, guidelines, and manufacturer safety warnings for the use of chemicals at the Facility.

52.    GEO had access to all of Spartan Chemical's safety information about HDQ Neutral, including the Safety Data Sheet, the Container Label, and Secondary Labels. Defendant Spartan Chemical knew that GEO kept the Safety Data Sheets in binders locked inside janitor's closets and Container Labels locked behind metal cages. By contrast, Plaintiffs and the Detained Class had access to none of this information.

53.    Just as the Safety Data Sheets and the Container Label indicate that HDQ Neutral should only be used on hard, nonporous surfaces (i.e., not on clothing, bed linens or skin), the EPA similarly warns that users of chemicals intended to kill COVID-19 cells shall use those chemicals only on surfaces, NOT on humans. Additionally, the EPA warns that fumigation and wide-area spraying of chemicals intended to kill COVID-19 cells are not appropriate. GEO was required to know and follow these EPA guidelines.

3.    Defendant GEO Knowingly Poisoned Plaintiffs and the Detained Class with HDQ Neutral

54.    On February 3, 2020, the United States Department of Health and Human Services declared COVID-19 a public health crisis. Within weeks, the federal government declared a National Emergency.

55.    News of the highly contagious and novel virus spread across the country. Local, state, and national government agencies made announcements regarding safety precautions and ways to prevent the virus from spreading. The news media, whether television, radio, or newspapers, reported daily updates on all COVID-19 related matters.

56.    For people caged in places such as Adelanto, information was much harder to access. Detained people at Adelanto have no internet access in their dormitory or cell blocks, and access to the internet in the law library is limited to legal resources. Detained people must rely on GEO staff to provide newspapers to their block, or to turn on the television to a news channel. Several of the Plaintiffs and many members of the Detained Class speak limited or no English. For these reasons, they heavily relied on the information GEO staff was willing to share about COVID-19.

57.    To the shock and concern of the Detained Class, shortly after learning of the COVID-19 pandemic, GEO placed Adelanto in lockdown with no in-person visits. In the days that followed, Plaintiffs and members of the Detained Class witnessed GEO staff spraying a red/pink chemical mixture in each of their rounds—which occurred every 15 to 30 minutes—within all dormitory and cell blocks at the Facility.

58.    Plaintiffs and members of the Detained Class had no control or say over where, how, or how often the chemical mixture was sprayed.

59.    GEO staff fumigated the air and surfaces of the Facility's living areas with HDQ Neutral in a manner that dangerously exposed Plaintiffs and members of the Detained Class to the toxic chemical mixture by inhalation, skin and eye contact, and oral ingestion. This aggregate exposure heightened the dangers of HDQ Neutral's

active components and violated the instructions of the Safety Data Sheet, the Container Label, and EPA guidelines.

60.    On July 29, 2020, the EPA conducted an inspection of Adelanto via video conference due to concerns that GEO staff may have been using HDQ Neutral in an improper manner. The EPA documented its findings from that virtual inspection in the EPA July 2020 Final Inspection Report ("EPA Report"). Following the inspection, the EPA issued a Notice of Warning to GEO, formalizing its findings and noting several violations of FIFRA based on GEO's improper use of HDQ Neutral.

61.    The EPA Report and Notice of Warning were not made public until March 21, 2021, and were the first governmental and scientific findings publicly available about GEO's improper use of HDQ Neutral.

62.    Despite the EPA's July 2020 inspection and warnings, GEO continued its dangerous and indiscriminate use of HDQ Neutral as outlined below.

63.    On information and belief, GEO staff was instructed by supervisors, officers, and/or directors representing GEO to continue GEO's dangerous and indiscriminate use of HDQ Neutral until at least November or December 2020.

4.    <u>Defendant GEO Poisoned Plaintiffs and Members of the Detained Class by Spraying HDQ Neutral Indoors and on All Surfaces</u>

64.    Prior to the pandemic, although improperly used in poorly ventilated spaces, GEO staff primarily used HDQ Neutral as a cleaning product. But starting in February 2020, GEO staff began using HDQ Neutral in wide-area spraying as a purported COVID-19 safety measure.

65.    GEO staff sprayed HDQ Neutral indoors directly into the air and on all types of surfaces. HDQ Neutral was sprayed throughout all areas of the Facility, including the front lobby, administrative areas, living areas, food and microwave areas, day room, corridors, intake units, and medical units. In the living areas, GEO staff would spray onto all surfaces including soft, porous surfaces like mattresses and sheets.

66.    Unlike other areas of the Facility, the cell or dormitory blocks where members of the Detained Class were held have no open-air ventilation.

67.    People placed in cell blocks were crammed into small cement cells which hold anywhere between four to eight people each. The cells have no windows, and their doors open into the inside common areas of the block. In the common areas of the cell blocks, there are no windows that can open outside. Bathroom and shower areas are also located inside the cell block and have no windows that can open. Cell blocks have a single door that leads to a small cement quad. But these quads have tall, thick, cement walls and only the roof is open to the outside. During the limited time that detained people have access to a quad, the open roof is the single source of fresh air.

68.    Members of the Detained Class held in dormitory blocks were crammed into poorly ventilated areas, too. Like the cell blocks, dormitories have no windows that can open to the outside and only one door that opens to a cement quad. People placed in dormitories sleep in bunk beds located at the back of the dormitories, in tightly packed rows, far from one door to the quad. The bathroom and shower areas are also located inside the dormitory block and have no windows that can open.

69.    With full knowledge of the poor ventilation of these living areas, GEO staff copiously sprayed HDQ Neutral throughout every cell and dormitory block in the Facility.

70.    The incessant indoor use of HDQ Neutral resulted in a pungent chemical smell that permeated Adelanto's living areas and a chemical mist that would linger for minutes after spraying took place. Members of the Detained Class had trouble breathing because HDQ Neutral remained in the air.

5.    Defendant GEO Poisoned Plaintiffs and Members of the Detained Class with HDQ Neutral by Spraying Every 15–30 Minutes

71.    GEO staff sprayed HDQ Neutral every 15 to 30 minutes, 24 hours a day, beginning in February 2020.

72.   GEO's rampant spraying of HDQ Neutral increased the likelihood that Plaintiffs and members of the Detained Class coming and going from an area would come into contact with the chemical before the 10-minute setting period required by the Container Label had passed.

73.   The frequency of the spraying caused the toxic chemical mixture to linger in the air leading to Plaintiffs and members of the Detained Class directly inhaling and/or ingesting the chemical.

74.   The incessant spraying also created build-up on surfaces frequently touched by Plaintiffs and members of the Detained Class, such as phones, door handles, railings, and tables, leading to dermal exposure.

75.   GEO staff carried out this constant spraying in violation of the PRR, which mandate that "cleaning supplies and frequency of cleaning schedule [be] sufficient to maintain a high level of sanitation within housing areas without negatively impacting the health of detainees or staff."

76.   Plaintiffs and members of the Detained Class would experience coughing, headaches, nosebleeds, dizziness, skin irritation, and other symptoms after exposure to HDQ Neutral and in plain view of GEO staff.

77.   Even though GEO staff could see the effects that the near-constant spraying of HDQ Neutral was having on Plaintiffs and members of the Detained Class, they continued this practice for months.

6.   <u>Defendant GEO Poisoned Plaintiffs and Members of the Detained Class by Not Providing Them with Necessary Personal Protective Equipment and Training</u>

78.   HDQ Neutral's Safety Data Sheet provides the following clear instructions for the safe handling of the toxic chemical mixture: "Wear protective [e.g., rubber or other chemical-resistant] gloves. Wear eye / face protection [e.g., splash goggles]. Wear protective clothing." It also instructs users to avoid contact with skin,

eyes, or clothing; to wash hands and any exposed skin thoroughly after handling; and to not breathe in the mist, vapor, or spray.

79.    Despite these clear instructions, GEO subjected Plaintiffs and members of the Detained Class to near-constant HDQ Neutral exposure without such protections. GEO failed to provide Plaintiffs and members of the Detained Class with adequate Personal Protective Equipment ("PPE") to protect them from oral, dermal, inhalation, or ocular exposure to HDQ Neutral.[2]

80.    Nor did GEO provide Plaintiffs and members of the Detained Class the opportunity to change or clean their contaminated clothing, in violation of the Safety Data Sheet.

81.    GEO provided surgical masks to Plaintiffs and members of the Detained Class only after the pandemic started and did so sporadically, at best. Some Plaintiffs and members of the Detained Class received three surgical masks per week; others received even fewer. The CDC recommends changing disposable masks, such as the surgical masks provided to Plaintiffs and the Detained Class, after a single use.

82.    GEO was even less likely to provide other types of PPE to Plaintiffs and members of the Detained Class. Rubber gloves or goggles were rarely available. On at least one occasion, when Plaintiff Scheetz requested protective goggles due to the pain in her eyes, a member of GEO's staff laughed at her.

83.    The EPA's Report and Notice of Warning cited this lack of access to PPE as one area of concern in GEO's use of HDQ Neutral.

84.    Although GEO staff sometimes used masks, gloves, goggles, and occasionally even full protective suits when spraying HDQ Neutral, this type of PPE was not provided to Plaintiffs or members of the Detained Class.

_____

[2] Of note, in January 2023, GEO was fined over $100,000 by Cal OSHA for—among several things—failing to supply PPE to detained workers.

85.     In addition to failing to provide the necessary PPE to protect from GEO's indiscriminate use of HDQ Neutral, GEO failed to provide required training on the use of HDQ Neutral to Plaintiffs and members of the Detained Class who were tasked with cleaning.

86.     The PBNDS's Environmental Health and Safety requirements mandate that "[d]etainees shall receive safety instructions as necessary for living area-related assignments, such as working with cleaning products to clean general use areas."

87.     However, Plaintiffs and members of the Detained Class tasked with cleaning the Facility's living areas, such as Plaintiffs Ronduen, Castillo, and Scheetz, were not trained on how to safely use the cleaning products GEO provided them, including HDQ Neutral.

88.     As for those people not tasked with cleaning, GEO staff would leave spray bottles containing HDQ Neutral in the common areas of cell and dormitory blocks, where anyone could access them, without previously training them on how to safely utilize the toxic chemical mixture.

       7.     <u>Defendant GEO Poisoned Plaintiffs and Members of the Detained Class by Improperly Diluting and Storing HDQ Neutral</u>

89.     The Safety Data Sheet, Container Label, and efficacy bulletin for HDQ Neutral all state that for all uses involving areas occupied by humans (hospitals, residential institutions) this toxic chemical mixture should be diluted and applied at 1 ounce per gallon with ten minutes of surface contact time. The Container Label only recommends a higher concentration if the chemical is being used in animal pens as a virucidal disinfectant.

90.     Moreover, the PRR mandated that GEO use an approved cleaning solution in the strength and in a manner as recommended by the product label.

91.     Further, EPA's COVID-19 Guidance for Cleaning and Disinfecting recommends that users "[f]ollow the instructions on the label for all cleaning and

disinfection products for concentration, dilution, application method, contact time and any other special considerations when applying."

92.     This information was available to GEO at all times. However, GEO consistently diluted and applied HDQ Neutral at 2 ounces per gallon.

93.     Defendant Spartan not only knew that Defendant GEO was using an over-concentrated solution of HDQ Neutral, but it recommended that GEO do so. In keeping with its obligations under the Statement of Work, sales representatives of Spartan conducted regular or semi-regular in-person inspections of the Facility from as early as 2017 until June 2020, accompanied by management staff from GEO. Upon information and belief, Spartan Chemical sales representatives were not introduced, nor was their presence otherwise disclosed to Plaintiffs or any detained individual during the course of any inspection.

94.     During the inspections, Spartan Chemical sales representatives tested the concentration of HDQ Neutral flowing out of the Spartan Chemical dispensers in areas of the Adelanto Facility, including the dispensers in the janitor's closets utilized both by GEO guards and Plaintiffs and the Detained Class to fill spray bottles or mop buckets. Based on the results of that inspection, Spartan Chemical sales representatives would adjust the Spartan chemical dispenser by applying a new, or adjusting an existing, nozzle tip designed to deliver 2 ounces of HDQ Neutral concentrate for each gallon of water (1:64 dilution rate), contrary to the EPA-approved label for HDQ Neutral, which authorizes 1 ounce of HDQ Neutral concentrate per gallon of water (1:128 dilution rate).

95.     In other words, Defendant Spartan's Sales Representatives (who earned commission on sales of HDQ Neutral) deliberately selected a two-ounce nozzle tip rather than a one-ounce nozzle tip of comparable cost and ease of installation to implement an off-label, or higher-than-labeled, concentration of HDQ Neutral for use by guards and detained individuals alike at Adelanto.

96.     Around May 2020—when EPA and California Department of Pesticide Regulation initiated their investigation into GEO's improper use of HDQ Neutral at the Adelanto Facility—GEO managers both at the Adelanto Facility and the Western Regional Division, as well as attorneys representing GEO, spoke with Spartan about the over-concentration of HDQ Neutral used at the Facility. In response to an inquiry, a representative for Defendant Spartan Chemical stated that the higher concentration of HDQ Neutral was appropriate "given the nature of the business."

97.     In fact, GEO Warden and officer James Janecka ("Warden Janecka") admitted to EPA in the July 2020 virtual inspection that GEO staff improperly diluted HDQ Neutral at Adelanto.

98.     The improper dilution was also noted in both the EPA Report and Notice of Warning, which alerted GEO that the improper dilution was a violation of FIFRA.

**D.      Defendant GEO Lied and Obscured Its Use of HDQ Neutral and the Chemical's Adverse Health Effects**

        1.      <u>Defendant GEO Falsely Told Plaintiffs and Members of the Detained Class GEO's Use of HDQ Neutral Was Necessary to Prevent COVID-19</u>

99.     GEO—through its employees, supervisors, officers, and/or directors— instructed GEO staff to use and represent to Plaintiffs and members of the Detained Class that HDQ Neutral was safe and necessary to prevent COVID-19.

100.    Plaintiffs and members of the Detained Class, held in different cell and dormitory blocks across Adelanto, raised concerns to GEO staff (including guards and supervisors) about the incessant spraying of HDQ Neutral.

101.    GEO staff's responses to these concerns were all the same: refraining from providing any information at all regarding the dangers of exposure to HDQ Neutral, intentionally dismissing valid concerns, and misrepresenting HDQ Neutral as the only safe available disinfectant against COVID-19.

102.   For example, Plaintiffs Scheetz and Gonzalez Mena asked GEO staff to stop spraying the chemical when people were eating or sleeping in their cells. Their requests were ignored, and GEO staff told them that GEO had to continue spraying during every round to prevent the spread of COVID-19. Similarly, Plaintiff Mendoza made requests that GEO staff use the chemical mixture more carefully, but her requests were also ignored.

103.   Plaintiffs and other members of the Detained Class also brought up concerns about their physical well-being to GEO staff. They complained of eye irritation and pain, blurry vision, headaches and dizziness, persistent cough, and nasal and throat irritation. Even after Plaintiff Scheetz fainted, GEO staff did not seem concerned about how her exposure to HDQ Neutral may be affecting her health.

/ / /

/ / /

2.   Defendant GEO Concealed the Dangers of HDQ Neutral from Plaintiffs and Members of the Detained Class

104.   Instead of warning Plaintiffs and members of the Detained Class that HDQ Neutral was dangerous, GEO *concealed* the dangers of HDQ Neutral and GEO's wrongful use of the product.

105.   GEO staff would provide spray bottles of HDQ Neutral with no labeling, meaning that Plaintiffs and members of the Detained Class were not informed of the risk posed by the chemical mixture or how to ameliorate its harm.[3]

106.   GEO also stored large HDQ Neutral containers which they used to fill up the smaller spray bottles. On information and belief, GEO staff would at times remove the HDQ Neutral Container Label from these larger containers. This was a violation of the PRR which require "[a]ll cleaning and disinfecting materials be stored in secure

[3] The EPA's Notice of Warning made note that: "[a]ccording to the accounts of current and former detainees, the 32-ounce spray bottles given to detainees did not always have a label attached and the detainees were not given any instructions as to how to properly or safely apply the product."

1  areas, in their original containers, and with the manufacturer's label intact on each
2  container."

3      107.  When containers had a label, it was only in English—which many
4  Plaintiffs and members of the Detained Class did not understand. GEO never provided
5  translations of the Container Label into other languages.

6      108.  Moreover, Plaintiffs and members of the Detained Class witnessed
7  multiple inspections at Adelanto by external agencies during which GEO staff would
8  hide bottles of HDQ Neutral.

9      109.  On information and belief, GEO staff never verbally shared nor posted
10 the Safety Data Sheet, the EPA Report, or the Notice of Warning regarding HDQ
11 Neutral with Plaintiffs or members of the Detained Class.

12          3.    <u>Medical Staff Consistently Discounted the Medical Concerns of</u>
13                <u>Plaintiffs and Members of the Detained Class as Unrelated to</u>
14                <u>HDQ Neutral Exposure</u>

15     110.  Plaintiffs and members of the Detained Class, many of whom were
16 suffering from acute symptoms related to their HDQ Neutral exposure, sought out
17 medical treatment from Adelanto's medical staff. During these consultations, members
18 of the Detained Class, including several named Plaintiffs, raised concerns about their
19 symptoms and a possible link to the red/pink chemical mixture that GEO was
20 constantly spraying.

21     111.  Like the rest of the staff at Adelanto, medical staff disregarded the
22 concerns of the Detained Class members about the red/pink chemical mixture.

23     112.  For example, Plaintiff Castillo was told by a medical staff member that
24 the medical staff member had no knowledge of the chemical spray, even though it was
25 being used throughout the entire facility. On at least one other occasion, a member of
26 the Detained Class was mocked by the medical staff over his concerns regarding the
27 chemical spray.

28

113.    On information and belief, medical staff would also knowingly and incorrectly attribute members of the Detained Class's symptoms to causes not involving HDQ Neutral.

114.    Plaintiffs' and members of the Detained Class's limited access to medical care outside of Adelanto was even more restricted during the pandemic. Therefore, they could only rely on the statements and actions of the Adelanto medical staff to assess the risk of HDQ Neutral exposure.

4.    Defendant GEO Made False and Misleading Statements to Government and Regulatory Entities About Its Use of HDQ Neutral

115.    GEO attempted to hide its callous use of HDQ Neutral by providing false and misleading information to the EPA and the United States Congress.

116.    At the outset of the July 29, 2020 EPA inspection, GEO objected to the participation of the California Department of Pesticide Regulation by claiming it lacked authority to do so, thus obstructing a more thorough investigation.[4]

117.    During that same inspection, Warden Janecka lied by claiming that GEO was using HDQ Neutral "in accordance to CDC guidelines." Warden Janecka also falsely represented that GEO did not use HDQ Neutral in areas where food was served or where detained people slept.

118.    Warden Janecka further claimed, contrary to fact, that GEO staff sprayed HDQ Neutral with a degree of care. For example, he represented that GEO staff would not spray tables or phones located next to those being used by a detained person, that

---

[4] The California Department of Justice ("Cal DOJ") issued a 2021 "Immigration Detention in California" report in which it outlined a pattern of obstructive practices by GEO. For example, GEO denied Cal DOJ's multiple requests to conduct site visits, including a one-day site visit in 2017, and a multi-day site visit in 2018. When GEO did permit Cal DOJ staff to visit the Facility, such as a planned week-long visit in 2019, GEO severely limited certain aspects of Cal DOJ's review, most notably by restricting access to detained people (for interviews), and restricting access to medical files. Cal DOJ's report further details how GEO limited their access to housing units, the Facility, and the Facility's kitchens.

GEO staff would not spray a particular area if individuals were sitting on the floor below, and that GEO staff would not spray the inside of cells or bunks.

119. During the EPA inspection, Warden Janecka was asked by the EPA inspector if there were any reports of adverse health effects by detained people after the application of HDQ Neutral; he refused to answer.

120. Additionally, Warden Janecka falsely reassured EPA inspectors that GEO provided different types of PPE to detained people, including surgical masks, nitryl gloves, and safety goggles.

121. Earlier that month, on July 13, 2020, GEO Chief Executive Officer, George Zoley ("CEO Zoley"), appeared before the Homeland Security Oversight Committee and claimed that GEO was "using that cleaning product [HDQ Neutral], which is registered with the Environmental Protection Agency, and follow[ing] strict safety guidelines set by FDA." Further, he stated that "doctors never reported any adverse effects by anybody."

122. As part of the Oversight Committee Hearing, CEO Zoley was asked if he would make sure that HDQ Neutral is used in line with the manufacturer's instructions, to which he responded, "Absolutely. Absolutely."

123. The pattern of lies and misrepresentations by GEO started at the highest levels of the company and trickled down to the Facility staff, all of whom, instead of ensuring the safety of detained people, actively harmed them.

     5.    <ins>Defendant Spartan Chemical Designed Dispensing Centers to Dispense HDQ Neutral at Twice the EPA Approved Concentration</ins>

124. Defendant Spartan Chemical designed, provided, adjusted and maintained the chemical dispensers used throughout the Adelanto detention facility. These dispensers were located in, among other places, locked janitor's closets adjacent to the cell blocks and dormitories of Plaintiffs and members of the Detained Class. Spartan sales representatives and their agents deliberately set the flow rate for HDQ

Neutral concentrate to dispense up to 2 ounces of concentrate for one gallon of water, contrary to the EPA-approved instructions for use. Based on recent testimony, the chemical dispensers were adjusted in the presence of GEO managers and could not be adjusted down to the EPA approved dilution rate without the expertise or tools of either a Spartan sales representative or the GEO manager who observed each adjustment.

125.    Defendant Spartan Chemical and Defendant GEO knowingly continued using the improperly metered dispensers despite its contraindication on the product label due to their determination that "the nature of GEO's business"—*i.e.*, immigration detention—merited a concentration higher than what was approved by the EPA. Per the Container Label as provided to Defendant GEO, the only approved use cases for concentrations higher than 1 ounce/gallon are for livestock applications and the eradication of canine viruses. And even then, the label directs that all living animals be cleared from the vicinity prior to application.

6.    Defendant Spartan Chemical Provided Incorrect or Incomplete Labels, Warnings and Signage for HDQ Neutral Throughout the Adelanto Facility

126.    Spartan Chemical, as the manufacturer of HDQ Neutral, published all labels, warnings, and signage for HDQ Neutral throughout the Adelanto Facility. Sales representatives from Spartan placed certain labels themselves on products and sent other labels to GEO staff, including managers, for placement within the Adelanto Facility.

127.    Spartan Chemical representatives, through regular inspections and initial facility walk through tours outlined in the Statement of Work, understood that the signage placed in the janitor's closets, as well as the labels on the bottles, would be read (if legible) by not only detained individuals on the "Cleaning Crew" but by all detained individuals at Adelanto.

   *a) Defendant Spartan Chemical restricted access to the Container Label for the containers connected to the chemical dispenser units.*

128. Defendant Spartan Chemical provided containment cages—dense, metal mesh cages that contained the open, five-gallon bucket of HDQ Neutral hooked up through a plastic hose to a meter. The five-gallon bucket of HDQ Neutral had an adhesive label (the Contained Label) that included the EPA approved "use cases"—claims of efficacy under various scenarios, including hospital or public health virucidal claims—approved dilution rates for use amongst humans (1 ounce per gallon of water) and uses in livestock pens (2 ounces per gallon of water) as well as methods of application, and warnings.

129. The cages themselves were locked with a padlock and only Defendant GEO had the keys. Whether or not the Container Label was adequate, photographic evidence indicates that its fine print was so obscured behind the cage as to render it illegible. As a result, Defendants Spartan Chemical and GEO created a condition wherein no Plaintiff or member of the Detained Class could access Defendant Spartan's instructions or warnings for diluted HDQ Neutral of any sort.

   *b) Defendant Spartan Chemical repeatedly mislabeled the chemical dispenser with the label for a less corrosive product.*

130. Were Defendants Spartan Chemical and GEO to have used cages that allowed for label visibility; however, it may not have mattered. Upon information and belief and based on documents recently disclosed to Plaintiffs, Spartan Chemical printed and labeled Spartan chemical dispensers dispensing HDQ Neutral throughout the Adelanto Facility with labels for a different product called "hdqC2" at least through May 2020. Spartan's hdqC2 is a far less noxious disinfectant that is properly diluted at 2 ounces of product per gallon of water for use among humans—twice the amount

than what is directed for the EPA-approved label for HDQ Neutral.[5]

131.    Indeed, the warnings for hdqC2 differ significantly from those for the more corrosive HDQ Neutral. They indicate a far less dangerous substance than the more potent and dangerous corrosive, HDQ Neutral:

| Hdqc2 Label Warning | HDQ Neutral Label Warning |
|---|---|
| Causes moderate eye irritation. Avoid contact with eyes, skin, or clothing. Wash thoroughly with soap and water after handling and before eating, drinking, chewing gum, using tobacco or using the toilet. Remove and wash contaminated clothing before use. | Corrosive. Causes irreversible eye damage and skin burns. Harmful if swallowed or absorbed through the skin. Do not get in eyes, on skin, or on clothing. Wear goggles or face shield and chemical resistant gloves and protective clothing when handling. Wash thoroughly with soap and water after handling and before eating, drinking, chewing gum, using tobacco or using the toilet. Remove contaminated clothing and wash clothing before reuse. |

132.    For months during the Class Period, Plaintiffs and members of the Detained Class were directed to fill spray bottles at a dilution center labeled with an entirely different product than what was coming out of the dilution center nozzle. Based on documents recently disclosed in discovery, it was not until the EPA scheduled a virtual inspection of the Adelanto Facility, in July 2020, that members of GEO's management and Spartan sales representatives corrected the mislabeling, at least with respect to the dispensers photographed and presented for inspection.

---

[5] *See Clean on the Go, hdqC2 Label*, Spartan Chemical, https://www.spartanchemical.com/globalassets/sharepoint/product-literature--documentation---epidocuments/secondary-and-user-prepared-solutions-labels/clean_on_the_go_hdqc2_user_prepared_solution_label.pdf (last visited Nov. 1, 2024).

FIRST AMENDED COMPLAINT

7.    Even if Defendant Spartan Had Not Mislabeled or Obscured the Container Label, Defendant Spartan Misrepresented the Concentration of HDQ Neutral Filling Spray Bottles, Buckets and Bulk Sprayers Throughout the Facility

133.    Even if Defendant Spartan Chemical had applied the proper label to the dispenser units and had made the Container Label prominent and clear, it and Defendant GEO never disclosed to Plaintiffs or members of the Detained Class that the dilution coming out of the nozzle was not the rate approved by the EPA for use in areas inhabited by humans. As explained above, Defendant Spartan Chemical deliberately increased the flow of HDQ Neutral from the five-gallon bucket through the dilution center. With EPA inspection imminent, Defendant Spartan Chemical and its agents defended its decision to GEO to increase the concentration of HDQ Neutral used throughout the Adelanto Facility claiming it was "appropriate" for the facility's needs and the "nature of the business." But Defendant Spartan Chemical never decided it would have been "appropriate" to produce an alternate label, one which accurately disclosed the concentration of HDQ Neutral flowing into bottles, bulk sprayers, and buckets. Neither Spartan nor GEO advised Plaintiffs and the members of the Detained Class of the true contents of the product they were handed to spray or were sprayed with.

8.    Defendant Spartan Chemical Provided Promotional Materials Rather Than Warnings Regarding HDQ Neutral

134.    Based on testimony recently obtained by Plaintiffs, Defendant Spartan Chemical provided the print signage for all users of HDQ Neutral throughout the Adelanto Facility, from at least 2017 through November 1, 2020. Those signs were posted in each of the janitor's closets, where Spartan Chemical sales representatives conducted their inspections, adjacent to the day rooms, dormitories, and dining halls where Plaintiffs were detained. They were not warnings, however. They were promotional materials in English and Spanish which stated, "KILLS GERMS IN

MINUTES!" The alleged instructions for use do not explain how to use HDQ Neutral safely or even effectively but rather simply describe proposed uses of the product: "Use HDQ Neutral for these applications: 1. Can be used as a general cleaner and/or deodorizer. 2. Can be prepared for disinfection/fungicidal/ virucidal use 3. Can be used for disinfecting hard, nonporous surfaces germs and viruses." There was no verbiage in any language, or symbols, at any time, indicating that the product could cause any harm to any part of the body, no matter how it was used.

<blockquote>

a)     *Just as Spartan Chemical mislabeled the dispensers, Spartan Chemical also mislabeled spray bottles with hdqC2 labels.*

</blockquote>

135.   Based on documents recently disclosed in discovery, Spartan sales representatives not only mislabeled the chemical dispensers but also mislabeled the 32-ounce spray bottles handed to Plaintiffs and members of the Detained Class filled with overconcentrated HDQ Neutral. That label, a secondary label for hdqC2 contained only the warnings in the table above, not the EPA-approved warnings for HDQ Neutral, and no instructions for use. Spartan did not simply provide an inadequate warning; it provided no warning at all.

<blockquote>

b)     *When Defendant Spartan Chemical did provide the correct HDQ Neutral Secondary labels, the label wholly failed to provide directions for use.*

</blockquote>

136.   Upon information and belief and based on testimony recently obtained by Plaintiffs, the 32-ounce spray bottles, when properly and legibly labeled with HDQ Neutral Secondary Labels, still contained inadequate warnings due to a complete failure to instruct. Based on photos recently disclosed by Defendant GEO in discovery, the only Secondary Label for HDQ Neutral that Spartan provided for use on the spray bottles (both in screen print and with adhesive), instructed only: "The product in this container is diluted as directed on the pesticide label. Follow the complete directions for use on the original container label when applying this product."

137.   The first sentence was a known misrepresentation. As explained above, Defendant Spartan Chemical deliberately set the dilution in "this container" to be *contrary* to what was "directed on the pesticide label." Nonetheless, the second sentence provides no cure. It directs a user to a known obscurity. As stated above, the "original container label" referred to on the labels Spartan provided was on the 5-gallon buckets it sold by the dozens to GEO, locked up in a dense metal cage provided by Spartan, under a cabinet in the locked janitor's closets. Only GEO officers (guards) had access to the keys to unlock the instructions. In other words, by Spartan Chemical and GEO's deliberate cage design and installation, no detained person had access to the alleged instructions for use.

138.   Spartan Chemical was under a duty to provide instructions. Federal law requires Spartan Chemical, as the manufacturer of the pesticide, to provide "clear[] and prominent" instructions for use. 40 C.F.R. § 156(a)(1)(vii) ("Labeling Requirements for Pesticides and Devices," "[t]he contents of a label must show *clearly and prominently* . . .[t]he directions for use." (emphasis added)). "Directions for use" is further defined in 40 C.F.R. § 156(i)(1)(i). "Directions for use must be stated in terms which can be easily read and understood by the average person likely to use or to supervise the use of the pesticide. When followed, directions must be adequate to protect the public from fraud and from personal injury and to prevent unreasonable adverse effects on the environment."

139.   Nowhere on the spray bottle, nor the buckets for mopping, on the walls, in the dormitories, or in the dayroom, did Spartan provide instructions for use. Again, according to federal law, those instructions were to be placed "on any portion of the label provided that they are conspicuous enough to be easily read by the user of the pesticide product." *Id.* at 156(i)(1)(ii). Hiding the instructions on a bucket locked in a cage, in turn locked in a closet is neither clear, prominent or conspicuous.

140.   Had Spartan adhered to federal law, its clear, prominent instructions would have included statements regarding what apparatus could be used safely to

apply HDQ Neutral (*id.* at § 156(i)(2)(vi) ("[t]he method of application, including instructions for dilution, if required, and type(s) of application apparatus or equipment required")), how frequently the product could be applied without injuring humans (*id.* at § 156(i)(2)(vii) ("[t]he frequency and timing of applications necessary to obtain effective results without causing unreasonable adverse effects on the environment")) and the safe removal of the product residue prior to human exposure (*id.* at 156(i)(2)(ix) (("[s]pecific directions concerning the storage, residue removal and disposal of the pesticide and its container.").

141.   Spartan did none of these things. No detained person looking at the bottle would have known that the bottle contains a higher than 1:128 concentration of product (indeed, that it was diluted at a concentration higher "than as directed" on the obscured label behind the cage door). Nowhere does the label instruct with respect to proper use, or warn of the danger of improper use—such as whether the product can be safely converted into a fine mist spray or if best applied with a rag. Nowhere are users of the product instructed to use the product in a well-ventilated space or to create an exclusion zone for pesticidal application or otherwise clear a room of all inhabitants prior to use (indeed, such a warning would have revealed the product's inaptness for use in overcrowded detention conditions). Nowhere are users instructed to use the product only twice a day, or no more than four times in a day, let alone the 48 times a day GEO mandated its use. Nowhere are users of the product instructed and warned that the multiple, repeated, unrinsed or unwiped layers of product can harm the skin. Nor would those instructions and warnings, even if visible to Plaintiffs and members of the Detained Class (which they were not), have disclosed that the HDQ Neutral being dispensed from the containers had been diluted for use in livestock pens, not amongst human beings.

142.   All of these uses—in poorly ventilated rooms, sprayed every 15 to 30 minutes, around the clock, without wiping down or rinsing, with spray nozzles and bulk sprayers set to "mist," in rooms crowded with detained adults, along phone banks

1  until they were visibly wet, while individuals were making calls home to their children
2  or wives or husbands, amongst rows of bunk beds with porous bed linens—were
3  known to Spartan Chemical sales representatives. Indeed, the Statement of Work
4  contemplates Spartan Chemical determining the usage needs for each of GEO's private
5  prisons and detention centers. And GEO escorted Spartan Chemical representatives
6  throughout their inspections such that the nonstop fumigation level use of HDQ
7  Neutral and the dangers that kind of usage presented was not simply foreseeable, it
8  was known to all. All except Plaintiffs.

9                          *c)*     *Defendant Spartan Chemical knew that GEO was*
10                                  *incessantly spraying an overconcentrated solution in*
11                                  *conditions that did not allow for safe use.*

12     143.   Based on information and belief, when Spartan Chemical did label the
13  spray bottles used to contain the diluted HDQ Neutral, the secondary label for HDQ
14  Neutral contained a generalized warning statement which stated: "Corrosive. Causes
15  irreversible eye damage and skin burns. Harmful if swallowed or absorbed through the
16  skin. Do not get in eyes, on skin, or on clothing. Wear goggles or face shield and
17  chemical resistant gloves and protective clothing when handling. Wash thoroughly
18  with soap and water after handling and before eating, drinking, chewing gum, using
19  tobacco or using the toilet. Remove contaminated clothing and wash clothing before
20  reuse."

21     144.   During the class period, while GEO used the spray every 15 to 30
22  minutes, the warnings would have required every GEO guard, and every detained
23  individual either using the spray or present within several feet of the spray, to don face
24  shields, nitrile gloves, and full protective clothing. It would have required access to
25  changes of clothing every time droplets of HDQ Neutral contaminated clothing or, by
26  extension, bed linens. It would have required proper ventilation and exclusion zones
27  to ensure no inadvertent contamination. Defendants Spartan and GEO both knew that

28

1  the product would not be used under any of the conditions required for its safe
2  deployment.

3      145.   Indeed, the warning label alone makes it clear that even at the dilution
4  rate indicated on the hidden 5-gallon bucket, the product itself was impracticable for
5  deployment within a detention center, let alone at double the concentration. Spartan
6  Chemical's thirst for a national contract, and GEO's desire to disinfect using the least
7  expensive product in the least time-consuming manner (demanding a "cost per inmate"
8  analysis) resulted in a conscious disregard of the risks of harm to and actual harm
9  suffered by the Plaintiffs and members of the Detained Class.

10          9.    Defendant Spartan Chemical Watched As Deliveries and Sales of
11                HDQ Neutral to the Adelanto Facility Skyrocketed

12      146.   According to recently disclosed sales information, sales of HDQ Neutral
13  for use at the Adelanto Facility for the months of March 1, 2020, through September
14  30, 2020 averaged 25 to 30 gallons more HDQ Neutral concentrate per month than for
15  prior years (2019 and 2018). Indeed, sales data shows that for the month of April 2020
16  alone, deliveries totaled 105 five-gallon pails, or 525 gallons of HDQ Neutral. This
17  was roughly five times the amount ordered in any prior month. Upon information and
18  belief, no Spartan Chemical representative ever scheduled a call with GEO to discuss
19  the spike in orders and usage, as contemplated by the Statement of Work. Instead,
20  Spartan Chemical watched as GEO negligently sprayed a toxic disinfectant 48 times a
21  day in and around living quarters of unprotected human beings—a disinfectant meant
22  solely for use under monitored and protected conditions. Spartan Chemical not only
23  understood there was a risk of overuse: with risk of harm enhanced by its own designed
24  overconcentration, it witnessed the overuse at the doubled concentrations and took no
25  action to end it. To the contrary, Spartan Chemical sales representatives were rewarded
26  with commissions, and Spartan Chemical pocketed the profits from the gross sales of
27  their toxic product while Plaintiffs' skin, airways, and gastrointestinal tracts were
28  saturated by HDQ Neutral.

# V.   NAMED PLAINTIFFS' FACTUAL ALLEGATIONS

147.   The six named Plaintiffs, individuals that spent months detained at Adelanto between February 2020 and November 2020, experienced firsthand the reckless spraying of HDQ Neutral by GEO staff and the subsequent coverup regarding GEO's unsafe use of the chemical.

148.   Plaintiffs, like members of the Detained Class, relied on GEO's affirmations regarding the necessity and safety of using HDQ Neutral. Some Plaintiffs joined or remained as part of the cleaning crew, others stopped filing grievances, and all of them refrained from seeking legal counsel or independent medical care because they could not know GEO was lying about its improper use of the chemical mixture.

149.   Plaintiffs' experiences are not unique; rather, they establish the patterns and practices exhibited by GEO in its attempt to coverup the poisoning of over 1,300 Detained Class members. Similarly, Plaintiffs' medical symptoms and harms from their exposure to HDQ Neutral are typical of those experienced by the Detained Class.

**Plaintiff Ligaya Ronduen**

150.   Plaintiff Ronduen (also known as Ligaya Jensen) is forty-six years old and a mother of two. Ms. Ronduen was detained at Adelanto for over four years, since December 21, 2018.

151.   Throughout her time at Adelanto, Ms. Ronduen has been housed in a dormitory block.

152.   In or around February 2020, Ms. Ronduen began hearing rumors about a highly contagious virus that was spreading outside the Facility. Within a few days, Ms. Ronduen noticed significant changes within Adelanto. Although GEO staff refused to provide her information about the virus, they began spraying a red/pink chemical mixture during their rounds, meaning at least every 30 minutes.

153.   A strong chemical smell started lingering inside the dormitory where Ms. Ronduen was housed.

154.   GEO staff would spray the chemical into the air and on every surface. They frequently sprayed the stair railings, the phones that she used to speak to her loved ones, the tables and chairs where she ate her meals, and around the microwave that she used to heat up food from the commissary.

155.   Ms. Ronduen noticed that GEO staff would spray the chemical directly onto the surfaces, without using a rag, and would not wipe off the residue that remained. When GEO staff sprayed on the top floor, a mist of the chemical would fall on those standing under or near the staircase.

156.   At night, GEO staff would walk up and down spraying the aisles of bunk beds where detained women slept. The constant spraying at night made it very difficult to sleep. Ms. Ronduen would wake up coughing and had difficulty breathing. Multiple nights, she heard members of the Detained Class asking GEO staff to please stop spraying. GEO staff continued their practice of spraying on every round.

157.   On at least one occasion, Ms. Ronduen complained to GEO staff about the constant spraying. Ms. Ronduen told staff that she felt her nose was burning. GEO staff stated that they were instructed to use the chemical and that it was necessary to prevent COVID-19.

158.   Throughout the entire time when GEO staff sprayed the red/pink chemical, Ms. Ronduen noticed that they always gave this same explanation, including when many other members of the Detained Class in her dormitory complained to GEO staff.

159.   Ms. Ronduen also noticed that some days the chemical was a darker color; on those days, the chemical smelled even stronger.

160.   Soon after GEO staff started using the chemical, Ms. Ronduen began experiencing respiratory issues. Ms. Ronduen felt burning in her nostrils and nasal passages; she had a persistent cough and had trouble breathing.

161.   Eventually, Ms. Ronduen began experiencing strong headaches and, at times, would feel dizzy. She also noticed that there were specks of blood when she coughed and, in her nostrils, and mucus.

162.   Ms. Ronduen grew concerned about her symptoms but did not understand what could be causing them. She had no information about the red/pink chemical, and did not even know the name of it, as the spray bottles used around the dormitory did not have labels.

163.   For the months to come, Ms. Ronduen continued to hear GEO staff reassuring members of the Detained Class that the chemical was a necessary COVID-19 precaution. She trusted these comments and believed that the chemical was being safely used.

164.   In or around July 2020, Ms. Ronduen was moved to a different dormitory where GEO's use of the red/pink chemical continued in the same manner.

165.   In or around October 2020, Ms. Ronduen began working as part of the cleaning crew. The cleaning crew is made up of detained people who are tasked with cleaning all the common areas in the dormitories or cell blocks.

166.   As part of the cleaning crew, Ms. Ronduen was instructed to clean the sinks along with the tables and chairs where detained women ate. She was provided the same red/pink chemical to clean that was being sprayed by GEO staff.

167.   Ms. Ronduen was not given any training or safety instructions on how to use the cleaning product. The bottle she used for cleaning had no label or instructions. She was not given protective goggles or clothing while cleaning with the red/pink chemical.

168.   When cleaning, Ms. Ronduen was careful not to spray directly into the air or close to other detained women. She would use a rag to wipe down the sinks and tables.

169.    Besides the physical symptoms that Ms. Ronduen experienced, the exposure to the chemical also affected her emotional well-being due to the various symptoms she experienced and her uncertainty of what was causing them.

**Plaintiff Carlos Castillo**

170.    Plaintiff Castillo is fifty-one years old and a father of two. He lived in the U.S. for over twenty years and was detained at Adelanto for over five years. Throughout his time at Adelanto, Mr. Castillo was housed in a cell block.

171.    When Mr. Castillo first arrived at Adelanto, the cleaning crew was using a red/pink chemical to wipe down tables and other surfaces. The cleaning crew would use the red/pink chemical twice a day. The spray bottles were unlabeled and left in the janitorial closet and in the common areas.

172.    Once the COVID-19 pandemic started, Mr. Castillo noticed that the use of the red/pink chemical changed dramatically. GEO staff began spraying the chemical approximately every 30 minutes at all hours of the day and night. They would spray it while people were eating, and when GEO staff sprayed the top floor, the mist from the chemical would fall on people's food, hair, and skin.

173.    GEO staff would often wear masks, latex gloves, and sometimes goggles while spraying.

174.    On April 11, 2020, Mr. Castillo started work on Adelanto's cleaning crew.

175.    GEO staff did not provide Mr. Castillo a mask to use while working as part of the cleaning crew. There was only one pair of goggles in the janitorial closet, available for the whole cell block. GEO did not provide Mr. Castillo with any instruction on how to properly use the cleaning chemical, or any information on safety precautions or potential risks of exposure.

176.    Unlike GEO staff, Mr. Castillo and other members of the cleaning crew were careful to move other detained people away from the area being cleaned with the

red/pink chemical. They were also careful not to clean the tables while people were eating or the phones while people were using them.

177.   Due to lack of ventilation, Mr. Castillo and other detained people could smell and feel the chemical in the air. Mr. Castillo began to suffer skin irritation; he developed a rash on his hands and arms. His eyes became very sensitive and felt like they were burning. Mr. Castillo had a constant cough and his throat and nose felt irritated. On more than one occasion, Mr. Castillo found blood in his nostrils. He also started to experience frequent headaches.

178.   As GEO staff continued the constant spraying of the red/pink chemical, Mr. Castillo noticed spray residue building up on surfaces, such as door handles and the telephones which Mr. Castillo used once or twice a day to call his children, wife, and other loved ones. Over time, Mr. Castillo noticed that metal on the door handles of the cells and the phones that he used to call his family had started to corrode.

179.   On several occasions, Mr. Castillo complained about the chemical to GEO staff. GEO staff never acknowledged or addressed his complaints.

180.   On one occasion, Mr. Castillo explained to a GEO staff supervisor that he was concerned that his face and hands were coming into contact with the chemical because of the constant spraying of surfaces like telephones. The GEO staff merely replied that GEO was authorized and approved to use the chemical for disinfecting.

181.   Mr. Castillo also sought medical care for his irritated skin. Mr. Castillo asked the medical staff if the chemical could be harming his skin. Instead of acknowledging the effect of the chemical, the medical staff told Mr. Castillo to buy skin cream from the commissary, which did not improve Mr. Castillo's symptoms.

182.   When Mr. Castillo told another medical staff member about his nosebleeds, he was told it was allergies and prescribed Loratadine. The Loratadine did not improve his symptoms.

183.   Mr. Castillo also shared with a third medical staff member his concerns that the chemical being sprayed could be irritating his eyes. The medical staff denied

any knowledge of the chemical, and simply gave Mr. Castillo a saline solution for his eyes. The saline solution did not improve his symptoms. Mr. Castillo's eyesight deteriorated over the following months, and toward the end of 2020, he was prescribed glasses.

184.    Although his health was deteriorating and he continued to suffer symptoms for months, Mr. Castillo had no reliable way to corroborate that it was the chemical spray, and GEO's misuse of it, that was causing his symptoms. He had to rely on the assurances from GEO and the medical staff about the chemical.

185.    Mr. Castillo suffered emotional distress as a result of the actions of GEO.

**Plaintiff Miriam Scheetz**

186.    Plaintiff Scheetz is fifty-nine years old and a mother of nine children. Mrs. Scheetz works at Inland Coalition for Immigrant Justice where she helps other currently and formerly detained immigrants to access immigration and community resources.

187.    Mrs. Scheetz was detained at Adelanto for approximately eighteen months from March 2019 to August 2020. During her detention at Adelanto, she was housed in a dormitory block.

188.    In or around May 2019, Mrs. Scheetz was asked to be part of the cleaning crew.

189.    As a member of the cleaning crew, Mrs. Scheetz was given a bottle with a red/pink liquid to use for cleaning. GEO staff instructed Mrs. Scheetz to use this chemical to clean all common areas. GEO staff also instructed her to pour the chemical from a gallon bottle into a smaller spray bottle but did not provide her protective gloves when doing so.

190.    Mrs. Scheetz cleaned the tables and chairs where detained women ate their meals. She cleaned the inside of the microwave used to heat up food purchased at the commissary. She mopped the floor and wiped down the telephones used by

detained people. She also cleaned the bathroom including the showers, toilets, and sinks.

191.  At no point during her time as part of the cleaning crew at Adelanto did GEO staff provide Mrs. Scheetz with gloves, face goggles, or other protective equipment to clean with the red/pink chemical. Nor did GEO staff provide her with any safety training or instruction on how to use it. Instead, she was only given a rag to use on surfaces and a mop for the floors.

192.  Mrs. Scheetz remained part of the cleaning crew until her release in August 2020.

193.  In or around February or March 2020, GEO staff began spraying the red/pink chemical, at all times of the day and night, throughout Mrs. Scheetz's block.

194.  GEO staff would spray the telephones, tables, chairs, the rails and stairs, and throughout the entire block. GEO staff would spray the rails and stairs of the second floor, which created a "shower" of chemical mist that would fall onto those on the lower floor, including on people's faces, hair, and food.

195.  When spraying surfaces, GEO staff did so at close range, without using any cloth or rag.

196.  GEO staff would also spray inside the bathrooms, including the showers, toilets, and sinks.

197.  In Mrs. Scheetz's block, there were several rows of bunk beds in the back of the dorm. At night, GEO staff would walk up and down the aisles of bunk beds and spray the red/pink chemical as the women attempted to sleep. Mrs. Scheetz would often wake up coughing and gasping for air. She felt chest pains as well.

198.  On one occasion, Mrs. Scheetz saw two detained women arguing and several GEO staff approached them. As the women continued to argue, the GEO staff began spraying the red/pink chemical all over the dorm and directly over the women. GEO staff sprayed such a vast amount of the chemical that people were choking and coughing incessantly. Eventually, GEO staff were forced to move all the detained

women to the cement quad because the heaviness of the chemical mist was choking people.

199.   Mrs. Scheetz noticed that the chemical GEO staff sprayed once the COVID-19 pandemic began was a darker color than when she used it for cleaning prior to the pandemic.

200.   On several occasions, Mrs. Scheetz asked GEO staff if they could refrain from spraying so often, especially when people were eating. GEO staff only responded that it was necessary to prevent COVID-19.

201.   Although some GEO staff would, at times, wear protective equipment—such as gloves, face coverings, or plastic suits—while spraying the red/pink chemical, Mrs. Scheetz and the other detained women never received any equipment to protect them against it.

202.   Mrs. Scheetz continued to experience symptoms. She frequently suffered headaches, including a sharp pain behind her ear which would cause her vision to blur. The headaches were so strong that she would have to sit still for long periods of time. Mrs. Scheetz feared that she might faint and hurt herself during a fall. Mrs. Scheetz also experienced nosebleeds and several times she also bled from her mouth. Her eyes were constantly itchy and would become swollen. Mrs. Scheetz eventually lost her eyelashes while at Adelanto. When she requested goggles to prevent further harm to her eyes and vision, GEO staff laughed at her.

203.   Sometime after GEO began its increased used of the chemical, Mrs. Scheetz fainted. She had been cleaning the tables and chairs when she began to feel dizzy and light-headed. Mrs. Scheetz went to her bed to lay down and told two other detained women that she had a strong headache. Shortly thereafter, Mrs. Scheetz started vomiting. The other two women called for GEO staff and asked for a doctor. GEO staff called medical staff, and a nurse arrived to the dormitory block. The medical staff had Mrs. Scheetz moved to the medical unit. The medical staff gave some liquid to Mrs. Scheetz without identifying what it was.

204.    The medical staff eventually moved Mrs. Scheetz to an "observation" cell located in the medical unit of Adelanto. The cell had bright lights; there was a cot, a sink, and toilet. Mrs. Scheetz was not allowed to have any personal belongings with her.

205.    Mrs. Scheetz continued vomiting throughout the day, and although she felt dehydrated, neither GEO staff nor medical staff provided her any water or food. Mrs. Scheetz felt extremely weak throughout the day and had trouble standing or walking around. In the evening, a GEO staff member threw a food tray on the floor and kicked it towards Mrs. Scheetz, who could not stand up. During her stay at the "observation" cell, she did not receive any additional medical care. Mrs. Scheetz returned to her dormitory block later that evening.

206.    Mrs. Scheetz repeatedly sought medical attention for her symptoms. However, the medical staff brushed off her requests. On at least one occasion, she was told by medical staff that she complained a lot.

207.    Mrs. Scheetz also filed a medical complaint with GEO in which she raised concerns that her symptoms, specifically the blood in her mouth and saliva, were not being addressed. In response to the complaint, a medical staff member had her transferred to an isolation cell which had bright lights on 24-hours a day. She spent two days in the isolation cell without any medical care.

208.    No member of the medical staff ever warned Mrs. Scheetz of the dangers of exposure to the red/pink chemical or suggested that it may be causing Mrs. Scheetz's health issues. When Mrs. Scheetz herself raised concerns that the chemical may be causing at least some of her symptoms, the medical staff denied it.

209.    Prior to arriving at Adelanto, Mrs. Scheetz had not experienced the strong headaches, nor the pain and itchiness in her eyes, nose, and throat that became common during her time at Adelanto. She also did not have nosebleeds or blood in her mouth or saliva prior to her detention at Adelanto.

210.    The physical symptoms she experienced, and the constant exposure to this chemical, also caused Ms. Scheetz to suffer emotional distress.

211.    A few months after she was released from Adelanto, Mrs. Scheetz had to call 911 because of a painful headache and vomiting. When the paramedics arrived, they told her they could not take her to the hospital because of the pandemic. However, the paramedics gave her medication for her vomiting and remained with Mrs. Scheetz for several hours until her symptoms subsided.

212.    On a second occasion, Mrs. Scheetz's son took her to urgent care, again due to a debilitating headache. She was given medication and kept in observation overnight.

213.    To this day, Mrs. Scheetz continues to experience symptoms related to her exposure to HDQ Neutral. She still has headaches that feel like those she experienced while being exposed to the red/pink chemical at Adelanto. Her eyes are often irritated and itchy, and sometimes swollen. She still experiences nosebleeds and nasal and throat irritation. The smell of strong chemical cleaning agents, such as bleach or Lysol, causes her sensitivity.

**Plaintiff Wilfredo Gonzalez Mena**

214.    Plaintiff Gonzalez Mena is forty-nine years old. He volunteers at an animal shelter to give back to his community. He has lived in the United States since he was twenty-four years old.

215.    Mr. Gonzalez Mena was detained at Adelanto for nearly a year, from November 2019 through September 2020. For the first eight months of his detention, he was housed in a cell block and later moved to a dormitory block.

216.    In or around February or March 2020, GEO staff began spraying a red/pink chemical on a daily basis throughout Mr. Gonzalez Mena's block. GEO staff would spray the chemical every 15 to 30 minutes directly into the air. GEO staff would spray the telephones, tables, chairs, the rails and stairs, and throughout the entire block, including the sleeping areas. They sprayed directly onto all surfaces without using a

cloth or rag. GEO staff would also haphazardly spray inside the bathrooms, including the showers and sinks, even when people were using a nearby shower or sink.

217.   GEO staff sprayed the red/pink chemical at all times of the day, including when Mr. Gonzalez Mena and others were eating. They also sprayed outside of the cells and around the door of the cell at night while he and other detained people slept. The chemical would enter the cell through the spaces between the door and the walls and floor. Mr. Gonzalez Mena tried to use his sheets to prevent inhaling the chemical, but it did not protect him. On at least one occasion, GEO staff sprayed the red/pink chemical directly inside the cell while Mr. Gonzalez Mena and other detained people were inside, without permitting them to leave the cell.

218.   When he was moved to the dormitory block, GEO staff would walk up and down the aisles of bunk beds at night and spray the red/pink chemical as the men attempted to sleep. Mr. Gonzalez Mena would often wake up coughing and gasping for air.

219.   On several occasions, Mr. Gonzalez Mena asked GEO staff if they could refrain from spraying the chemical, especially when people were eating. GEO staff only responded that it was necessary to prevent COVID-19. GEO staff never gave any warnings about the dangers of the red/pink chemical to Mr. Gonzalez Mena, nor expressed any concerns about the chemical.

220.   Although some GEO staff would, at times, wear protective equipment— such as gloves, goggles, or white plastic suits—while spraying the red/pink chemical, Mr. Gonzalez Mena and the other detained people never received any protective equipment to protect them.

221.   After GEO staff increased spraying of the chemical, Mr. Gonzalez Mena started experiencing redness of the skin on both eyelids, rashes and/or tender red bumps on the edge of his eyelid, worsening eyesight, dry skin, body pain, and a burning sensation on the palm of his hands, the soles of his feet, and his back. Additionally, he experienced headaches, felt dizzy, and his vision became blurry. He

1  also began to suffer respiratory issues, including a persistent cough, itchiness in his

2  throat, and trouble breathing, especially at night and early morning.

3      222.   The physical symptoms he experienced, and the constant exposure to the

4  chemical, caused Mr. Gonzalez Mena emotional distress.

5      223.   To this day, Mr. Gonzalez Mena continues to experience symptoms. He

6  has headaches and a persistent cough similar to what he experienced while being

7  detained at Adelanto. His vision is impaired and he now requires glasses for reading,

8  which he did not prior to being exposed to the chemical. Additionally, Mr. Gonzalez

9  Mena experiences sensitivity and discomfort when certain aerosol cleaning products

10 are used in his vicinity.

11     **Plaintiff Somboon Phaymany**

12     224.   Plaintiff Phaymany is forty-six years old. He helps his sister care for their

13 elderly parents. He has lived in the United States for over forty years.

14     225.   Mr. Phaymany was detained at Adelanto for almost two years, from April

15 2018 until April 2020. He was housed in a cell block throughout his time at Adelanto.

16     226.   When Mr. Phaymany arrived at Adelanto in 2018, another detained

17 person asked if he was interested in joining the cleaning crew, which paid $1 each day.

18 Mr. Phaymany wanted to earn some money while detained, so he agreed.

19     227.   Mr. Phaymany's duties included cleaning the common area twice a day.

20 Before each cleaning session, detained people would leave the common area, generally

21 going into their cells, while the cleaning crew sprayed the tables, railings, and door

22 handles with the chemical. The spray bottles they used did not have labels.

23     228.   Mr. Phaymany did not know the name of the chemical he was using but

24 trusted that GEO staff knew whether the chemical was safe to use.

25     229.   In or around February 2020, Mr. Phaymany noticed a substantial change

26 in the use of the chemical spray at Adelanto. While the cleaning crew continued

27 spraying twice a day, GEO staff started spraying far more frequently, with no regard

28 for whether detained people were in the immediate vicinity.

230.    The only instruction Mr. Phaymany received with respect to spraying was to let the chemical sit on surfaces for up to ten minutes, rather than wiping the chemical away after spraying.

231.    On multiple occasions, when Mr. Phaymany was in the common area, he inhaled the chemical when GEO staff sprayed it nearby. On some occasions, GEO staff sprayed the chemical while Mr. Phaymany was eating nearby.

232.    While GEO staff wore surgical masks when spraying the chemical, there were no surgical masks provided to detained people.

233.    In the early months of 2020, Mr. Phaymany also noticed a number of symptoms: exacerbation of his asthma, a persistent cough, dry and cracking skin, irritation and burning sensation in his eyes, nausea, and headaches. On multiple occasions, he noticed traces of blood when blowing his nose.

234.    Mr. Phaymany was concerned about these symptoms, particularly the exacerbation of his asthma and the increased need to use his inhaler, but he did not know what caused it. Even after he was released from Adelanto in April 2020, his asthma flare-up persisted, leading Mr. Phaymany to seek additional care.

**Plaintiff Yolanda Mendoza**

235.    Plaintiff Mendoza is fifty-four years old. Ms. Mendoza has lived in the United States for thirty years. She is the mother of a twenty-three-year-old son.

236.    She was detained at Adelanto from September 2019 to October 2020. Ms. Mendoza was housed in dormitory blocks.

237.    When Ms. Mendoza arrived at Adelanto, she participated in cleaning her living areas three times daily, although she was not paid. She and other detained people were instructed to use a chemical that smelled like bleach, which was applied from spray bottles and a mop bucket.

238.    After the pandemic started, GEO staff began using a different chemical, which was a red/pink color, to spray the common areas as often as every 15 minutes. The red/pink chemical had an extremely strong odor.

239.    Ms. Mendoza was exposed to the chemical day and night. She began noticing symptoms, such as irritated and itchy skin, trouble breathing, and a feeling of her throat constricting.

240.    On multiple occasions, Ms. Mendoza was in her bed when GEO staff sprayed the sleeping area, including a doorway mere feet from her bed.

241.    On multiple occasions, Ms. Mendoza could see the chemical falling onto her food while she ate at the downstairs dining tables. She tried to use her hands and arms to cover her food, but often she had to throw the food away.

242.    In the beginning of the pandemic, Ms. Mendoza and other detained people did not have masks to wear. When Ms. Mendoza saw GEO staff approaching with spray bottles, she would pull her shirt up over her mouth and nose to try to avoid inhaling the red/pink chemical.

243.    On one occasion, Ms. Mendoza witnessed a GEO staff spray another detained person directly on their body.

244.    When Ms. Mendoza and other detained people asked GEO staff to be more careful with the red/pink chemical, GEO staff dismissed the complaints, saying that they had been ordered to spray.

245.    During this period, Ms. Mendoza developed a rash on her face. She began suffering nosebleeds, eye irritation, nausea, and dizziness. Often, she felt so ill that she expressed to friends that she thought she might die.

246.    Ms. Mendoza submitted multiple medical requests and sought medical care for her symptoms, which Adelanto medical staff attributed to poor water quality and high blood pressure. She was advised by Adelanto's medical staff to drink water, try exercise, and take ibuprofen.

247.    After Ms. Mendoza was released from Adelanto, she noticed that her eyesight and sense of smell had deteriorated while she was in detention. Years later, she still experiences dizziness and sensitivity in her nasal passages.

# VI.    CLASS ALLEGATIONS

248.    Pursuant to Federal Rule of Civil Procedure 23(b)(3), Plaintiffs bring this lawsuit on behalf of themselves and as a class action on behalf of the following class:

**Detained Class**: All persons who were detained at Adelanto Detention Center between February 2020 through November 1, 2020 that were exposed to HDQ Neutral.

249.    Excluded from the Detained Class are any entities, including Defendant GEO and its officers, agents, and employees. Also excluded from the Detained Class are officers, agents, and employees of any other governmental or corporate entity affiliated with the operation and management of Adelanto.

250.    The proposed Detained Class satisfies the requirements of Federal Rule of Civil Procedure 23(a)(1) because it is so numerous that joinder of all members is impracticable. Upon information and belief, there were over 1,300 people detained at Adelanto on or around February 2020, when Defendant GEO began spraying HDQ Neutral as a purported COVID-19 safety measure.

251.    The proposed Detained Class meets the commonality requirements of Federal Rule of Civil Procedure 23(a)(2). There are numerous questions of law or fact common to each member of the Detained Class. For the Detained Class, those common questions of law and fact predominate over any question affecting only an individual in the Detained Class. Defendant GEO acted on grounds generally applicable to the Detained Class in improperly using HDQ Neutral and making misrepresentations regarding the chemical and its use.

252.    The proposed Detained Class meets the typicality requirements of Federal Rule of Civil Procedure 23(a)(3) because Plaintiffs' claims are typical of the claims of the Detained Class. The claims of Plaintiffs and members of the Detained Class arise from the same set of actions, statements, misrepresentations, concealment, and other actions by Defendant GEO relating to its use of HDQ Neutral at Adelanto.

253.    Plaintiffs meet the requirements of Federal Rule of Civil Procedure 23(a)(4) as they will fairly and adequately protect the interest of the Detained Class.

Plaintiffs do not have any interests antagonistic to, or in conflict with, the Detained Class that Plaintiffs seek to represent. Plaintiffs, as well as the Detained Class, seek compensatory and punitive damages arising from Defendant GEO's negligent, fraudulent, and other tortious acts which caused them injury.

254.   The proposed Detained Class also meets the requirements of Federal Rule of Civil Procedure 23(b)(3) because questions of law or fact common to the class "predominate" over questions affecting the individual members, and a class action is "superior" to other methods available for adjudicating the controversy. The numerous common questions of law and fact that predominate will advance resolution of the litigation as to all the Detained Class members. These common legal and factual issues include the following:

    a.   whether Defendant GEO engaged in the conduct alleged herein;

    b.   whether Defendant GEO's use of HDQ Neutral was a wrongful and offensive touching causing Plaintiffs and the Detained Class harm;

    c.   whether Defendant GEO's conduct violated duties owed to Plaintiffs and the Detained Class;

    d.   whether Defendant GEO made unlawful and misleading representations or material omissions with respect to the safety of Defendant GEO's and its staff's use of HDQ Neutral at Adelanto;

    e.   whether Defendant GEO took steps to conceal the toxic and harmful use of HDQ Neutral at Adelanto or otherwise falsely assured Plaintiffs and the Detained Class that its use of HDQ Neutral was safe; and

    f.   whether Plaintiffs and the Detained Class are entitled to damages and other monetary relief, including punitive damages, and if so, in what amount.

255.   A class action is superior to other available methods for the fair and efficient adjudication of the controversy. Treatment as a class action will permit a large

number of similarly situated persons to adjudicate their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of effort and expense that numerous individual actions would produce. Treatment of the matter as a class will also permit the adjudication of claims by many members of the Detained Class who could not individually afford to litigate such a claim. This class action likely presents no difficulties in management that would preclude maintenance as a class action.

256.   Plaintiffs and the Detained Class are represented by counsel experienced in class action lawsuits, civil rights litigation, and representation of people in carceral settings.

257.   Plaintiffs and the Detained Class have all suffered and will continue to suffer harm and damages as a result of Defendant GEO's wrongful conduct and use of HDQ Neutral.

258.   Plaintiffs reserve the right to amend the Detained Class definition if discovery and further investigation reveal that the Detained Class should be expanded, divided into subclasses, or modified in any other way.

## CAUSES OF ACTION

### FIRST CAUSE OF ACTION
### Cal. Civ. Code § 1714(a)
### NEGLIGENCE
### (Against All Defendants on behalf of Plaintiffs and the Detained Class)

259.   Plaintiffs hereby incorporate allegations contained in the preceding paragraphs, as though fully set forth herein.

260.   Defendants GEO and Spartan Chemical both owed a duty of care to Plaintiffs and the Detained Class with respect to HDQ Neutral. Defendant GEO had a special duty of care to protect Plaintiffs and the Detained Class, people detained in a facility they own and operate, from foreseeable harm. Relatedly, Defendant Spartan Chemical owed a duty of care to Plaintiffs and the Detained Class as the known captive

1  end users of the HDQ Neutral and the related machinery that Defendant Spartan

2  Chemical manufactured, sold, maintained, and serviced at the Adelanto Facility.

3      261.  Defendant GEO, as the purchaser of HDQ Neutral and holder of the

4  related Safety Data Sheet and Container Label, knew or should have known that eye

5  contact and skin contact with HDQ Neutral could cause pain, redness, swelling, tissue

6  damage, blistering, and burning, among other symptoms. Defendant Spartan

7  Chemical, as the manufacturer and supplier of HDQ Neutral, knew or should have

8  known the same.

9      262.  Defendant GEO, as the purchaser of HDQ Neutral and holder of the

10  related Safety Data Sheet and Container Label, knew or should have known that

11  inhalation of HDQ Neutral could cause coughing and nasal irritation, among other

12  symptoms. Defendant Spartan Chemical, as the manufacturer and supplier of HDQ

13  Neutral, knew or should have known the same.

14      263.  Defendant GEO knew or should have known that frequent spraying of

15  HDQ Neutral in poorly ventilated areas posed a risk of inhalation, eye contact, and

16  skin contact with HDQ Neutral. Relatedly, Defendant Spartan Chemical knew or

17  should have known through its tours, inspections, and the observed soaring sales of

18  HDQ Neutral that Defendant GEO Group was spraying an overly concentrated HDQ

19  Neutral frequently in a 24-hour period.

20      264.  Defendant GEO knew or should have known that frequent spraying of

21  HDQ Neutral onto surfaces and objects that Plaintiffs and the Detained Class touched

22  would pose a risk of skin contact. Similarly, based on its repeated tours, inspections

23  and other contacts with managers at the Adelanto Facility, Defendant Spartan

24  Chemical knew or should have known that given the conditions of immigration

25  detention under Defendant GEO's for-profit management, it was impossible or

26  impracticable to keep HDQ Neutral from coming into contact with clothing or bed

27  linens during the frequent spray application of HDQ Neutral in dormitories and

28  common rooms. Defendant Spartan Chemical knew or should have known that

Defendant GEO would not provide immediate laundering of contaminated clothing or bed linens, as directed in certain warnings.

265.   Defendant GEO knew or should have known that exposure to HDQ Neutral without protective equipment such as goggles, gloves, and masks posed a risk of inhalation, ingestion, eye contact, and skin contact with HDQ Neutral. Similarly, based on its repeated tours, inspections, and other contacts with managers at the Adelanto Facility, and given the crowded conditions of detention, Defendant Spartan knew or should have known that Defendant GEO did not possess or would not provide adequate personal protective equipment such as goggles, face shields, masks or protective clothing for the safe application of HDQ Neutral throughout the Adelanto Facility.

266.   Defendant GEO knew or should have known that failure to dilute HDQ Neutral as recommended by the manufacturer could increase the severity of exposure symptoms. Similarly, Defendant Spartan Chemical knew or should have known that the risks associated with properly diluted HDQ Neutral coming into direct contact with skin or the eyes, inhalation of HDQ Neutral, or inadvertent consumption of the product would increase if not double should HDQ Neutral spray be over-concentrated.

267.   In breach of its duty to Plaintiffs and the Detained Class, Defendant GEO sprayed HDQ Neutral as often as every fifteen minutes in poorly ventilated areas.

268.   In breach of its duty to Plaintiffs and the Detained Class, Defendant GEO sprayed HDQ Neutral and instructed detained people to spray HDQ Neutral onto surfaces and objects such that the chemical mixture came into contact with Plaintiffs' and the Detained Class members' skin.

269.   In breach of its duty to Plaintiffs and the Detained Class, Defendant GEO failed to provide Plaintiffs and the Detained Class with goggles, gloves, and masks sufficient to prevent inhalation, ingestion, eye contact, and skin contact with HDQ Neutral.

270.    In breach of their duty to Plaintiffs and the Detained Class, Defendant GEO and Defendant Spartan Chemical each failed to dilute HDQ Neutral as recommended and instead deliberately dispensed HDQ Neutral at or near double the recommended concentration.

271.    In breach of Defendant Spartan Chemical's duty to its end users—Plaintiffs and members of the Detained Class—Defendant Spartan Chemical recommended, sold and continued to sell HDQ Neutral to Defendant GEO despite knowing that Defendant GEO was unable or unwilling to take the necessary precautions to use the product safely.

272.    As a result of Defendant GEO's and Defendant Spartan Chemical's actions, Plaintiffs and the Detained Class suffered and continue to suffer physical injuries, including, but not limited to, chronic coughing and shortness of breath, skin rashes and blisters, eye irritation and burning, blurred vision, nosebleeds, headaches, dizziness, nausea, fatigue, and/or fainting.

273.    Defendant GEO's and Defendant Spartan Chemical's actions also caused Plaintiffs and the Detained Class to suffer emotional distress.

274.    As detailed in the preceding paragraphs, Defendant GEO also made material misrepresentations to the public about its use of HDQ Neutral and continued to clandestinely misuse the pesticide at Adelanto, warranting punitive damages.

**SECOND CAUSE OF ACTION**
**BATTERY**
**(Against GEO on Behalf of Plaintiffs and the Detained Class)**

275.    Plaintiffs hereby incorporate allegations contained in the preceding paragraphs, as though fully set forth herein.

276.    Without consent or legal privilege, Defendant GEO intentionally assaulted and physically battered Plaintiffs and the Detained Class with the intent to harm Plaintiffs and the Detained Class by spraying a toxic chemical mixture on and around their person while Plaintiffs and the Detained Class were eating. Such conduct

was extreme and outrageous and would be deemed highly offensive to a reasonable person.

277. Without consent or legal privilege, Defendant GEO intentionally assaulted and physically battered Plaintiffs and the Detained Class with the intent to harm Plaintiffs and the Detained Class by spraying a toxic chemical mixture on and around their person while Plaintiffs and the Detained Class were sleeping in their living quarters. Such conduct was extreme and outrageous and would be deemed highly offensive to a reasonable person.

278. Without consent or legal privilege, Defendant GEO intentionally assaulted and physically battered Plaintiffs and the Detained Class with the intent to harm Plaintiffs and the Detained Class by spraying a toxic chemical mixture on and around their person while Plaintiffs and the Detained Class were talking on the phone. Such conduct was extreme and outrageous and would be deemed highly offensive to a reasonable person.

279. Without consent or legal privilege, Defendant GEO intentionally assaulted and physically battered Plaintiffs and the Detained Class with the intent to harm Plaintiffs and the Detained Class by spraying a toxic chemical mixture on and around their person while Plaintiffs and the Detained Class were detained at Adelanto. Such conduct was extreme and outrageous and would be deemed highly offensive to a reasonable person.

280. As a result of the wrongful touching by Defendant GEO, Plaintiffs and the Detained Class suffered and continue to suffer physical injuries, including, but not limited to, chronic coughing and shortness of breath, skin rashes and blisters, eye irritation and burning, blurred vision, nosebleeds, headaches, dizziness, nausea, fatigue, and/or fainting.

281. As a result of the wrongful touching by Defendant GEO, Plaintiffs and the Detained Class suffered emotional distress.

282.   Defendant GEO acted with malice and oppression and with a conscious disregard of Plaintiffs' and the Detained Class's rights, making all Defendants liable for punitive damages under California Civil Code § 3294.

### THIRD CAUSE OF ACTION
### Cal. Civ. Code § 1714(a)
### PREMISES LIABILITY
### (Against GEO on Behalf of Plaintiffs and the Detained Class)

283.   Plaintiffs hereby incorporate allegations contained in the preceding paragraphs, as though fully set forth herein.

284.   At all relevant times, Adelanto was operated, leased, possessed, managed, maintained, secured, inspected, serviced, staffed, and/or otherwise controlled by Defendant GEO.

285.   At all relevant times, Defendant GEO had the right to control conditions on the premises of Adelanto.

286.   Defendant GEO acted wantonly, recklessly, negligently, and carelessly in owning, operating, leasing, possessing, managing, maintaining, securing, inspecting, servicing, staffing, and/or otherwise controlling Adelanto. Among other things, Defendant GEO created a hazardous condition on the premise of Adelanto by using HDQ Neutral without properly diluting it; spraying HDQ Neutral in poorly ventilated spaces and on food, clothing, and objects coming into contact with skin and eyes; and, on information and belief, instructing and permitting its employees to use HDQ Neutral without training them about how to maintain the safety of the detained persons in their care.

287.   Defendant GEO acted wantonly, recklessly, negligently, and carelessly in owning, operating, leasing, possessing, managing, maintaining, securing, inspecting, servicing, staffing, and/or otherwise controlling Adelanto. Among other things, Defendant GEO failed to warn detained persons of a hazardous condition on the premises of Adelanto; failed to guard against the misuse of HDQ Neutral by properly training its employees to safely use HDQ Neutral; failed to guard against the negative

health effects of HDQ Neutral by providing goggles, masks, or other equipment sufficient to mitigate the known hazards of HDQ Neutral; and failed to heed complaints from detained people experiencing the negative health effects of HDQ Neutral on the premises.

288.   Defendant GEO had actual and/or constructive notice that its use of HDQ Neutral created a hazardous and unsafe condition on the premises: among other things, Defendant GEO had access to Spartan Chemical's HDQ Neutral Safety Data Sheet warning of the risks of HDQ Neutral.

289.   It was reasonably foreseeable that Plaintiffs and the Detained Class would suffer injury as a result of Defendant GEO's overuse and misuse of HDQ Neutral at Adelanto, as well as GEO's failure to take reasonable precautions in light of the available evidence.

290.   As a result of the continued hazard on the premises controlled by Defendant GEO, Plaintiffs and the Detained Class suffered and continue to suffer physical injuries, including, but not limited to, chronic coughing and shortness of breath, skin rashes and blisters, eye irritation and burning, blurred vision, nosebleeds, headaches, dizziness, nausea, fatigue, and/or fainting.

291.   As a result of the continued hazard on the premises controlled by Defendant GEO, Plaintiffs and the Detained Class suffered emotional distress.

292.   Defendant GEO acted willfully and with malice by consciously disregarding the risks of misusing HDQ Neutral, concealing its use, and refusing to use it differently even in the face of injuries brought to Defendant's attention.

293.   Defendant GEO knew that its use of HDQ Neutral on the premises without training, safeguards, or protective equipment could cause health injury to Plaintiffs and the Detained Class who were in Defendant GEO's care. Despite this knowledge, and although the dangerous use of HDQ Neutral continued for sufficient time to have been remedied, Defendant GEO nevertheless consciously and deliberately failed to act to avoid the probability of injury.

294.    Instead, as detailed in the preceding paragraphs, Defendant GEO made material misrepresentations to the public about its use of HDQ Neutral and continued to clandestinely misuse the pesticide at Adelanto, warranting punitive damages.

**FOURTH CAUSE OF ACTION**
**Cal. Civ. Code § 1710(3)**
**CONCEALMENT**
**(Against GEO on Behalf of Plaintiffs and the Detained Class)**

295.    Plaintiffs reallege and incorporate the allegations set forth in the preceding paragraphs as though fully set forth herein.

296.    Defendant GEO concealed and suppressed its improper use of HDQ Neutral indoors on and around Plaintiffs and the Detained Class at Adelanto.

297.    Defendant GEO concealed and suppressed its improper dilution of HDQ Neutral at Adelanto.

298.    Defendant GEO concealed and suppressed its failure to provide the required PPE for use of HDQ Neutral.

299.    As the party responsible for the custody, care, and well-being of Plaintiffs and the Detained Class, Defendant GEO had a special duty to inform Plaintiffs and the Detained Class of its improper use and dilution of HDQ Neutral.

300.    Defendant GEO intentionally concealed and suppressed its improper use and dilution of HDQ Neutral indoors on and around Plaintiffs and the Detained Class, improper dilution of HDQ Neutral, and failure to provide PPE, among other failures, with the intent to defraud Plaintiffs and the Detained Class.

301.    Plaintiffs and the Detained Class were unaware of Defendant GEO's actual improper use of HDQ Neutral indoors on and around Plaintiffs and the Detained Class, improper dilution, and failure to provide PPE, among other failures.

302.    Plaintiffs and the Detained Class would not have acted as they did if they had known of the concealed and suppressed facts.

303.    As a result of the concealment and suppression of these and other material facts, Plaintiffs and the Detained Class suffered and continue to suffer physical

injuries, including, but not limited to, chronic coughing and shortness of breath, skin rashes and blisters, eye irritation and burning, blurred vision, nosebleeds, headaches, dizziness, nausea, fatigue, and/or fainting.

304.    Defendant GEO's actions also caused Plaintiffs and the Detained Class to suffer emotional distress.

305.    Defendant GEO acted with fraud, malice and oppression, and with a conscious disregard of Plaintiffs' and the Detained Class's rights, making all Defendants liable for punitive damages under California Civil Code § 3294.

**FIFTH CAUSE OF ACTION**
**Cal. Civ. Code § 1710(1)**
**INTENTIONAL MISREPRESENTATION**
**(Against GEO on Behalf of Plaintiffs and the Detained Class)**

306.    Plaintiffs hereby incorporate by reference all preceding paragraphs of this Complaint as if fully set forth herein.

307.    Defendant GEO made false and material misrepresentations to the public regarding its use of HDQ Neutral at Adelanto.

308.    Defendant GEO made false and material misrepresentations to the public regarding the availability of PPE to Plaintiffs and the Detained Class who used or were exposed to HDQ Neutral at Adelanto.

309.    Defendant GEO made false and material misrepresentations to Plaintiffs and the Detained Class that HDQ Neutral was for COVID safety, that HDQ Neutral was not causing their health issues, and regarding Defendant GEO's lack of available alternative products.

310.    Defendant GEO knowingly made the aforementioned false and material misrepresentations. Alternatively, Defendant GEO made the misrepresentations recklessly and without regard for their truth.

311.    Defendant GEO intended that Plaintiffs and the Detained Class rely on these misrepresentations.

312. Plaintiffs and the Detained Class reasonably relied on Defendant's misrepresentations.

313. As a result of Defendant GEO's misrepresentations, Plaintiffs and the Detained Class suffered and continue to suffer physical injuries, including, but not limited to, chronic coughing and shortness of breath, skin rashes and blisters, eye irritation and burning, blurred vision, nosebleeds, headaches, dizziness, nausea, fatigue, and/or fainting.

314. Defendant GEO's actions also caused Plaintiffs and the Detained Class to suffer emotional distress.

315. Plaintiffs' and the Detained Class's reliance on Defendant GEO's misrepresentations was a substantial factor in causing harm to Plaintiffs and the Detained Class.

316. Defendant GEO acted with fraud, malice and oppression, and with a conscious disregard of Plaintiffs' and the Detained Class's rights, making Defendant GEO liable for punitive damages under California Civil Code § 3294.

**SIXTH CAUSE OF ACTION**
**Cal. Civ. Code § 1710(2)**
**NEGLIGENT MISREPRESENTATION**
**(Against GEO on Behalf of Plaintiffs and the Detained Class)**

317. Plaintiffs hereby incorporate by reference all preceding paragraphs of this Complaint as if fully set forth herein.

318. Defendant GEO made false and material misrepresentations to the public regarding the use of HDQ Neutral at Adelanto.

319. Defendant GEO made false and material misrepresentations to Plaintiffs and the Detained Class regarding the use of HDQ Neutral at Adelanto.

320. Defendant GEO made those false and material misrepresentations with no reasonable ground for believing them to be true.

321. Defendant GEO intended that Plaintiffs and the Detained Class rely on the misrepresentations.

322.   Plaintiffs and the Detained Class reasonably relied on the misrepresentations.

323.   Plaintiffs and the Detained Class suffered and continue to suffer physical injuries, including, but not limited to, chronic coughing and shortness of breath, skin rashes and blisters, eye irritation and burning, blurred vision, nosebleeds, headaches, dizziness, nausea, fatigue, and/or fainting.

324.   Defendant's actions also caused Plaintiffs and the Detained Class to suffer emotional distress.

325.   Plaintiffs' and the Detained Class's reliance on Defendant GEO's misrepresentations was a substantial factor in causing harm to Plaintiffs and the Detained Class.

## SEVENTH CAUSE OF ACTION
## DESIGN DEFECT - STRICT LIABILITY
### (Against Spartan Chemical on Behalf of Plaintiffs and the Detained Class)

326.   Plaintiffs hereby incorporate by reference all preceding paragraphs of this Complaint as if fully set forth herein.

327.   Defendant Spartan Chemical manufactured, provided and serviced the Spartan chemical dispensers in use during the Class Period throughout the Adelanto Detention Facility.

328.   Defendant Spartan Chemical deliberately adjusted the flow rate of HDQ Neutral to deliver a higher concentration of HDQ Neutral into the spray bottles, bulk sprayers and mopping buckets than as directed for use by the EPA approved label.

329.   The deliberate design to provide overconcentrated HDQ Neutral was a substantial factor in causing harm to Plaintiffs and the Detained Class, including harm to Plaintiffs' and the Detained Class's skin, respiratory distress, and injuries to their eyes.

330.   There is minimal or no additional cost associated with using a 1-ounce nozzle instead of a 2-ounce nozzle, and the virucidal efficacy claims are not diminished

by using a concentrate as indicated by the EPA approved label. The benefit associated with dispensing HDQ Neutral at a concentration indicated by the EPA approved label is minimization of risk of harm.

## EIGHTH CAUSE OF ACTION
## FAILURE TO WARN - STRICT LIABILITY
**(Against Spartan Chemical on Behalf of Plaintiffs and the Detained Class)**

331.    Plaintiffs hereby incorporate by reference all preceding paragraphs of this Complaint as if fully set forth herein.

332.    Spartan Chemical manufactured and sold HDQ Neutral, as well provided instructions, signage, labels, screen-printed bottles, cages, and dispenser units for its storage and dispensing to Defendant GEO Group for further use by guards, Plaintiffs, and members of the Detained Class inside the Adelanto Facility.

333.    When used at off-label concentrations, every 15 to 30 minutes, in crowded rooms with humans not protected by personal protective equipment (*e.g.*, goggles, masks, and clothing), HDQ Neutral bore risks of eye burns, skin rashes, respiratory, and gastric distress that were known to Spartan Chemical throughout the class period.

334.    These potential risks presented a substantial danger when the product was used or misused in the intended or reasonably foreseeable way, *i.e.,* in immigration detention where usage was near or atop of Plaintiffs and the Detained Class while they ate, spoke to loved ones on the phone, and slept in their bunks.

335.    HDQ Neutral, masked with a floral scent and a bright pink color, is not a household name or a product with which ordinary consumers would recognize the potential risks of improper usage.

336. Defendant Spartan Chemical failed to adequately disclose the overconcentration of HDQ Neutral and to warn of the potential risks related to spraying overconcentrated HDQ Neutral throughout the Adelanto Facility every 15 to

30 minutes amongst unprotected humans and, additionally, failed to provide any instruction regarding the safe or unsafe uses of the product.

337.   Plaintiffs and the Detained Class sustained acute and chronic injuries from the frequent spraying of over-concentrated HDQ Neutral in and around their living and eating quarters without adequate protective equipment.

338.   Spartan Chemical's failure to label its product accurately, its failure to provide adequate warnings, and its complete failure to provide instructions was a substantial factor in causing Plaintiffs' and the Detained Class's harms.

## NINTH CAUSE OF ACTION
## FAILURE TO WARN - NEGLIGENCE

**(Against Spartan Chemical on Behalf of Plaintiffs and the Detained Class)**

339.   Spartan Chemical manufactured and sold HDQ Neutral as well as provided instructions, signage, labels, screen-printed bottles, cages, and dispenser units for its storage and dispensing to Defendant GEO Group for deployment at the Adelanto Facility.

340.   Defendant Spartan Chemical knew or reasonably should have known that HDQ Neutral was a dangerous, toxic to humans, pesticide and was dangerous or likely to be dangerous when used in crowded detention settings at off-label concentrations, sprayed at least 48 times a day, where no exclusion zones could be created during application. Spartan Chemical also knew or reasonably should have known through its tours, inspections, adjustments, and sales data that its product, HDQ Neutral, would be used in this manner.

341.   Spartan Chemical knew or reasonably should have known that Plaintiffs and all detained individuals given access or ordered to use HDQ Neutral by officers of GEO, would not realize the danger of using the product in crowded conditions, with high rates of frequency, and without adequate protection.

342.   Spartan Chemical failed to adequately warn of the danger resulting from the planned use of HDQ Neutral at the Adelanto Facility and/or instruct on the safe

use of HDQ Neutral in any of the visible or legible signage or labels within the Adelanto Facility. Spartan Chemical and GEO purposefully obscured or hid access to any instructions on the safe use of HDQ Neutral.

343.    A reasonable manufacturer distributing pesticides within the state of California to a private prison corporation running immigration detention centers, would have taken reasonable steps, including by providing visible and legible instructions for safe use and warning of the dangers of failing to clear a room of other humans or spraying within three feet of unmasked humans.

344.    As a result of Spartan Chemical's mislabeling, failure to provide any instructions with respect to any use of HDQ Neutral, and failure to give adequate warnings regarding, among other dangers, overuse, Plaintiffs and the Detained Class suffered injuries to their eyes, rashes on their skin, and respiratory and gastric distress, as well as emotional distress. Spartan Chemical's failure to warn that its product was overconcentrated, failure to instruct not to spray frequently, near humans, without masks or proper ventilation, was a substantial factor in Plaintiffs' and the Detained Class's injuries.

## VII.  PRAYER

WHEREFORE, Plaintiffs, individually and on behalf of the Detained Class, respectfully request that the Court enter judgment in their favor against Defendant The GEO Group, Inc. and Defendant Spartan Chemical Company, Inc., and award the following relief:

A.    Certifying the Detained Class and appointing Plaintiffs as Class Representatives for the Detained Class;

B.    Awarding each Plaintiff compensatory and special damages for injuries;

C.    Awarding each Plaintiff punitive damages;

D.    Awarding Detained Class members compensatory and special damages for injuries;

E.    Awarding Detained Class members punitive damages;

1   F.   For an order requiring Defendant GEO to pay for medical monitoring and
2        expenses for the next five (5) years of each Plaintiff;

3   G.   For an order requiring Defendant GEO to pay for medical monitoring and
4        expenses for the next (5) years for each Detained Class member;

5   H.   Awarding Plaintiffs and the Detained Class reasonable attorney's fees,
6        costs, and expenses as allowed by law;

7   I.   Awarding declaratory relief that Defendant GEO knowingly poisoned
8        and harmed Plaintiffs and the Detained Class in violation of California
9        law;

10  J.   Awarding further appropriate equitable relief; and

11  K.   Granting any other relief this Court deems just and proper.

## VIII.  DEMAND FOR TRIAL BY JURY

Plaintiffs, individually and on behalf of the Detained Class, demand a trial by jury as to all those issues triable as of right.

Dated:  January 6, 2025                SOCIAL JUSTICE LEGAL FOUNDATION


By: _____
    Sara Haji
    Marjorie J. Menza
    Vanessa M. Domenichelli

Dated:  January 6, 2025                HUESTON HENNIGAN LLP


By: _____
    John C. Hueston
    Robert N. Klieger
    Emily Michael Munson

    *Attorneys for Plaintiffs*