UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

| Case No. | **EDCV 23-0481 JGB (SHKx)** | Date | September 26, 2025 |
|---|---|---|---|

| Title | ***Ligaya Ronduen, et al. v. The Geo Group, Inc.*** |
|---|---|

Present: The Honorable    JESUS G. BERNAL, UNITED STATES DISTRICT JUDGE

| MAYNOR GALVEZ | Not Reported |
|---|---|
| Deputy Clerk | Court Reporter |

| Attorney(s) Present for Plaintiff(s): | Attorney(s) Present for Defendant(s): |
|---|---|
| None Present | None Present |

Proceedings:    **Order (1) DENYING-IN-PART and GRANTING-IN-PART Plaintiffs' Motion for Class Certification (Dkt. No. 318); (2) GRANTING the Parties' Ex Parte Applications to File Under Seal (Dkt. Nos. 314, 354); (3) GRANTING Plaintiffs' Ex Parte Application to Exceed Page Limit (Dkt. No. 357); and (4) VACATING the September 29, 2025, Hearing (IN CHAMBERS)**

The primary motion before the Court is Plaintiffs' Motion for Class Certification. ("Motion," Dkt. No. 318.)  The parties submitted applications to file documents related to Plaintiffs' Motion under seal, which the Court **GRANTS**.  (Dkt. Nos. 314, 354.)  Plaintiffs filed an application to exceed the page limit by five pages, which the Court **GRANTS**.  (Dkt. No. 357.) The Court finds these matters appropriate for resolution without a hearing.  <u>See</u> Fed. R. Civ. P. 78; L.R. 7-15.  After considering the papers filed, the Court **DENIES-IN-PART** and **GRANTS-IN-PART** Plaintiffs' Motion.  The September 29, 2025, hearing is **VACATED**.

## I.  BACKGROUND

On March 20, 2023, Plaintiffs Wilfredo Gonzalez Mena, Carlos Castillo, Somboon Phaymany, Yolanda Mendoza, Ligaya Ronduen, Miriam Scheetz, and Cesar Hernandez Carrillo filed a putative class action complaint against Defendant the Geo Group, Inc.  ("GEO"). ("Complaint," Dkt. No. 1.)  The Complaint asserted six causes of action on behalf of Plaintiffs and the putative class: (1) negligence, pursuant to Cal. Civ. Code § 1714(a); (2) battery; (3) premises liability, pursuant to Cal. Civ. Code § 1714(a); (4) concealment, pursuant to Cal. Civ. Code § 1710(3); (5) intentional misrepresentation, pursuant to Cal. Civ. Code § 1710(1); and (6) negligent misrepresentation, pursuant to Cal. Civ. Code § 1710(2).  (<u>See</u> <u>id.</u>)

On May 12, 2023, Defendant filed a Motion to Dismiss. ("MTD," Dkt. No. 23.) The Court denied the MTD on July 6, 2023. (Dkt. No. 32.) On July 20, 2023, Defendant filed a third-party complaint ("TPC," Dkt. No. 35) against third-party defendant Spartan Chemical Company, Inc. ("Spartan") and Roes 1-10. The TPC asserted six causes of action: (1) breach of contract; (2) negligence; (3) implied indemnity; (4) equitable indemnity; (5) contribution; and (6) declaratory relief. (See TPC.)

On June 28, 2024, GEO and Spartan (together, "Defendants") filed a motion to continue the trial and related pretrial deadlines. ("Motion to Continue," Dkt. No. 95.) On August 26, 2024, the Court granted the Motion to Continue and set November 4, 2024, as the deadline for filing a motion to amend pleadings or add new parties and March 28, 2025, as the all discovery cut-off (including hearing of discovery motions) deadline. (Dkt. No. 104.) On October 15, 2024, the parties jointly stipulated to dismissed Plaintiff Ceasar Hernandez Carillo. (Dkt. No. 108.)

On January 6, 2025, Plaintiffs filed their First Amended Complaint. ("FAC," Dkt. No 152.) On June 30, 2025, Defendants filed a motion for leave to amend their answer Plaintiffs' FAC. (Dkt. No. 250.) On July 1, 2025, Defendants filed a motion for summary judgment. (Dkt. No. 251.) The same day, Plaintiffs filed a motion for class certification. (Dkt. No. 252.) On July 18, Defendants jointly filed their opposition. (Dkt. No. 297.) On July 21, 2025, the Court struck the summary judgment motion, motion for leave to file an amended answer to the FAC, and motion for class certification for the parties' failure to comply with the Court's standing order. (Dkt. No. 305.) As relevant to this order, Plaintiffs refiled their motion for class certification on August 25, 2025. ("Motion," Dkt. No. 318.) The Motion is accompanied by:

- Declaration of Hannah Comstock and Exhibits 1-85 (Dkt. Nos. 318-1-86)
- Declaration of Ligaya Ronduen (Dkt. No. 318-87)
- Declaration of Yolanda Mendoza (Dkt. No. 318-88)
- Declaration of Miriam Scheetz (Dkt. No. 318-89)
- Declaration of Somboon Phaymany (Dkt. No. 318-90)
- Declaration of Wilfredo Gonzalez Mena (Dkt. No. 318-91)
- Declaration of Carlos Castillo (Dkt. No. 318-92)
- Declaration of John C. Hueston (Dkt. No. 318-93)
- Declaration of Robert N. Klieger (Dkt. No. 318-94)
- Declaration of Sara Haji (Dkt. No. 318-95)

Additionally, Plaintiffs' Motion was accompanied by an application to file documents under seal. (Dkt. No. 314.) In addition to the primary proposed class, Plaintiffs alternatively propose various issue classes. (Mot. at 41-45.) On September 8, 2025, GEO and Spartan jointly filed their opposition to Plaintiffs' Motion. ("Opposition," Dkt. No. 339.) The Opposition is accompanied by:

- Declaration of David Mesa (Dkt. No. 339-1)
- Compendium in Support of Opposition to Class Certification (Dkt. No. 339-2)
- Declaration of Fred M. Blum (Dkt. No. 339-3)

- Defendants' Evidentiary Objections in Support of Opposition to Class Certification (Dkt. No. 339-4)

Additionally, Defendants' Opposition was accompanied by an application to file documents under seal. (Dkt. No. 354.) Plaintiffs filed their reply on September 15, 2025. (Dkt. No. 359.) The same day, Plaintiffs filed an ex parte application to exceed the page limit for their Motion. (Dkt. No. 357.)

## II. FACTS

Plaintiffs allege the following: Six individuals detained at Adelanto Detention Center ("Adelanto" or "the Facility") between February 2020 and November 2020 bring this lawsuit on their behalf and on behalf of the more than 3,000 other detained people harmed by GEO's improper use of a toxic chemical at Adelanto, and Spartan's failure to ensure proper use of the toxic chemical at the Facility. (FAC ¶¶ 1; 18-19.) GEO is a private company that manages and operates the Immigration and Customs Enforcement ("ICE") detention and processing facility in Adelanto, California. (Id. ¶¶ 3, 30.) Defendant Spartan Chemical is a private company that manufactures HDQ Neutral, the chemical sprayed at the Facility, and sold it to GEO for use at Adelanto. (Id. ¶ 31.) Plaintiffs are former detainees at Adelanto and the putative class involves civil immigration detainees who are or were held at Adelanto pending the outcome of their immigration proceedings. (Id. ¶¶ 24-29.)

After the onset of the COVID-19 pandemic, between February 2020 and April 2020, GEO staff sprayed a red/pink toxic chemical called HDQ Neutral throughout Adelanto. (Id. ¶¶ 7, 57, 147.) GEO had also used HDQ Neutral as a cleaning disinfectant before the COVID-19 pandemic started, but beginning in February 2020, GEO significantly changed the manner and increased the frequency of its use to a startling degree. (Id. ¶ 7.) GEO's chemical spraying was a near-constant and invasive presence at Adelanto. (Id. ¶ 8.) GEO staff sprayed HDQ Neutral every 15 to 30 minutes from vats strapped to their backs and from smaller spray bottles (the "Spray Policy"). (Id.) GEO staff sprayed this chemical into the air and onto all surfaces, including food contact surfaces, telephones, rails, door handles, bathrooms, showers, and sinks. (Id.) GEO staff sprayed when people were eating, and the chemical mist would fall on their food. (Id.) GEO staff sprayed at night, on or around the bunk beds and cells where people slept. (Id.) And on at least one occasion, GEO staff sprayed individuals as a disciplinary measure. (Id.)

Spartan, who supplied HDQ Neutral to GEO, was responsible for monitoring GEO's use, but failed to do so—even when GEO ordered up to five times its monthly average of HDQ Neutral. (Id.) Due to their incessant, months-long exposure to HDQ Neutral, Plaintiffs and others detained at Adelanto experienced acute symptoms, including but not limited to persistent cough, irritation of the throat and nasal passages, skin irritation and rashes, and headaches. (Id. ¶ 10.) Various Plaintiffs had nosebleeds or found blood in their mouths and saliva. (Id. at 11.) Others had debilitating headaches or felt dizzy and lightheaded. (Id.) Several Plaintiffs have chronic, long-term health effects. (Id.)

HDQ Neutral is pesticide approved for use as a very diluted disinfectant in institutional settings, but is not available directly to consumers at retail stores. (Id. ¶ 43.) HDQ Neutral's two active components, DDAC and ADBAC1, have been linked to numerous, serious acute and chronic health effects. (Id. ¶ 44.) The Environmental Protection Agency ("EPA") classifies five types of acute toxicity data (oral, dermal, inhalation, skin irritation, and eye irritation) into four Toxicity Categories, with Category 1 being the highest hazard. (Id. ¶ 45.) The EPA has categorized acute toxicity data for DDAC and ADBAC, the active components in HDQ Neutral, as Category 1 toxicity for skin and eye irritation, Category 2 for oral ingestion and inhalation, and Category 3 for dermal exposure. (Id.)

Spartan acknowledges that inhalation of HDQ Neutral can result in nasal discomfort, nasal bleeding, coughing, sore throat, trouble breathing, and damage to the mucosal membrane of the respiratory tract. (Id. ¶ 46.) Skin contact can result in redness, blistering, and rashes. (Id.) Ingestion can result in burns to the digestive tract, pain, nausea, vomiting, and diarrhea. (Id.) Eye exposure can result in irritation, pain, redness, itchiness, swelling, and worsened vision. (Id.) Various scientific sources have documented how DDAC and ADBAC are correlated with severe skin irritation that can lead to skin sensitization or dermatitis, respiratory irritation and inflammation, chronic obstructive pulmonary disease, reproductive and developmental effects (including decreased fertility, disruption of hormone-regulated processes like ovulation, late-term fetal death, and birth defects, such as neural tube defects), and genotoxicity. (Id. ¶ 47.)

Spartan provides usage regulations, safety information, and other warnings regarding the use of HDQ Neutral, including Spartan's HDQ Neutral Safety Data Sheet (the "Safety Data Sheet") and HDQ Neutral's Container Label (the "Container Label"). (Id. ¶ 49.) GEO has used HDQ Neutral for at least 10 years at Adelanto. (Id. ¶ 50.) As manager and operator of Adelanto, GEO is responsible for ensuring its staff follows regulations, guidelines, and manufacturer safety warnings for the use of chemicals at the Facility to safeguard the health and welfare of the people in its custody. (Id. ¶ 51.) GEO had access to all of Spartan's safety information, but kept the Safey Data Sheets in binders locked inside janitor's closets and Container Labels locked behind metal cages. (Id. ¶ 52.) Additionally, the EPA warns that fumigation and wide-area spraying of chemicals intended to kill COVID-19 cells are not appropriate. (Id. ¶ 53.) GEO was required to know and follow these EPA guidelines. (Id.)

GEO's use of HDQ Neutral went against its manufacturer's and regulators' safety guidelines, including through constant spraying indoors, improper dilution (diluting and applying HDQ neutral with a ratio of 2 ounces per gallon, when all available information indicated that it should be diluted with a ratio of 1 ounce per gallon, except for when used in animal pens as a virucidal disinfectant), failing to provide Personal Protective Equipment ("PPE"), and failing to train detained individuals on its proper use. (Id. ¶¶ 53, 78-82, 87, 92-94.) (Id.) Plaintiffs and putative class members had no control or say over where, how, or how often the chemical mixture was sprayed. (Id. ¶ 58.) GEO concealed the dangers of HDQ Neutral from Plaintiffs and its wrongful use of the product. (Id. ¶ 104.)

Plaintiffs reported to GEO and medical staff concerns about the symptoms Plaintiffs experienced and their theory of a link with the constant spraying of HDQ Neutral.  (See, e.g., id. ¶¶ 110-111.)  GEO staff ignored Plaintiffs' concerns, continued the constant spraying of HDQ Neutral, and repeatedly told Plaintiffs and other detained individuals that HDQ Neutral was necessary and required to prevent the spread of COVID-19.  (See, e.g., id. ¶ 157.)  Medical staff at Adelanto either ignored or failed to provide information and adequate medical care for the symptoms Plaintiffs experienced.  (Id. ¶¶ 16-17.)

Because Adelanto was in lockdown due to the COVID-19 pandemic, Plaintiffs and other people detained at Adelanto were fully reliant on GEO for COVID-19 related updates, safety measures, and care—yet GEO provided little or no information to them.  (Id. ¶¶ 6, 57.)  Plaintiffs and others detained at Adelanto, alarmed at the amount and frequency in which HDQ Neutral was being sprayed, began complaining.  (Id. ¶ 12.)  But with little information about the pandemic, Plaintiffs and others had to rely on the assurances made by GEO that HDQ Neutral was a necessary and safe protective measure against COVID-19.  (Id.)  Detained people at Adelanto have no internet access in their dormitories or cell blocks, and access to the internet in the law library is limited to legal resources.  (Id. ¶ 56.)  Detained people must rely on GEO staff to provide newspapers to their block, or to turn on the television to a news channel.  (Id.)  Several of the Plaintiffs and the putative class speak limited or no English.  (Id.)  For these reasons, they heavily relied on the information GEO staff was willing to share about COVID-19.  (Id.)  GEO did not provide Plaintiffs with safety information for HDQ Neutral, such as container labels.  (Id. ¶¶ 105-107.)

On July 29, 2020, the EPA conducted an inspection of Adelanto via videoconference due to concerns that GEO staff may have been using HDQ Neutral in an improper manner.  (Id. ¶ 60.)  The EPA documented its findings from its inspection in the EPA July 2020 Final Inspection Report ("EPA Report").  (Id.)  Following its inspection, the EPA issued a Notice of Warning to GEO, formalizing its findings and noting multiple violations of the Federal Insecticide, Fungicide and Rodenticide Act ("FIFRA").  (Id.)  The EPA Report and Notice of Warning were not made public until March 21, 2021, and were the first governmental and scientific finding publicly available about GEO's improper use of HDQ Neutral.  (Id. ¶ 61.)  Despite the EPA's July 2020 inspection and warnings, GEO continued its dangerous and indiscriminate use of HDQ Neutral.  (Id. ¶ 62.)

### III.  LEGAL STANDARD

Federal Rule of Civil Procedure 23 ("Rule 23") governs the litigation of class actions. A party seeking class certification must establish the following prerequisites:

> (1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class.

Fed. R. Civ. P. 23(a). After satisfying the four prerequisites of numerosity, commonality, typicality, and adequacy, a party must also demonstrate one of the following: (1) a risk that separate actions would create incompatible standards of conduct for the defendant or prejudice individual class members not parties to the action; (2) the defendant has treated the members of the class as a class, making appropriate injunctive or declaratory relief with respect to the class as a whole; or (3) common questions of law or fact predominate over questions affecting individual members and that a class action is a superior method for fairly and efficiently adjudicating the action. See Fed. R. Civ. P. 23(b)(1)-(3).

A trial court has broad discretion regarding whether to grant a motion for class certification. See Bateman v. Am. Multi-Cinema, Inc., 623 F.3d 708, 712 (9th Cir. 2010). Still, "[a] party seeking class certification must affirmatively demonstrate compliance with [Rule 23]—that is, the party must be prepared to prove that there are in fact sufficiently numerous parties, common questions of law or fact, etc." Wal-Mart Stores, Inc. v. Dukes, 564 U.S. 338, 350 (2011). A district court must conduct a "rigorous analysis" that frequently "will entail some overlap with the merits of the plaintiff's underlying claim." Id. at 351. "Courts typically proceed claim-by-claim in determining whether the Rule 23 requirements have been met, particularly as to the Rule 23(a)(2) and (b)(3) requirements of common questions and predominance." Allen v. Verizon California, Inc., 2010 WL 11583099, at *2 (C.D. Cal. Aug. 12, 2010). A "district court must find by a preponderance of the evidence that the plaintiff has established predominance under Rule 23(b)(3)." Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC, 993 F.3d 774 (9th Cir. 2021).

Rule 23 further provides that "[w]hen appropriate, an action may be brought or maintained as a class action with respect to particular issues," Fed. R. Civ. P. 23(c)(4), or the "class may be divided into subclasses that are each treated as a class under this rule," Fed. R. Civ. P. 23(c)(5). "This means that each subclass must independently meet the requirements of Rule 23 for the maintenance of a class action." Betts v. Reliable Collection Agency, Ltd., 659 F.2d 1000, 1005 (9th Cir. 1981).

## IV.  DISCUSSION

Plaintiffs seek to certify the following class:

> All persons who were detained at Adelanto Detention Center between February 2020 through November 1, 2020 that were exposed to HDQ Neutral.

(FAC ¶ 248.)

In the alternative, Plaintiffs seek to certify issue classes for negligence liability ("Negligence Liability Issue Class"), general causation ("General Causation Issue Class"), fraud ("Fraud Issue Class"), failure-to-warn ("Failure-to-Warn Issue Class"), design defect

("Design Defect Issue Class"), and availability of punitive damages ("Punitive Damages Issue Class"). (Mot. at 41-45.)

## A. Proposed Class

### 1. Numerosity

Rule 23(a)(1) requires the class to be so numerous that joinder of individual class members is impracticable. See Fed. R. Civ. P. 23(a)(1). To be impracticable, joinder must be difficult or inconvenient, but need not be impossible. Keegan v. Am. Honda Motor Co., 284 F.R.D. 504, 522 (C.D. Cal. 2012). There is no magic number which automatically satisfies the numerosity inquiry. Id. Forty or more members, however, will generally satisfy the requirement. Id. A plaintiff has the burden to establish that this requirement is satisfied. United Steel, Paper & Forestry, Rubber, Mfg. Energy v. Conoco Phillips Co., 593 F.3d 802, 806 (9th Cir. 2010).

Plaintiffs argue the proposed class is sufficiently numerous because at it likely includes upwards of 3,000 people who were detained during the class period. (Mot. at 19.) Defendants counter that, because it is impossible to ascertain who was exposed to HDQ Neutral among those who were detained at Adelanto during the class period, numerosity is not met. (Opp'n at 23.) Because Plaintiffs have alleged that "GEO staff fumigated the air and surfaces of the Facility's living areas with HDQ Neutral," it would appear that everyone detained at the facility would have at least been exposed to some quantity of HDQ Neutral at some point. (FAC ¶ 59.) As such, numerosity is satisfied.

### 2. Commonality and Predominance

The Court analyzes commonality under Rule 23(a) and predominance under Rule 23(b)(3) together, because the latter is an extension of the former, and is more stringent. Comcast Corp. v. Behrend, 133 S. Ct. 1426, 1432 (2013) ("Rule 23(b)'s predominance criterion is even more demanding than Rule 23(a) . . . Rule 23(b) requires that courts take a close look at whether common questions predominate over individual ones.") (citations omitted). The Rule 23(a)(2) commonality and Rule 23(b)(3) predominance inquiries require the Court to engage in a "rigorous" analysis and may "entail some overlap with the merits of the plaintiff's underlying claim." In re Capacitors Antitrust Litig. (No. III), 2018 WL 5980139, at *2 (N.D. Cal. Nov. 14, 2018) (internal quotations omitted).

To satisfy the commonality requirement under Rule 23(a)(2), Plaintiffs are required to show "questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2). A common question "must be of such a nature that it is capable of classwide resolution—which means that the determination of its truth or falsity will resolve an issue that is central to the validity of each of the claims in one stroke." Dukes, 564 U.S. at 350. "By contrast, an individual question is one where members of a proposed class will need to present evidence that varies from member to member." Olean Wholesale Grocery Coop., Inc., 31 F.4th at 663. What matters is not the raising of common questions in droves, but the "capacity of a class-wide proceeding to generate

common answers apt to drive to the resolution of the litigation. Dissimilarities within the proposed class are what have the potential to impede the generation of common answers." <u>Dukes</u>, 564 U.S. at 350.

"The Rule 23(b)(3) predominance inquiry tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." <u>Amchem Prod., Inc. v. Windsor</u>, 521 U.S. 591, 623-24 (1997). "When one or more of the central issues in the action are common to the class and can be said to predominate, the action may be considered proper under Rule 23(b)(3) even though other important matters will have to be tried separately, such as damages or some affirmative defenses peculiar to some individual class members." <u>Tyson Foods, Inc. v. Bouaphakeo</u>, 577 U.S. 442, 453 (citations and internal quotations omitted.)

Plaintiffs argue that commonality and predominance exist across their six claims because resolution of each claim will turn on proof of the following: "[(1)]GEO implemented the facility-wide Adelanto Spray Policy; [(2)] [t]he Adelanto Spray Policy consistently exposed the Detained Class to dangerous levels of HDQ Neutral; [(3)] [t]he compounds in HDQ Neutral corrode and inflame the body systems exposed to the pesticide and thus cause common injury; [(4)] GEO should have known and actually did know that the Adelanto Spray Policy was harming the Detained Class; and [(5)] [a]s to the fraud-based claims, GEO concealed those harms from the Detained Class. (Mot. at 21.) Plaintiffs also point to courts' reliance on centralized policies or procedures for identifying commonality, and consider the Spray Policy to fit this standard. (<u>See</u> Mot. at 22; <u>Maney v. State</u>, 2022 WL 986580, at *16 (D. Or. Apr. 1, 2022)).

Defendants, on the other hand, contend that neither commonality nor predominance exists because Plaintiffs cannot establish who exactly was exposed, or at what level.

Based on Plaintiffs' allegations, it appears that everyone in the facility would have been exposed to some amount of HDQ Neutral. (FAC ¶ 8.) Issues arise, however, with the question of level of exposure and resulting injuries. Plaintiffs' proposed class focuses on exposure, not injury. (<u>See</u> FAC ¶ 248.) Plaintiffs' own motion, however, alleges that "certain levels" of HDQ Neutral will result in an "inflammatory response." (Mot. at 24.) This necessarily implicates each individual's level of exposure and whether that level of exposure actually caused an injury. Plaintiffs allege that every Plaintiff and putative class member's exposure was uniformly at toxic levels. (<u>Id.</u> at 11.) Yet Plaintiffs' own expert explained during his deposition that his modeling did not differentiate between the exposure of a person a foot from spraying versus 100 feet from spraying, which he acknowledged "could make a difference for sure." (Compendium of Evidence in Support of Opposition to Motion ("COE"), Dkt. No. 339-2 at 98.) Additionally, some Plaintiffs and members of the proposed class were part of cleaning teams and were exposed while filling and using spray bottles, while others were exposed when the spraying occurred in their vicinity. (<u>See, e.g.</u>, FAC ¶¶ 175, 189, 214-223.) One would expect cleaning staff members' exposure would vary relative to those who did not personally spray HDQ Neutral. Plaintiffs also
//
//
//

allege different access to masks and gloves, which could have changed individuals' exposure.[1] (See, e.g., id. ¶¶ 81, 220.)  Such variation in exposure—given the role of exposure levels in producing injuries and the class definition's emphasis on exposure over injury—presents a formidable obstacle to class certification.

As further illustration of the challenge of relying on mere exposure, Plaintiffs allege that, over a two-week period in May 2020, nearly 50 detainees sought medical attention for symptoms associated with inhalation of, or dermal exposure to, HDQ Neutral.  (Mot. at 7.)  Adelanto has a capacity of roughly 1,940 people.  (FAC ¶ 32.)  Fifty detainees represents just about three percent of the capacity of Adelanto, or five percent if the facility was, for example, operating at half capacity.  Even assuming capacity as low as 50 percent, that up to 95 percent of detainees did not seek medical care during that period suggests either different levels of exposure within the facility, and/or different tolerance levels to exposure.  As another example, Plaintiffs allege that HDQ Neutral was sprayed onto doorways leading to small four- or eight-person cells.  (Mot. at 11.)  Cell size, however, would make a difference in the concentration of HDQ Neutral in a given area, which would change exposure levels.  (See COE at 98.)  This sample of allegations presents just some of the ways exposure levels or exposure tolerances appear to have varied across the facility, even if every detainee was exposed to some level of HDQ Neutral.

Given the apparently substantial variation in exposure levels experienced by different detainees and the fact that different exposure levels produce different levels of risk, the commonality of the proposed class is insufficient.  While determining every individual's precise exposure level may not be necessary, the role of exposure level in causing symptoms requires multiple fact-finding inquiries with insufficient commonality to be tried as a class.  This is further compounded by the fact that many symptoms of HDQ Neutral exposure—including headaches, coughing, vomiting, nose bleeds, asthma, dry skin, and eye and skin irritation—can also be associated with other causes, including COVID-19 itself.  (See Opp'n at 18.)  Plaintiffs would have to show their symptoms were more likely than not caused by HDQ Neutral, as opposed to something else.

Ultimately, Plaintiffs' proposed focus on exposure defeats commonality.  While it would appear that every detainee was exposed to some degree, variations in exposure and, resultingly, whether each individual was actually injured, are essential components of their claims.  This variation precludes commonality.  Without commonality, the more stringent predominance standard also cannot be met.

### 3. Typicality

"The purpose of the typicality requirement is to assure that the interest of the named representative aligns with the interests of the class."  Hanon v. Dataproducts Corp., 976 F.2d

---

[1] Plaintiffs contend that the masks provided to detainees would not protect against exposure to HDQ Neutral, but they do not similarly contend the gloves provided to some detainees were ineffective at mitigating skin exposure.  (See Reply at 4.)

497, 508 (9th Cir. 1992). "The test of typicality is whether other members have the same or similar injury, whether the action is based on conduct which is not unique to the named plaintiff, and whether other class members have been injured by the same course of conduct." <u>Wolin v. Jaguar Land Rover No. Am.</u>, 617 F.3d 1168, 1175 (9th Cir. 2010) (quoting <u>Hanon</u>, 976 F.2d at 508). Because typicality is a permissive standard, the named Plaintiffs' claims need not be identical to those of the other class members. <u>Hanlon v. Chrysler Corp.</u>, 150 F.3d 1011, 1020 (9th Cir. 1998).

Plaintiffs argue that their claims are typical of the putative class because they were subjected to the same Spray Policy; were housed in different units and experienced the same harmful exposure; and experienced the same or similar symptoms of exposure as others. (Mot. at 34.) Given the difficulties surrounding the ability to determine individual exposure, the individual Plaintiffs' exposure does not appear to satisfy the typicality requirement. First, some Plaintiffs were on the cleaning crews that filled spray bottles and handled them regularly. (<u>See</u> Opp'n at 11.) Further, most Plaintiffs had pre-existing medical conditions before they entered Adelanto or were exposed to the Spray Policy that may have individually impacted their alleged injuries resulting from HDQ Neutral exposure. (<u>Id.</u> at 43.) For example, Plaintiff Ronduen already suffered from headaches, vertigo, dry skin, chest pain, dermatitis, and nausea; Plaintiff Phaymany was diagnosed with asthma before arriving at Adelanto and "suffered from allergic rhinitis, which caused him to experience a dry, drowsy, and runny nose, as well as itchy, watery, and stinging eyes, sneezing, sinus congestion, and dry and itchy skin"; and Plaintiff Mena suffered from swelling, redness, pain, blurriness and yellow discharge from both eyes before the Spray Policy went into effect. (Opp'n at 2-3.) Plaintiffs' preexisting medical conditions—given their overlap with symptoms alleged to be caused by HDQ Neutral exposure—muddy a factfinder's ability to disaggregate these conditions from injuries caused by HDQ Neutral for members of the class who did not have these conditions. This, coupled with the difficulty in determining the named Plaintiffs' exposure relative to others in the facility, defeats typicality.

### 4. Adequacy

In determining whether proposed class representatives will adequately protect the interests of the class, the court should ask whether the proposed class representatives and their counsel have any conflicts of interest with any class member and whether the proposed class representatives and their counsel will prosecute the action vigorously on behalf of the class. <u>Johnson v. General Mills, Inc.</u>, 275 F.R.D. 282, 288 (C.D. Cal. 2011). The named Plaintiffs have submitted declarations indicating that they will prosecute the action vigorously on behalf of the class. (<u>See</u> Declaration of Ligaya Ronduen, Dkt. No. 318-87; Declaration of Yolanda Mendoza, Dkt. No. 318-88; Declaration of Miriam Scheetz, Dkt. No. 318-89; Declaration of Somboon Phaymany, Dkt. No. 90; Declaration of Wilfredo Gonzalez Mena, Dkt. No. 318-91; Declaration of Carlos Castillo, Dkt. No. 91.) Counsel have also submitted declarations listing their qualifications and experience with class actions and multi-party litigation. (<u>See</u> Declaration of John C. Hueston, Dkt. No 93; Declaration of Robert N. Klieger, Dkt. No. 94; Declaration of Sara Haji, Dkt. No. 95.) Defendants do not contest the adequacy of either Plaintiffs or counsel.

Accordingly, the Court finds that both Plaintiffs and proposed class counsel meet the adequacy requirement of Rule 23(a).

Because the Court finds that Plaintiffs have failed to satisfy commonality, predominance, and typicality, the Motion to certify the proposed class is **DENIED**.

## B. Alternative Issue Classes

Plaintiffs argue that, in the event the Court denies certification on the main proposed class, the Court should alternatively certify various issue classes. (Mot. at 41-45.) The Negligence Liability Issue Class fails for the same reason as Plaintiffs' main proposed class—the issue of breach is inherently tied to exposure levels and the existence of injuries, which are not susceptible to classwide resolution.

As to the Fraud Issue Class, "a case may be unsuited for class treatment if there was material variation in the representations made or in the kinds or degrees of reliance by the persons to whom they were addressed." In re First All. Mortg. Co., 471 F.3d 977, 990 (9th Cir. 2006) (internal citations omitted). Unlike in a scenario with a single representation applied to all class members similarly or equally, the allegations here rely on different representations allegedly made to each individual Plaintiffs or putative class member by different GEO employees in different scenarios, be they guards, medical staff, or others. Reliance would depend on individual evaluations as well. As such, the Fraud Issue Class is not susceptible to classwide resolution.

The Failure-to-Warn Issue Class similarly fails. Such a claim is reliant on a determination that, even if there was an adequate warning, Plaintiffs and the putative class members would have learned of the warning and altered their conduct as a result. (See, e.g., Huitt v. S. California Gas Co., 188 Cal. App. 4th 1586, 1603 (Cal. Ct. App. 2010). Such a showing in this case would require individualized proof for which classwide resolution is not conducive.

The Design Defect Issue Class fails because it requires consideration of the harm resulting from the alleged design defect. This evaluation of harm is not susceptible to classwide resolution as discussed above.

The Punitive Damages Issue Class fails because it relies on the uniformity of the Spray Policy as applied to the proposed class, yet the core issue the Court has identified is that even if the Spray Policy was applied uniformly to the class, that does not mean exposure levels were uniform across the class, nor that symptoms resulting from such exposure were uniform.

That leaves the General Causation Issue Class. Plaintiffs argue that the issue of whether HDQ Neutral exposure at certain levels can cause certain injuries is an issue with common proof. Defendants do not appear to dispute that this issue class is certifiable. (See Opp'n at 38-45.) While many remaining issues in this case would not be resolved by a general causation finding— individuals' exposure levels, their injuries, and whether their injuries resulted from HDQ Neutral exposure—the question of whether HDQ Neutral *can* cause certain specific injuries at

some exposure levels appears to be susceptible to uniform proof. (See Mot. at 34.) As such, the Court **GRANTS IN PART** Plaintiffs' Motion as to the General Causation Issue Class. This issue class is limited to the evaluation of what, if any, symptoms can result from exposure to specific levels to HDQ Neutral.

## V.   CONCLUSION

For the foregoing reasons, Plaintiffs' Motion is **DENIED-IN-PART** and **GRANTED-IN-PART**.

- -   Certification of the proposed class is **DENIED**;
- -   Plaintiffs' proposed General Causation Issue Class is **CERTIFIED** as to what, if any, symptoms can result from exposure to specific levels to HDQ Neutral;
- -   The parties' applications to file under seal are **GRANTED**;
- -   Plaintiffs' application to exceed page limit by five pages is **GRANTED**; and
- -   The September 29, 2025, hearing is **VACATED**.

**IT IS SO ORDERED.**